# UNITED STATES BANKRUPTCY COURT
## FOR THE
## DISTRICT OF MASSACHUSETTS

~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~

In re
**INOFIN INCORPORATED,**                          Chapter 7
    Debtor                                Case No. 11-11010-JNF

~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~

**MARK G. DeGIACOMO, CHAPTER 7
TRUSTEE OF THE ESTATE OF
INOFIN INCORPORATED,**
    Plaintiff
v.                                                Adv. P. No. 11-1136
**RAYMOND C. GREEN, INC.,**
    Defendant

~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~

## MEMORANDUM

## I. INTRODUCTION

Mark G. DeGiacomo, the Chapter 7 Trustee (the "Trustee") of Inofin Incorporated

("Inofin") filed a Complaint against Raymond C. Green, Inc. ("RCG") on April 25, 2011, one

day before this Court conducted a hearing on RCG's Motion for Relief from the Automatic

Stay and for Related Relief.  Approximately one year later, on April 4, 2012, the Trustee

filed a First Amended Complaint.  RCG filed an Answer to the First Amended Complaint

and a Counterclaim, together with a demand for a jury trial.  In October of 2012, the Trustee

withdrew numerous counts of his First Amended Complaint, rendering RCG's demand for

1

a jury trial moot.[1]

The Court conducted a trial in this adversary proceeding on September 16, 17, and

18, 2013 with respect to the following counts of the Trustee's First Amended Complaint:

> Count I (Declaratory Judgment -Validity of the Defendant's Security Interest);
> Count II (Declaratory Judgment - Defendant's Foreclosure Sale is Void Due to Lack of Security Interest);
> Count III (Declaratory Judgment - Defendant's Foreclosure Sale is Void Due to Bad Faith);
> Count IV (Violation of Mass. Gen. Laws c. 106, § 9-625(a));
> Count V (Violation of Mass. Gen. Laws c. 93A, §§ 2 and 11);
> Count IX (Preference Pursuant to 11 U.S.C. § 547(b) - Security Documents);
> Count X (Preference Pursuant to 11 U.S.C. § 547(b) - Loan Payments);
> Count XVII (Recovery Pursuant to 11 U.S.C. § 550); and
> Count XVIII (Preservation of Avoided Transfers Pursuant to 11 U.S.C. § 551).

In addition, the Court tried the following counts set forth in RCG's Counterclaim:

> Counterclaim Count I (Declaratory Judgment – Validity of RCG's Security Interest);
> Counterclaim Count II (Accounting); and
> Counterclaim Count III (Payment of Proceeds).[2]

---

[1] Specifically prior to and at an October 1, 2012 hearing on the parties' Cross-Motions for Summary Judgment, the Trustee withdrew Count VI (Declaratory Judgment - the Defendant is a Non-Statutory Insider); Count VII (Equitable Subordination Pursuant to 11 U.S.C. § 510(c)(1)); Count VIII (Preference Pursuant to 11 U.S.C. § 547(b) - The Foreclosure Sale); Count XI (Fraudulent Transfer Pursuant to 11 U.S.C. § 544(b) and M.G.L. 109A § 5(a)(2) - Security Documents); Count XII (Fraudulent Transfer Pursuant to 11 U.S.C. § 544(b) and M.G.L. c. 109A § 6(a) - Security Documents); Count XIII (Fraudulent Transfer Pursuant to 11 U.S.C. § 548(a)(1)(B) - Security Documents); Count XIV (Fraudulent Transfer Pursuant to 11 U.S.C. § 544(b) and M.G.L. c. 109A § 5(a)(2) - Loan Modification Collateral); Count XV (Fraudulent Transfer Pursuant to 11 U.S.C. § 544(b) and M.G.L. c. 109A § 6(a) - Loan Modification Collateral); and Count XVI (Fraudulent Transfer Pursuant to 11 U.S.C. § 548(a)(1)(B) - Loan Modification Collateral).

[2] RCG set forth additional counts in its Counterclaim, namely Counts IV for breach of contract and Count V for violation of Mass. Gen. Laws ch. 93A. RCG

Prior to the commencement of the trial, on September 9, 2013, in conjunction with their Joint Pretrial Memorandum, the parties submitted a Statement of Uncontested Facts.[3] At the trial, eight witnesses testified and numerous exhibits were introduced into evidence.

The parties submitted post-trial memoranda on October 30, 2013. On December 4, 2013, the Trustee submitted a Supplemental Brief on the limited issue of whether he was required to include a count under 11 U.S.C. § 544(a)(1), to which RCG did not respond.

This Court has jurisdiction over the proceeding pursuant to 28 U.S.C. § 1334(b). With the exception of Count V, the Counts and Counterclaims involve core matters pursuant to 28 U.S.C. § 157(b)(2)(B), (C), (F), (K), and (O). Count V involves claims under Mass. Gen. Laws ch. 93A which are related to the bankruptcy case. *See, e.g.,* In re G.S.F. Corp., 938 F.2d 1467, 1475 (1st Cir. 1991). Accordingly, this Court is required to submit proposed findings of fact and conclusions of law to the United States District Court with respect to Count V as RCG did not consent to the entry of a final order by this Court on that count. *See* 28 U.S.C. § 157(c)(1). The findings of fact and conclusions of law set forth in Section II.E, with respect to Count V, and Section III.E.3.b, therefore, are proposed findings of fact and conclusions of law subject to consideration by the United States District Court pursuant to 28 U.S.C. § 157(c)(1).

The issues presented in this adversary proceeding include whether RCG established

---

submitted neither evidence nor argument with respect to those counterclaims and, therefore, waived them.

[3] Where appropriate, the Court has incorporated the parties' agreed facts verbatim.

that it has a perfected security interest in Retail Installment Sales Contracts ("Installment

Contracts") in its possession in light of an authenticated Security Agreement between

Inofin's predecessor and RCG through which RCG obtained a security interest, perfected

by filing, in "all of the Debtor's rights in and to chattel paper . . . . and all motor vehicle

installments sales contracts [sic] purchased by Debtor with the proceeds of loans from

Secured Party and assigned and delivered to Secured Party."[4] Resolution of the issue

requires an examination of provisions of both the Uniform Commercial Code ("UCC"), as

enacted in Massachusetts, and the Bankruptcy Code.  Additional issues include whether

RCG's foreclosure sale of its collateral was commercially unreasonable, and, if so, whether

the Trustee sustained his burden of proof as to the measure of damages; whether the

Trustee's claims under Mass. Gen. Laws ch. 93A are viable; whether the Trustee satisfied

his burden of proof under 11 U.S.C. § 547(b) with respect to his claims that RCG received

preferential transfers in the form of payments and the conveyance of Installment Contracts;

and whether any exceptions to avoidance under 11 U.S.C. § 547(c) apply.

## II. FACTS

### A. Background

On February 9, 2011, approximately 38 creditors holding claims in the stated amount

of $12,927,517.75 filed an involuntary petition against Inofin under Chapter 7 of the

---

[4] As discussed in greater detail below, it is undisputed that RCG cannot establish that any of the Installment Contracts it possessed were purchased "with the proceeds of loans" from RCG to Inofin.  The restrictive language employed in the Security Agreement is a primary source of the dispute between the parties.

Bankruptcy Code. The Court, on February 16, 2011, entered an order for relief, and the Trustee became the permanent trustee on April 19, 2011.

RCG filed a Motion for Relief from the Automatic Stay and Related Relief on March 9, 2011. In its Motion for Relief from the Automatic Stay, RCG sought a determination that the automatic stay did not apply to its rights with respect to its portfolio of Installment Contracts in its possession, which were assigned to it by Inofin, purportedly to secure RCG's loans to Inofin in excess of $8 million, or, in the alternative, relief from the automatic stay pursuant to 11 U.S.C. § 362(d) to obtain the portfolio which RCG contended was its collateral and the subject of valid, prepetition foreclosure sales. RCG also sought a finding that it was entitled to possession of the portfolio, including, without limitation, all of the proceeds of the portfolio and all documents, books and records in the possession of the Trustee relating to the portfolio, by reason of two foreclosure sales conducted prior to the entry of the order for relief.

The Trustee filed an Objection to the Motion for Relief from the Automatic Stay, and the Court conducted an evidentiary hearing on May 16, 2011. The Court, on July 27, 2011, issued a Memorandum and Order denying the Motion, finding that RCG did not establish a colorable claim to relief. *See* In re Inofin Inc., 455 B.R. 19 (Bankr. D. Mass. 2011). RCG appealed the decision; the United States Bankruptcy Appellate Panel of the First Circuit dismissed the appeal because of the absence of a final order. *See* Raymond C. Green, Inc., v. DeGiacomo (In re Inofin Inc.), 466 B.R. 170 (B.A.P. 1st Cir. 2012).

The parties raised a number of issues in the litigation in connection with the Motion

5

for Relief from Stay.  There are, however, a number of additional issues presented in this

litigation.  The Motion for Relief from the Automatic Stay was a summary proceeding at

which the ultimate issue was whether RCG established a colorable claim to the estate's

property.  As the United States Court of Appeals for the First Circuit observed in Grella v.

Salem Five Cent Sav. Bank, 42 F.3d 26, 32 (1st Cir. 1994), stay relief proceedings "do not

involve a full adjudication on the merits of claims, defenses, or counterclaims, but simply

a determination as to whether a creditor has a colorable claim to property of the estate."

Thus, the findings of fact and conclusions of law set forth below are more developed and

different from those that informed the Court's decision with respect to the Motion for Relief

from the Automatic Stay which was preliminary in nature.  Not only have the parties

presented substantially more testimony and documentary evidence, the present litigation

will result in final determinations of the Trustee's claims (except as to Count V) and RCG's

counterclaims.  Indeed, the findings and rulings in the decision issued with respect to the

Motion for Relief from the Automatic Stay do not bind the Court now.  See Grella v. Salem

Five Cents Savs. Bank, 42 F.3d at 32.  As will be evident from the Court's decision, the

issues posed in this proceeding regarding the extent and enforceability of RCG's security

interest and the validity of its foreclosure sales pose complex and challenging problems in

commercial law.

   B. The Debtor's Business and Its Written Agreements with Dealers and RCG

   Inofin was a licensed financial services company, specializing in purchasing and

servicing sub-prime automobile loans. Used car dealers ("Dealers") in Massachusetts and

6

other states up and down the Eastern Seaboard would sell vehicles to consumers for small cash down payments. The balance of the purchase price was financed by the Dealers using Installment Contracts. Each Installment Contract set forth the buyer's weekly payment obligations to the Dealer and also granted the Dealer a security interest in the vehicle. Pursuant to the Installment Contracts, the buyer of the automobile granted the Dealer a security interest "in the collateral and all parts or other goods put on the collateral," as well as "all money or goods received for the collateral and all insurance premiums, service and other contracts we finance."[5]

The Dealers then sold and assigned the Installment Contracts to Inofin pursuant to a Seller Agreement."  Each Installment Contract, such as the one introduced as an exhibit, was signed by the Dealer as Seller and Inofin and contains the following assignment clause:

> By Signing below the Dealer/Creditor accepts this Contract and Assigns it to Inofin Incorporated in accordance with the Assignment of Seller below.
> Stoughton Motor Mart, Inc.
> Dealership
>
> By: L. Jack Giandomenico  Title: President_____  Date: 8/23/2008_____
>
> **Assignment of Dealer**: For value received, Dealer hereby transfers and assigns to Inofin Incorporated ("Assignee") all of its rights, title and interest in this contract and the collateral. This transfer and assignment is made pursuant to and is subject to an Agreement between the Dealer and the Assignee by which the Assignee has agreed to accept the transfer and assignment of contracts from Dealer. The Dealer understands that this contract is sold under the recourse provisions of the Agreement.

---

[5] The grant of a security interest also provided:  "The security interest secures payments of all amounts you owe in this Contract and performance of your other agreements in the Contract."

7

It is unclear which "Agreement" the Dealers and Inofin referenced in the Installment

Contracts, as Inofin and the Dealers separately executed a "Seller Agreement"[6] and a

"Partial Purchase and Assignment" ("PPA"). The Seller Agreement was an agreement

between Inofin, as Buyer, and the Dealer, as Seller, and pertained to all Installment

Contracts assigned by the Dealer to Inofin.  The consideration for the Seller Agreement was

set forth as follows:

> In consideration for the purchase of the Contracts by INOFIN, Seller agrees
> to sell, assign, convey, transfer, and set over to INOFIN all of its right, title
> and interest in and to the Contracts and Contract Documents (as hereinafter
> defined) and all rights conferred thereunder. All Contracts, Contract
> Documents and assignments shall be in a manner and form acceptable to
> INOFIN.  The term "Contract Documents" as used herein shall  mean
> contracts of sale, installment contracts, security agreements, UCC filings, and
> all other documents or instruments evidencing, securing otherwise [sic]
> relating to the Contracts.

Pursuant to paragraph 4.E. of the Seller Agreement, only Inofin's name was to

appear in the lienholder section of the title issued by the Registry of Motor Vehicles for

each vehicle subject to an Installment Contract.  Pursuant to paragraph 5, the Dealer/Seller

guaranteed "full, prompt and faithful performance and observance by the obligors under

such Contracts of all terms, covenants and conditions."

Inofin and the Dealers (but not the motor vehicle buyers) also executed a PPA for

---

[6] The Seller Agreement introduced as an exhibit is dated January 11, 2010.  Like
the Partial Purchase and Assignment discussed below, it was executed by the President
of Stoughton Motor Mart, Inc.  The Seller Agreement provided in paragraph 12 that
"This document (and any non-conflicting terms of any assignment appearing as part of
any of the Contract Documents) contains the entire Agreement of the parties and except
as provided in this Paragraph 12 cannot be modified except by a writing signed by both
Seller and INOFIN."

each transaction, which included a VIN number and a reference to an Inofin Worksheet

Number.  Among other things, the PPA set forth Inofin's obligation to remit to the Dealers

the balance of the weekly cash payments received by Inofin from the motor vehicle

purchasers after Inofin had fully recovered the monies due it under the PPA.  These

payments to the Dealers are commonly referred to as the "dealer reserve," or "backend

payments."[7]  Specifically, in each PPA, the Dealer agreed to assign, transfer, set over and

convey to Inofin all of its right, title and interest in a specific "security instrument," to be

reassigned as provided in the agreement.  That reassignment provision is as follows:

> **TERMINATION OF ASSIGNMENT:** This assignment shall terminate at such
> time as Buyer [Inofin] has received the Amount Purchased required under
> this Agreement, together with all other additional expenses for which Buyer
> is entitled to reimbursement or at any prior time as the Buyer, in its
> discretion, may determine.  Upon such termination, Buyer shall reassign to
> Seller all Buyer's then remaining right, title and interest in the Security

---

[7] As will be discussed in more detail below, Inofin did not send original PPAs to
RCG as part of its investor packages, despite the language in Loan Agreements between
RCG and Inofin which identified "Borrower's *Original* Partial Purchase And
Assignment" (emphasis supplied) as a Security Document.  By way of an example, in the
PPA, the Amount Purchased by Inofin from Stoughton Motor Mart, Inc. was defined as
follows:

> The right to receive the net sum of <u>$14,016.00</u> is due the Buyer [Inofin], in
> accordance with such obligation, repayment and terms stated in the
> accompanying instrument, the balance of such total payment amount(s)
> shall be paid to Seller [Dealer].

Thus, under the Installment Contract submitted as an exhibit, the consumer agreed to
total payments of $15,943.20, excluding a $2,000 down payment, payable weekly for 182
weeks in the amount of $87.60.  Therefore, Stoughton Motor Mart, Inc. was entitled to
"backend" payments, totaling $1,927.20 ($15,943.20 - $14,016.00 = $1,927.20).  These
figures are incorporated into a Worksheet sent to Inofin as part of the investor package.
The Worksheet revealed that the interest rate charged the consumer was 19.79%.

Instrument and shall execute such documents and instruments as may be necessary to effect such reassignment and terminate Buyer's interest as a matter of record. Upon reassignment any [and] all liability of the Buyer, if any, in regard to the Security Instrument or in regard to obligations, if any owed to Seller shall cease. Seller may terminate the assignment at any time by paying to [B]uyer the amount due together with all other additional expenses for which buyer is entitled to be reimbursed. Buyer may terminate any residual interest that [S]eller may have in the security instrument, notwithstanding any term or provision to the contrary in this agreement, at any time sixty (60) days after a default has occurred on the security instrument.

***

**MISCELLANEOUS:** Seller further acknowledges that Buyer is purchasing an interest as defined in this agreement and specifically acknowledges that this is not a loan or loan type transaction. *This Agreement shall inure to the benefit of and be binding upon the heirs, successors, representatives and assigns of the parties hereto.* This Agreement shall not be modified except in writing signed by all parties hereto. In the event any term or provision of this Agreement is found to be unenforceable or unlawful for any reason, the remainder shall be carried into effect as though the unenforceable portion was stricken here from.[8]

(emphasis supplied). Thus, RCG, as an assignee of Inofin, as set forth in detail below, is bound by the terms of the PPA. Kenneth Shilson, CPA ("Shilson"), RCG's expert witness, testified that the PPAs were typical documents found in subprime used car financing transactions.

RCG and Inofin, then known as First Investors Factoring, Inc., commenced their lending relationship in April of 1996. First Investors Factoring, Inc. implemented a corporate name change with the Massachusetts Secretary of State on January 15, 1997,

---

[8] The PPA, which contains the inscription, "Copyright 2008, Inofin Incorporated . . ." provided that "Seller is the owner and holder of the secured obligation described as: (see attached)." Presumably that obligation was the Installment Contract.

changing its name to "Inofin Incorporated."   Inofin obtained most of its capital for

purchasing Installment Contracts from a large number of private lenders, including RCG,

whose principal and owner is Raymond C. Green ("Green").  Inofin and RCG maintained

a business relationship for almost 15 years until Inofin's bankruptcy.

Specifically, the parties' relationship commenced when First Investors Factoring, Inc.

accepted the terms of a Commitment Letter, dated March 21, 1996, drafted by Green and

addressed to Michael J. Cumomo [sic] ("Cuomo"), the President of First Investors

Factoring, Inc. (and later Inofin).  Through the Commitment Letter, Green informed Cuomo

that First Investors Factoring, Inc.'s  application had been approved and that RCG was

prepared to make it a $500,000 secured loan with a one-year term at a 17% per annum

interest rate, to be disbursed at the rate of $50,000 per week, "provided that *prior to each*

*disbursement the Borrower assign the collateral described in para 8* having a principal advance

of $50,000 for ten consecutive weeks."  (emphasis supplied). The Commitment Letter for

the loan, which could not be prepaid in whole or in part, further provided:

> Each $50,000 weekly advance shall require weekly payments commencing
> one week after funding.  All funds advanced to the Borrower shall be wired
> to Borrower's account and all funds due from Borrower shall be wired to
> Lender's account.  The amount of the weekly payment shall be the total of
> the weekly principal payments due from the individual customers plus
> interest calculated  as set forth in 4. above. . . .

In paragraph 8, Green defined the collateral as "First lien on customer notes, dealers'

guaranties and other collateral received by Borrower;" in paragraph 11.a.v., he further

required that "All original titles must be delivered to Lender with an allonge assigning said

11

titles to Lender." In addition, the Commitment Letter provided for a $125 per week audit fee up to a maximum of $500 per month, as well as a requirement that the Borrower deliver internal monthly operating statements and profit and loss statements, balance sheets, and "[s]tatements showing the payments made by all customers assigned to Lender [sic]." The Commitment Letter contained the equivalent of an integration clause at paragraph 13.[9]

Following acceptance of the terms of the Commitment Letter, RCG's attorney, Stanley Wallerstein, Esq. ("Wallerstein"), prepared the initial loan documents in April 1996, which included a Promissory Note, a Loan Agreement, a Security Agreement and a UCC Financing Statement. On April 18, 2006, Wallerstein caused to be filed a UCC-1 Financing Statement with the Massachusetts Secretary of State's Office on behalf of RCG against First Investors Factoring, Inc. On April 19, 1996 Wallerstein caused to be filed a UCC-1 Financing Statement with the Clerk for the Town of Rockland on behalf of RCG against First Investors Factoring, Inc.

Wallerstein testified that he discussed with Green the mechanism by which RCG would acquire a security interest in the Installment Contracts. He indicated that "they [Inofin] would deliver possession of the Installment Contracts and then he [RCG] would advance funds against them. And then next week they would give us [RCG] more chattel paper and Ray would advance funds against the new paper." He testified that there were

---

[9] An integration clause is a commonly used short-hand expression for a contractual provision providing that the contract represents the parties' complete and final agreement and supersedes all informal understandings and oral agreements relating to the subject matter of the contract. <u>Black's Law Dictionary</u> 880 (9th ed. 2009).

never any discussions about tying or tracing the Installment Contracts that were delivered

to RCG to specific loan proceeds advanced by RCG or that RCG's security interest was

limited to Installment Contracts purchased with RCG loan proceeds as provided in the

Security Agreement.

Wallerstein stated:

I believed at the time that the only safe way to perfect chattel paper was by
possession because otherwise we would have no way of knowing whether
they might have been  delivered to another creditor right before we filed. So
the only way to perfect and be assured of the first security interest or priority
security interest was to keep possession.  We still had to check the UCC to
make sure there were no blanket filings before we got them, but once we had
possession we knew if the UCC record was clear that we had a first priority.

During the 15 years in which they engaged in business, RCG and Inofin executed

a number of documents pertinent to the resolution of the issues before the Court.  A

discussion of the documents and the parties' practices follows.

1. The Promissory Notes

The documents executed by RCG and Inofin included promissory notes in favor of

RCG executed by Inofin as follows:

1) a $500,000 promissory note, dated April 17, 1996, due and payable on
April 17, 1997;[10]

---

[10] The April 17, 1996 note provided:

Payments of principal and interest, in arrears, shall be due and payable
weekly on Monday of each week commencing April 29, 1996.  Each such
payment shall be an amount sufficient to amortize the amount advanced
and interest thereon over that number of weeks which is equal to the
number of weeks of installments scheduled to be paid by Buyer [the
motor vehicle purchaser] under each Installment Contract, *the sum of which*

2) a  $400,000 promissory note, dated April 18, 2008, due and payable on April 18, 2011;[11]

3) a $7 million promissory note, dated May 2, 2008, due and payable on May 2, 2010;[12]

---

*is equal to the "Amount Purchased", i.e. the "net sum" which Maker has the right to receive under the Partial Purchase and Assignment with respect to such Installment Contract* but shall not be less than the total weekly principal payment owing from the "Buyer" under the Installment Contract collaterally assigned to the holder pursuant to Section 2 of the Loan Agreement of even date between the Maker and the holder whether or not such payments are actually made by the Buyer of the installments which are included in said "net sum" under any such Installment Contract. Payments shall be due whether or not the "Buyer" under the Installment Contract makes any payment.

All principal and accrued unpaid interest shall, in all events, be due and payable on April 17, 1997.  Payments shall be applied first to costs of collection, then to accrued interest and then to principal reduction.  The Maker shall have no right to prepay this note, in whole or in part.

(emphasis supplied).

[11] This note, executed 12 years after the 1996 note, eliminated the provision for payment set forth in the April 17, 1996 notes, providing instead: "Consecutive equal payments of $3,099.68 each shall be due and payable weekly on Friday of each week commencing April 25, 2008."  In addition, it provided:  "The Maker shall have the right to prepay this note, in whole or in part, at any time.  Prepayments of principal shall be applied in reverse order of maturity."

[12] This note provided the following with respect to payments:

Payments of interest, in arrears, shall be due and payable weekly on Friday of each week commencing on May 9, 2008.  Each interest payment shall be accompanied by a principal payment equal to the sum of: (i) *the amount advanced by the holder to the Maker for the purchase of each of the outstanding "Installment Contracts" collaterally assigned to the holder pursuant to Section 2 of the Loan Agreement of even date* between the Maker and the holder amortized over the number of weeks equal to (x) the total number of weeks of payments remaining under the Installment Contracts, divided

14

4) an $8 million promissory note, dated August 21, 2009, due and payable on August 21, 2011;[13]

5) a $200,000 promissory note, dated January 8, 2010, due and payable on January 8, 2013.[14]

All but the 1996 promissory note expressly provided: "Secured by a Security Agreement dated April 17, 1996." The most recent note dated January 8, 2010 provides: "Secured by a Security Agreement dated April 17, 1996 and by the accounts set forth on the Allonge attached hereto."[15]

---

by (y) the number of Installment Contracts, multiplied by (z) seventy-five (75%) percent, plus (ii) any prepayment in full actually made by a Buyer under any such Installment Contract or the outstanding principal amount of any Installment Contract which is the subject of a repossession; provided, however, that no prepayment under this subsection (ii) shall be required if the outstanding principal balance under this Note is less than the then remaining outstanding principal balance under the remainder of the Installment Contracts. Principal payments shall be due whether nor [sic] not the "Buyer" under the Installment Contract makes any payment.

All principal and accrued unpaid interest shall, in all events, be due and payable on May 2, 2010. Payments shall be applied first to costs of collection, then to accrued interest and then to principal reduction. The Maker shall have no right to prepay this note, in whole or in part.

(emphasis supplied). This note was amended on October 1, 2010.

[13] The provisions of this note track those of the May 2, 2008 note except for the commencement date and the due date. It also was amended on October 1, 2010 with similar provisions.

[14] The note provided for consecutive weekly payments of $1,555.11 payable on Fridays, commencing January 15, 2010.

[15] The Allonge was captioned "Accounts Securing $200,000 Promissory Note Dated January 8, 2010" and contained a chart setting forth 34 accounts identified by account number, the names of the motor vehicle purchasers, the Inofin Partial Purchase

Additionally, the notes contained provisions relative to defaults. They provided the following:

> At the option of the holder, this note shall become immediately due and payable without notice or demand upon the occurrence at any time of the following events:  (1) Default in any payment of principal or interest which is not cured within seven (7) days; (2) Default, for more than 21 days after notice thereof from holder to Maker, no cure having been effected, in the performance or observance of the terms or conditions of the Security Agreement or other instruments and documents . . . securing this note; (3) Default for more than 21 days after notice thereof from holder to Maker, no cure having been effected, in the payment or performance of any other liability or obligation of the Maker to the holder; (4) Service, pursuant to trustee process, upon the holder hereof of a writ in which the holder is named as trustee of at least $10,000 of the Maker; (5) If the Maker is a corporation, trust or partnership, the liquidation, termination or dissolution of any such organization; or (6) If the Maker shall make an assignment for the benefit of creditors, or if a receiver of all or substantially all of Maker's property shall be appointed and not dismissed within 60 days, or if a petition in bankruptcy or other similar proceeding under any law for relief of debtors shall be filed by or against  . . . Maker.

The parties agreed to the existence of the five promissory notes.  Wallerstein testified that the second paragraph of the 1996 promissory note regarding payments of principal and interest involved complicated drafting.  He stated:

> The purpose of that paragraph was to describe the maker's obligation to make weekly payments and it was very complicated because the -- while the interest part was simple, the principal part was quite complicated because it was actually based upon the performance characteristics of the collateral package that had been given to RCG prior to the advance for that week.  And so you'll see that there's a reference in terms of -- to the partial purchase and assignment, the amount purchased.  There's also reference to the installment contract in order to  determine how they -- how this note had to amortize based upon the way that the underlying collateral for the note amortized.

―――――――――――――――

Amount, the number of payments purchased, and the NADA value of the motor vehicle.

A substantial gap in time exists between the $500,000 note executed on April 17, 1996 and the $400,000 note executed on April 18, 2008. The testimony and e-mail exchanges between Green and Wallerstein, however, establish that RCG made additional loans to Inofin during those years. On April 18, 2006, Green wrote Wallerstein, stating: "We have fully advanced on the last $2 million note. Would you please e-mail Kevin [Kevin Mann, Inofin's Chief Executive Officer] new documents. The new loan would have the same terms and conditions as the last one." Wallerstein replied:

> I've attached the New Agreement and Note. However, I checked on-line to make sure that Joan [Green's spouse and in-house counsel to RCG] had continued the old UCC-1 Financing Statement and it has not been continued and has expired. I also discovered that Kevin has been doing similar contract financings with three other lenders since 2004 - - Mike Sgarzi, Robert Downing and John Butler. *I hope he has not double financed any contracts. Assuming you do a new filing now, you will be behind their loans (on the specific contracts)*, as well as many vendor financings on leased and financed equipment and software.

(emphasis supplied). Wallerstein, later the same day, advised Green that he had "filed your new UCC," adding "[y]ou will be ahead of any other secured parties (unless Kevin double financed any of your installment contracts with one of the three other lenders who recorded that deal first)." Neither the Trustee nor RCG introduced evidence as to how other creditors could obtain a security interest in Installment Contracts that were in RCG's possession. In addition, neither party introduced evidence as to the method or methods employed by other secured parties to obtain perfected security interests in Installment Contracts. In other words, the Court has no evidence as to the amount of secured debt held by other secured lenders.

With respect to the $400,000 loan made by RCG to Inofin on April 18, 2008, Green, on behalf of RCG, advised Wallerstein that it was a "free standing loan" and would have "nothing to do with the other loans that I have made except for the fact that it is to be collateralized in the same manner." Wallerstein replied with a question: "The collateral under the current security agreement is the consumer paper financed with your loans. Is this adequate collateral for this loan (what is its purpose)?"  After learning 1) that the purpose was to enable Inofin to make more consumer loans, 2) that Green believed the consumer paper was adequate collateral for the loan, and 3) that, if all that was needed was a note, Green was prepared to "complete the deal as soon as he [Kevin Mann] puts up the collateral," Wallerstein replied:  "I assumed you were advancing the entire amount up front.  If so, there is no need for a loan agreement.  The Security Agreement referenced at the end of the note still governs." On the same day, Green e-mailed Kevin Mann ("Mann") about the quality of the collateral, which Green referred to as "the additional titles" to secure the loan.  Upon receiving the list of accounts that were to make up the collateral for the $400,000 loan, Green advised Mann that only one contract on the list that Mann sent him met the tests required, namely a 10% deposit by the motor vehicle purchaser and an amount purchased not to exceed 110% of the NADA price.

2. The Security Agreement

The Security Agreement, dated April 17, 1996, referenced in four of the promissory notes, provided in its preface the following:

First Investors Factoring, Inc., a Massachusetts corporation with a place of

business at 55 Accord Park Drive, Rockland, MA 02370 ("Debtor"), subject to the terms and conditions hereof, hereby grants a security interest to Raymond C. Green, Inc. (the "Secured Party"), in and to the following property, whether now owned or hereafter acquired:

>    (i) all of the Debtor's rights in and to chattel paper, instruments and all motor vehicle installments sales contracts *purchased by Debtor with the proceeds of loans from Secured Party and assigned and delivered to Secured Party*;

>    (ii) all collateral security for and all guaranties of, and all proceeds of, any of the foregoing.

>    (iii) all documents, books and records relating to the foregoing.

The property described above shall hereafter be collectively referred to as the "Collateral".

>    The Collateral is pledged, assigned, mortgaged and transferred, and a security interest therein is granted, to the Secured Party as security for payment of all sums due under a promissory note (the "Note") of Debtor in the original principal amount of $500,000.00 of even date herewith and as security for any and all obligations and liabilities of Debtor to the Secured Party of every kind, direct or indirect, absolute or contingent, due or becoming due, now existing or hereinafter arising  (hereinafter collectively referred to as the "Obligations").

(emphasis supplied).

In addition to the provisions reproduced above, the Security Agreement contained

provisions through which Inofin 1) agreed to provide RCG with the right to examine and

inspect and make extracts from its books and other records and "to arrange for verification

of accounts, under reasonable procedures, directly with account debtors or by other

methods;" 2) irrevocably appointed RCG its "true and lawful attorney . . . with full power

of substitution, in the name of the Secured Party or in the name of the Debtor or otherwise,

for the sole benefit of the Secured Party, but at the sole expense of the Debtor, in the event

of default . . . ;" 3) granted RCG the rights and remedies of a secured party under the UCC

and agreed that any notification of a sale or disposition of the Collateral would be deemed

reasonable "if given at least ten (10) days before the time of such public sale, or the date

after which any such private sale or other intended disposition is to be made . . . ;" and 4)

agreed, among other things, to waive demand and notices of any description.   Inofin also

expressly agreed to the following:

> TO THE MAXIMUM EXTENT PERMITTED BY LAW DEBTOR ALSO WAIVES ANY AND
> ALL RIGHTS THAT IT MAY HAVE TO JUDICIAL HEARING IN ADVANCE OF THE
> ENFORCEMENT OF ANY OF THE SECURED PARTY'S RIGHTS HEREUNDER,
> INCLUDING WITHOUT LIMITATION, THE SECURED PARTY'S RIGHTS FOLLOWING
> AN EVENT OF DEFAULT TO TAKE IMMEDIATE POSSESSION OF THE COLLATERAL
> AND EXERCISE ITS RIGHTS WITH RESPECT THERETO.

 (capitalization in original).

Additionally, the Security Agreement provided that "*[a]ll the Secured Party's rights*

*and remedies, whether evidenced hereby or by any other agreement, instrument or paper,*

*shall be cumulative and may be exercised separately or concurrently*."  (emphasis supplied).  The

Security Agreement, which was prepared by Wallerstein, was to be governed by

Massachusetts law.  The Security Agreement did not contain a fixed term, but provided

that it was "a continuing agreement in every respect," unless terminated by Inofin subject

to certain conditions.  Absent any outstanding obligations, Inofin was afforded the right

to terminate the Agreement.  The Security Agreement did not contain an integration clause

but provided that "[a]ny condition or restriction hereinabove imposed with respect to

Debtor may be waived, modified or suspended by the Secured Party but only on the

20

Secured Party's prior action in writing and only so expressed in such writing and not

otherwise."

### 3. The Financing Statements

RCG filed UCC-1 financing statements with the Secretary of State for the

Commonwealth of Massachusetts, the most recent one on April 18, 2006, with respect to

the following:

> All the Debtor's rights in and to chattel paper, instruments and motor vehicle
> installment sales contracts *purchased by Debtor with the proceeds of loans from
> Secured Party and assigned and delivered to Secured Party.* All collateral security
> for and all guaranties of and all proceeds of any of the foregoing.  All
> documents, books and records relating to the foregoing.

(emphasis supplied).

### 4. The Loan Agreements

Inofin and RCG also executed several Loan Agreements, the first dated April 17,

1996 and subsequent ones on May 2, 2008, and August 21, 2009, relating to the $7 million

and $8 million promissory notes, respectively.  Wallerstein testified that the 1996 Loan

Agreement was the first document he drafted and its purpose generally was to establish

a "road map for the entire loan."  He also stated that "it would lay out the terms of the loan

and the advances of the loan, the repayments of the loan, the security for the loan, [and]

description of the collateral," adding: "It would have representations and warranties of the

borrower.  It would have default provisions and it would have generally other boilerplate."

The Loan Agreements are identical except for their dates, the loan amounts set forth

in the agreements and the weekly advances contemplated by the parties.  The May 2, 2008

Loan Agreement provided that advances under the $7 million note were to be made once per week in the amount of not less than $50,000 or more than $150,000, while the August 21, 2009 Loan Agreement provided that advances under the $8 million note were to be made once per week in an amount of not less than $50,000 or more than $170,000.

The Loan Agreements in paragraph 1 (a) provided:

> [A]dvances hereunder shall be used by Borrower solely for the purpose of funding the purchase, from car dealers ("Sellers"), . . . of "Installment Contracts". . . Advances hereunder shall be used by Borrower solely for the purpose of funding the purchase from car dealers (Sellers") . . . Each such advance is secured by the collateral described in Section 2 hereof.  Prior to each advance, Borrower shall deliver to Lender a schedule confirming that the income stream from the "Buyer's" . . . principal payments under each Installment Contract will fully amortize the principal amount advanced by Lender with respect to such Installment Contract prior to the maturity date of the Note.

As set forth above, each advance was to be secured by the collateral described in Section 2 of the Agreement, which provided:

> In consideration of, and to evidence and secure the Loan, *Borrower has executed and delivered, or will execute and deliver prior to the first weekly advance*, the following loan documents:
>
> (a) This Agreement.
>
> (b) The Note.
>
> (c) Security Agreement, which was executed on April 17, 1996.
>
> (d) UCC-1 Financing Statements filed with Massachusetts Secretary of State . . .  and Rockland Town Clerk . . . as continued. [sic]

and *prior to or simultaneously with each advance* the following:

(e) The Security Documents, as follows:

(i) Original Retail Installment Sale Agreements (the "Installment Contracts" or singularly, an Installment Contract"), in the form of Exhibit 1 attached hereto with the original signature of the Buyer.  The "Buyer" as described therein shall have made a down payment of not less than ten (10%) percent of the sale price of the vehicle described therein (the "Vehicle") and each transaction shall have Vendor's Single Interest Insurance ("VSI Coverage") and extended warranty coverage  (if available), as described therein.  Each Installment Contract shall be assigned by the "Seller" as defined therein to the Borrower, utilizing the "RECOURSE ASSIGNMENT" set forth on the reverse side thereof.

(ii) Borrower's *Original* Partial Purchase And Assignment (the "Assignment") in the form of Exhibit 2 attached hereto.   The "Amount Purchased" as set forth therein shall not exceed one hundred ten (110%) percent of the wholesale price of the Vehicle as listed in the most current NADA Price Book plus the premium for VSI Coverage and extended warranty coverage (if purchased).   Lender shall not be obligated to make any one of the advances described in Section 1(a) hereof unless (i) *Borrower is then assigning, to Lender, or Lender already has an Assignment in which the aggregate "amount purchased" equals or exceeds the amount of such advance.*

(iii) Application for Title (the "Application") in the form of Exhibit 3 attached hereto or such form as is currently approved by the Registry of Motor Vehicles.  Each such Application shall be completely filled in, including the insurance certification and shall list the Borrower as the first lien holder.

(iv) Allonge (the "Allonge") from Borrower to
Lender in the form of Exhibit 4 attached hereto
executed by the Borrower.

All of the documents in this Section 2 are called the "Loan Documents" and
those in clauses (c), (d) and (e) are called the Security Documents.[16]

(emphasis supplied). In Section 9(c) of the Loan Agreements, the parties agreed that "[n]o

modification or waiver of *any provisions of the Loan Documents* shall be effective unless

signed in writing by all parties thereto." (emphasis supplied). Because the Security

Agreement executed on April 17, 1996 is defined as both a Security Document and a Loan

Document, none of its provisions could be modified or waived, unless "signed in writing

by all parties thereto."

The Commitment Letter provided that "prior to each disbursement the Borrower

assign the collateral," whereas in the 2008 and 2009 Loan Agreements, the language was

changed to "prior  to or simultaneously with each advance."  In addition, in the

Commitment Letter, "original titles" were to be delivered via the allonges, whereas in the

Loan Agreements the allonges referenced specific Installment Contracts, original PPAs and

a VIN number.

Throughout their relationship, each Installment Contract delivered to RCG included

an attached Allonge which provided as follows:

In consideration of One Dollar ($1.00) and other valuable consideration, the
receipt and sufficiency of which is hereby acknowledged, Inofin, Inc. [sic]

---

[16] The Loan Agreements executed in 2008 and 2009 referred to *original*
Installment Contracts and PPAs.  The 1996 Loan Agreement did not contain a reference
to original documents.

> hereby assigns, with full recourse, to Raymond C. Green, Inc., all of its right,
> title and interest in, to and under the following *instruments*:
>
> Retail Installment Sale Agreement dated . . .
> by and between Seller . . .
> and Buyer: . . .
> with respect to (the "Vehicle") a: . . .
> VIN: . . .
> Inofin, Inc. [sic] Partial Purchase and Assignment dated . . ., *by and between*
> *Inofin, Inc. and Raymond C. Green, Inc.* with respect to the aforesaid Retail
> Installment Agreement and Vehicle.

(emphasis supplied). As set forth above, the PPAs were executed by the Dealers as Sellers

and Inofin as Buyer. RCG was not a party to the PPAs, which had the effect of limiting its

rights with respect to the total amounts due under the Installment Contracts between the

Dealers and consumers which were assigned to RCG by Inofin.

Wallerstein testified that the PPAs were documents "that we needed to have because

the formula in the commitment letter for determining the loan-to-value ratio was

dependent upon what was called the amount purchased that was set forth in the partial

purchase assignment agreement[s],"[17] adding that "both the installment sale contract and

the partial purchase assignment had an absolute assignment of the security interest in the

vehicle, so that wasn't something that we [RCG] needed to perfect." Wallerstein also

testified that "each allonge was intended to be a security agreement that conveyed a

security interest in the particular contract [Installment Contract] to which it was attached."

Wallerstein further testified that the Seller Agreement, discussed above, was not

---

[17] As noted above, the payment formula changed after the first note was executed
on April 17, 1996.

chattel paper and RCG could not perfect a security interest by possession. He also stated

that the Security Agreement had two purposes:

> [O]ne was to perfect by filing those elements of RCG's collateral that could
> only be perfected by filing [a UCC-1 financing statement]; and the second
> was an attempt to broaden the scope of RCG's security interest from
> contracts that we had by possession to also include contracts that we
> advanced funds against, but hadn't necessarily been delivered or fully
> delivered including the title at a time that Inofin might default in the future.

In other words, according to Wallerstein, the purpose of the UCC-1 Financing Statement

was to perfect a security interest in the Seller Agreements.  With respect to the second

purpose, he explained:

> What I was concerned about was a  situation. And essentially the last week
> or two where RCG would have gotten a collateral delivery and we would
> have given Inofin money, and then between the time they went and spent
> that money to buy contracts and the time that they delivered contracts to us,
> they might go under. And I felt that RCG should be entitled to what I
> considered to be a purchase money security interest in those contracts. I was
> particularly worried since I knew from my own experience as a
> Massachusetts resident that it could take four, five, six weeks to get a title out
> of the Registry of Motor Vehicles. I was concerned that someone might make
> an argument that we were unperfected in that period because we didn't have
> the original title, so I thought I would expand it to make it clear that if we
> had financed the acquisition of a contract that we were claiming a security
> interest in that contract, even if we didn't have full possession.

Wallerstein testified that he viewed "perfection by possession under 9-313 of the

Code [UCC] as our principal means of getting a security interest and getting it perfected."

He added:  "I had to modify the grant in the collateral we had perfected by filing, that is,

the guaranties [the Seller Agreements] in [sic] the books and records because I couldn't take

blanket ones otherwise another lender couldn't finance contracts without coming to RCG

for release." He emphasized that he "wasn't concerned so much except with respect to the title with respect to a gap and what I had by possession.  I was looking to expand it to get to contracts that we didn't have possession on, we hadn't lent against, but we had advanced funds." He added: "So I thought it was very fair that, you know, if they gave us $50,000 of contracts and we gave them $50,000 and they went out and the next day or ten days later or whatever, they went under that any proceeds that came in from the contracts that were bought with Ray's money but we didn't have a new collateral delivery on, I wanted to be able to claim it."  Finally, he stated:

> So I thought I was making it quite clear in this agreement to other creditors as to how they might make loans, but never ever, ever did it ever cross my mind that a security agreement under -- and filing under 9-312 in any way invalidated or limited a security interest by possession under 9-313. It just never crossed my mind until I saw the Trustee's objection.[18]

On cross-examination, Wallerstein admitted that there would have been no need for the extensive rights granted to RCG to monitor its loans with Inofin, to act as Inofin's attorney, as well as upon default, if it was only utilizing the Security Agreement to take a security interest in the dealer guaranties set forth in the Seller Agreements.  In addition, he admitted to advising RCG, upon learning that its UCC-1 had lapsed, that if it had received collateral packages with Installment Contracts that had been identified by other secured parties on UCC-1s filed after RCG's UCC-1 had lapsed that it would be in second place with respect to those Installment Contracts delivered to it, explaining that "it was a

---

[18] As discussed below, a security interest is perfected by possession, not obtained by possession.

question of the timing. If we had possession before they filed we would be in first place. If they had filed before we had possession, they would be in first place."[19]   He also admitted that, because of the lapse in the UCC-1 Financing Statement, RCG would have to check UCC filings each week in order to verify that the Installment Contracts in its possession were not listed on another lender's UCC filing if it were only perfected by possession because the loans in its portfolio could not be traced to RCG's loan proceeds. He stated: "They should have done that."   On cross-examination, he also agreed that a segregated account at Inofin through which RCG could have traced its proceeds based on its security agreement would have obviated any risk of "double hawking" Installment Contracts.

Wallerstein testified that he did not include an integration clause in any loan documents he prepared because "they're all supposed to work together supplementing, explaining, giving different rights, cumulative rights to each other. . . ."   Nevertheless, the Loan Agreements provided that the Loan Documents, including the Security Agreement, could not be modified or waived unless signed in writing by all parties.

---

[19] He added:

But the point is, is that the filing portion of it had lapsed and that meant that if they had done their filing before we took possession as to those specific contracts -- I was concerned -- very concerned about double hawking of contracts because that's exactly what I had to deal with in the Rockland Trust and -- and I was telling Ray, you know, "You've got to be more careful because if somebody gets a filing on a contract before you take possession, you're going to be in second place." Had nothing to do with perfection, had nothing to do with security interest; it had everything to do with priority.

28

C. <u>The Parties' Business Dealings</u>

The parties agreed to an exhibit detailing how allonge packets were processed for

RCG, captioned, "Processing Allonge packets for Ray Green." The document sets forth the

following procedure:

> The packets need to be sent via FedEx each Friday, so this process is usually
> started by Wednesday of that week in order to ensure that all parts can be
> completed by Friday morning.
>
> Grab stack of allonge packets from File Room (these are the loans from
> independent dealers), also grab a few (5 or less) of allonge packets from the
> Drive stores.
>
> Sign onto Intrack >Tools> Allonges >Enter  loan account#> "LOAD
> ACCOUNT" Change date to Friday's Date.  If Friday is a holiday, use
> Thursday's date.
>
> Change "Inofin!Demo" to "Raymond C Green"; Click "Assign".
>
> Continue doing this with several of the allonge packets.  To check the
> amount total as you are working, click on "Allonge Letters & Reports";
> Choose "Ray Green" Enter Friday's date; "Generate Closing Report"; then
> see what the total is so far.  You can see on Line 6 of the top page of each
> allonge packet what its value is.
>
> YOU WANT TO END UP WITH AS CLOSE TO $170,000.'s [sic] WORTH OF
> LOANS AS POSSIBLE. It's ok to be a couple of hundred dollars over, but try
> to get as close as possible.
>
> IMPORTANT:  Take the NADA value total and multiply by 1.10%.   This
> number MUST be at least the amount of the Inofin Partial Purchase Price.  If
> it's not, then you must use a few different allonge packets where the NADA
> value is higher in respects [sic] to the Inofin Partial Purchase Price.  Usually
> this means replacing 1 or 2 of the Drive store allonges with independent store
> allonges.

<div align="center">***</div>

When you have all of your loans assigned to Ray Green and they're as close to $170,000 as possible and your values are correct, you need to print the report and letters:

\*\*\*

You also need to save the report in Excel format so that you can email it to Joan Green on Friday. There is a link when you're viewing the report that says "SAVE TO EXCEL"; click on this and save.  I usually save it to my desktop for easy retrieval.

\*\*\*

Back in "Allonges" choose "Allonge Letters & Reports" then choose "Ray Green" as investor, then click "Generate Letters". Print only 1 copy of each letter.

Before giving the allonge packets and letters to Maggie, be sure that the packets and the letters are both in the same exact order as they are listed on the report. Once that is done, give the packets, letters, and report to Maggie.

When they come back from Maggie, verify that the last page of the packet is the original signed contract (also making sure that it's the correct customer's contract for the loan of the packet); sign MJC's name to the letters (checking to make sure the correct letter is attached to the right packet), place the 2nd copy of the Report on top of the pile, and give to Crystal.  On Friday morning email the Closing Report to joan@raygreen.com.

\*\*\*

MONDAY: Cut 3 checks out of lnofin  payable to Ray Green. Email Spiro, Tracy, and Ray Green the total amount of the 3 checks, copy Kristen. You HAVE  TO MAKE SURE to get this deposit to Rockland Trust on Monday before they close. The Drive- Thru is open until 4:30pm, the lobby is open until 4pm.  . . . Ray Green''s account number is [redacted]. We use blank deposit slips.  Save the bank receipt, it will go with the allonges on Friday.

Sample Monday email: Good morning:
Today's deposit will be for $170,123.56.  Thank you.

In addition, RCG created a document captioned, "Inofin-How to Process Advances and

Repayments on Both the Loan System and Peachtree." It provided:

> Loan System-Advances- We usually make a weekly advance of $150,000.
> Then Inofin sends in a number of deals which Fred processes. Usually, the
> number is not exactly $150,000 but several hundred dollars more. We just
> issue a check to Inofin for this extra amount. . . .

The parties' conduct did not comport with the specific language of the Security

Agreement, namely that the "chattel paper, instruments and all motor vehicle installments

sales contracts . . . [be] purchased by Debtor with the proceeds of loans from Secured Party

and assigned and delivered to Secured Party." This was confirmed by the testimony of

Green and in an email, dated August 19, 2010, concerning an accounting discrepancy when

an employee of RCG, Spiro Stylianopoulos, wrote: "[$]205.99 - was advanced on 7/7/10,

being the shortfall to match the alones [sic] you sent us on 7/2/10 [$]170,000 - was

advanced on 7/7/10, being a fresh advance for the new week, the alones [sic] for which

you would have sent on 7/9/10." RCG, through Green's testimony, admitted that there

was never an attempt to confirm that Installment Contracts assigned to it had been

purchased with its loan proceeds, and neither Green nor Mann believed that there was

such a requirement.

In addition, there was a lag between the transmittal of the Installment Contracts and

RCG's receipt of certificates of title naming Inofin as the lienholder.

Michael Ayre ("Ayre"), the former director of account services at Inofin before the

filing of the involuntary petition, and currently an employee of the Trustee, testified. He

described his primary responsibilities at Inofin as "run[ning] operations for all the

consumer-related services which would include custom [sic] service, collection, asset

recovery and liquidation." He also "worked with the Division of Banks of the various

states up and down the Eastern Seaboard and maintain[ed] consumer compliancy." He

performed collection analyses on a daily basis using specialized software. He testified that

Inofin was licensed or maintained licenses in Florida, Georgia, South Carolina, Virginia,

West Virginia, Connecticut, Rhode Island, Maine, and New Hampshire, as well as

Massachusetts. He added that Inofin did not have relationships with dealerships in Boston

and the dealerships with which it did the most business in Massachusetts were in the

western part of the state. He further testified that approximately 60 percent of Inofin's

portfolio was located in Massachusetts with the remaining 40 percent located in other

regions.

Ayre distinguished the "buy-here/pay-here model, used by RCG's expert, Shilson,

from Inofin's business model. He indicated that Inofin was more like a traditional lender,

requiring automatic withdrawal from customers' bank accounts.

D. Events Leading to, and Execution of, the Loan Modification Agreement

On July 20, 2010, Green prepared and delivered a memorandum to Attorney D.

Ethan Jeffery ("Jeffery"), a bankruptcy attorney retained by RCG, concerning "Inofin

business relationship." In the memorandum, Green represented:

> Until July 12, 2010, Inofin would send us a weekly list of new consumer loans
> against which we would advance $170,000. This $170,000 advance would be
> amortized between two and three years with interest at 13%. That same
> week RCG Inc. would receive the payments on all its unpaid prior weekly
> loans. Recently that number was about $190,000 of which $170,000 went to

principal and $20,000 went to interest.

Green also indicated in the memorandum that Inofin was very thinly capitalized and that

the United States Securities and Exchange Commission ("SEC") had begun an investigation

of the company in January of 2010 and informed it that it was "not to embark on any new

loans to 'smaller investors,'" a circumstance having "a major deleterious effect on the

company and substantially curtailed its new business activities." Green concluded that the

purpose of an upcoming meeting was "to get myself in the best possible position in the

case of a [bankruptcy] filing."

Following the meeting, in a memorandum addressed to the "Inofin file," Green

recognized that Inofin was in default but added that the notes, Security Agreement and

UCC Financing Statement appeared to be in order and "appear to limit our collateral to the

loans specifically pledged to us." He noted that he intended to discuss a forbearance

agreement with Inofin. Green indicated that he agreed with Jeffery's recommendation that

RCG "do a UCC search back to 2003 to find out what UCC's are outstanding," adding "the

law of UCCs [sic] seems to be first on record first in line for the assets" while noting "many

of the UCCs seem to have a list of loans attached to them which would limit their security

to those loans."

In mid-July, Green exchanged emails with Wallerstein, noting Inofin's defaults and

identifying potential issues in the event Inofin were to file a bankruptcy petition. In an

email, dated July 22, 2010, Green expressed an understanding that, following Inofin's

default, it "sent me a package of notes to secure the $165,501 in principal which I didn't not

[sic] receive on July 12, 2010. In other words instead of paying me my principal they sent me a package of loans as though they had taken my principal and used it to fund new loans."

While engaged in discussions with Jeffery, who advised that public advertising of a foreclosure sale might alert the Massachusetts Division of Banks to Inofin's financial distress and create difficulties down the road, Green sent a memorandum to Mann, recommending that he talk to Inofin's secured lenders to convince them to reduce their interest rates and accept principal, adding "[a]s your largest Lender, I am willing to be a leader in this process."  He also advised Mann that unsecured lenders be told that their payments would have to wait until the conclusion of the SEC investigation.  In addition, Green counseled that overhead should be cut to the bone, new loans should only be made if they could be sold for a profit to another finance company, that the SEC should be encouraged to expedite its investigation, and that Inofin should line up reorganization counsel.

On October 1, 2010, several months after Green  learned of the SEC's investigation of Inofin, and, concomitantly, Inofin's financial difficulties, the parties executed a Loan Modification Agreement ("LMA").  The LMA referenced the May 2, 2008 and August 21, 2009 promissory notes and the two corresponding Loan Agreements, "which are all secured by a security interest, pledge and assignment of Installment Contracts (as defined in the Loan Agreements)."  These four documents were defined in the LMA as the "Loan Facility." The parties confirmed that the outstanding principal balances of the 2008 and

2009 notes, as of October 1, 2010, were $1,970,339.15 and $6,019,257.59, respectively, and

that interest was current on both notes.  They agreed that, during the pendency of the SEC

investigation, RCG would reduce the contract interest rate from 13% to 8%; that Inofin

would not be entitled to any advances; and that Inofin would pay interest only on a weekly

basis.  The parties, in paragraph 4, further agreed:

> As security for the Loan Facility, on or after the date hereof, Borrower shall
> assign and deliver to Lender, pursuant to Section 2(e) of the Loan
> Agreement, Installment Contracts having an outstanding balance of equal to
> the greater of (i) $10,000,000.00 or (ii) 125% of the outstanding principal
> balance due to Lender under the Loan Facility (both Notes).  With each
> weekly interest payment, Borrower shall certify to Lender the total
> outstanding principal balance of the pledged Installment Contracts and shall
> assign and pledge new Installment Contracts as necessary.  It shall be a
> default under the Notes and Loan Facility if, at any time, the outstanding
> balance of the pledged Installment Contracts is less than is required under
> this Section 4.

Additionally,  in paragraph 9, they stated that "[e]xcept as specifically modified" in the

LMA, the parties "ratified, confirmed and approved in their entirety" all the loan

documents executed in conjunction with the Loan Facility which were to secure the notes

as amended.  Moreover, they agreed that the LMA represented their entire agreement,

"supercedes all prior discussions, and may not be modified or amended except by a

writing executed by both parties." In summary, as a result of the LMA, Inofin was

permitted to retain for its own use payments made by consumers with respect to their

Installment Contracts and was required to pay RCG interest only, on a weekly basis, under

the notes.[20]  The promissory note dated May 2, 2008 was amended on October 1, 2010 to

provide for its maturity on June 1, 2011; to delete the second paragraph reproduced above

at note 10; and to provide as follows:

> Payment of interest only, in arrears, shall be due and payable weekly on
> Friday of each week commencing October 8, 2010.  This Note shall be secured
> as set forth in the LMA [Loan Modification Agreement].

In addition, the amended note contained a revision of paragraph 6 of the original note with

respect to events of default:

> . . . (8) if any lawsuit or enforcement action is filed against the Maker by any
> government agency or lender, which lawsuit or enforcement action alleges
> that the Maker's method of raising money and/or doing business violates
> federal or state law.

The August 21, 2009 note was similarly modified.

Mann testified that paragraph 4 was intended to be a "go forward" provision with

respect to collateral to be given to RCG from and after the LMA while paragraph 9 was

intended to be a "looking back" provision with respect to collateral that had been given to

RCG prior to the LMA.  Green testified that the purpose of paragraph 9 was "[j]ust to ratify

that all these notes [Installment Contracts] were my collateral."  He added: "It was always

my understanding that all the notes I was holding -- all were holding -- all was holding was

collateral for my loans of the seven and eight million-dollar loans."

------

[20] The LMA also provided that Inofin would arrange for the prompt installation
of a computer terminal in RCG's office which was to have "continuous real-time access
to Borrower's computer system" and "at a minimum, display all of the information
relating to the Installment Contracts pledged to Lender and permit Lender to input data
relating to the pledged Installment Contracts."

36

Prior to the execution of the LMA on October 1, 2010, RCG made weekly advances to Inofin until July 2010 when the weekly advances ceased,[21] except RCG made one further advance to Inofin in the sum of $170,243.27 under the $8 million note on August 9, 2010. With the exception of one weekly advance and payment in August, Inofin no longer made principal payments, and RCG no longer made principal advances on the 2008 and 2009 notes pursuant to the Loan Agreements. Every week during that period Inofin delivered Security Document packages, as defined in the Loan Agreements, to RCG, however, and Inofin continued to make interest payments on the $7 million loan and the $8 million dollar loan, as well as the principal and interest payments on the $200,000 and $400,000 loans until January 3, 2011.

Ayre testified about the allonge packages delivered to RCG during the period between November 12, 2010 and December 24, 2010, i.e., during the 90-day period

---

[21] The August 19, 2010 email suggests that the last advance was made on July 7, 2010 in the sum of $170,000.

preceding the bankruptcy case, a period during which the value of the allonge packages

were as follows:

| Date | Total Principal Balance |
|------|-------------------------|
| 11/12/2010 | $  47,387.67 |
| 11/19/2010 | $ 248,522.80 |
| 11/26/2010 | $  78,165.63 |
| 11/30/2010 | $ 564,198.03 |
| 12/03/2010 | $ 295,045.81 |
| 12/10/2010 | $ 226,412.50 |
| 12/17/2010 | $ 158,569.77 |
| 12/24/2010 | $  74,189.19 |
| Total | $1,692,491.40 |

The value of allonge packages delivered to RCG after the LMA and before the

commencement of the preference period are as follows:

| Date | Total Principal Balance |
|------|-------------------------|
| 10/01/2010 | $ 148,855.19 |
| 10/08/2010 | $ 127,596.94 |
| 10/18/2010 | $ 118,177.95 |
| 10/22/2010 | $  88,008.81 |
| 10/29/2010 | $  63,935.27 |
| 11/05/2010 | $ 111,507.94 |
| Total | $ 658,082.10 |

Ayre explained the reason for the disparity in weekly amounts.  He stated:

> On or around July of 2010 the collateral structure for RCG had changed
> where I was advised that [sic] by Kevin Mann that RCG was to maintain a
> principal balance of his portfolio of ten million dollars. In July, August,
> September it wasn't a problem to maintain RCG at that ten million dollar
> principal balance level as Inofin had sufficient accounts, whether they were
> from new purchases from our independent dealer base or they were existing
> contracts that weren't assigned to any investor. As we went later in the year,
> it became important for our loan processing department when they were
> starting to scramble  looking for loan contracts that I compiled reports to try

38

to extract non-investor assigned accounts out of our East Point system and that's -- was my involvement with that. So on a week-to-week basis because we were running dry on capital, it became difficult for us to fund new purchases from our dealer base, so we had to continue to find loan contracts. As each week [sic] I would go through and run a query, new collateral for whatever reason would become available. As it was available it was handed over to our accounting department who would then compile the -- put them on assignment for RCG, and then a loan closing report would be created, and that's why you see in the various inconsistent amounts on these allonge closing reports.

<div align="center">***</div>

There were times we weren't able to maintain it. It may have been off $100,000 either way so, yes, we were constantly monitoring it and at certain weeks when we could not fulfill to maintain the ten million dollars balance we were catching up in subsequent weeks to try to get that balance to where it needed to be.

E. The Foreclosure Sales

On December 30, 2010, the Division of Banks obtained a Cease and Desist Order (the "Cease and Desist Order") against Inofin.  As a result, RCG, in consultation with its attorneys, considered a number of options to protect its interests: 1) a Forbearance, Purchase and Servicing Agreement ("Forbearance Agreement") with Inofin; 2) a Disposition and Servicing Agreement; 3) an assignment for the benefit of creditors ("ABC"); and 4) a foreclosure sale.  The Forbearance Agreement was drafted by Wallerstein and dated January 1, 2011 but was never executed.  Similarly, the Disposition and Servicing Agreement was never executed.  It set forth, in pertinent part, the following:

A. Inofin received from Green a series of secured loans as affected by a Loan Modification Agreement (the "Modification Agreement") dated as of October 1, 2010 (the "Secured Loans") which Inofin used to purchase Retail Installment Sales Agreements ("Installment Contracts") and for working

<div align="center">39</div>

capital.

B. As security for the Secured Loans, Inofin granted Green security interests in the Installment Contracts purchased with the proceeds of Green's loans (the "Collateral").[22]

In an email to Louis Grossman and Richard Sgarzi, individuals holding secured claims against Inofin, Green described how an ABC would work and identified a potential assignee. RCG did not seriously pursue any of the first three options and proceeded with a foreclosure sale.

Green asked his spouse, Joan Green, RCG's in-house counsel, to handle the foreclosure sale. Because Joan Green did not have prior experience in personal property secured party sales, she contacted Wallerstein, who recommended that she consult with the attorneys at Hanify & King, now known as Murphy & King, P.C. ("M&K"). Joan Green consulted with M&K throughout the foreclosure process, receiving from M&K a list of persons to whom notices were to be sent. M&K also reviewed and revised the draft notice of sale she prepared.

She testified that she initially was unaware of whether RCG issued a notice of default to Inofin at the time she initiated the foreclosure process on January 4, 2011 when she emailed Wallerstein: "Help! I have no idea what I am doing." On that same day, she received an email from an attorney at M&K inquiring "Are there any other separate security agreements with respect to the Inofin notes?" She then emailed Wallerstein: "Do you know the answer to this?" Wallerstein replied: I just spoke with Ethan [Jeffery]. He

---

[22] The Forbearance Agreement contained similar language.

has the 1996 Security Agreement and I just sent him the Loan Agreement that incorporates it.  I think he is now set."

The impetus to conduct the foreclosure sale accelerated after the issuance of the Cease and Desist Order on December 30, 2010.  On January 5, 2011, Green transmitted a copy of the December 30, 2010 order[23] to Wallerstein and Jeffery, observing "[i]n my opinion, the order of December 30 spells the death knell for Inofin."  He addressed several questions to his attorneys, including "Should we go forward with the private sale of the Inofin collateral?"

Joan Green engaged RCG's regular foreclosure auctioneer, Dean & Associates, and requested Stephen Dean ("Dean"), the owner and sole officer of Dean & Associates, to advertise the sale one time in the *Boston Herald* and to conduct an auction on Tuesday, January 18, 2011.  Dean placed legal notices, not display ads, in the *Boston Herald*.  RCG mailed an original Notice of Sale for "Tuesday, January 20, 2011" to Inofin and all creditors with UCC financing statements on file, although January 20th was a Thursday.  On January 13, 2011, RCG mailed a Corrected Notice of Sale, dated January 5, 2011, to Inofin only, for a sale on "Tuesday, January 18," although Green contacted the auctioneer in an attempt to

---

[23] The December 30, 2010 Cease and Desist Order was predicated on Inofin's failure to comply with a Consent Order of June 18, 2011.  The Administrative Hearing Officer at the Division of Banks determined that ". . . Inofin failed to demonstrate that its financial responsibility, character, reputation, integrity and general fitness are such as to command the confidence of the public and to warrant the belief that the motor vehicle sales finance business will be operated lawfully, honestly and fairly, in violation of Massachusetts General Laws chapter 255B, section 2 and the Division's regulations 209 CMR 20.03."

have the ad for the January 18, 2011 sale canceled.  Inofin received this foreclosure notice

on January 14, 2011. On January 17, 2011, Inofin signed a document titled "Waiver of

Notice of Sale of Collateral Under Section 9-601 of the Massachusetts Uniform Commercial

Code." On January 18, 2011, RCG held a sale at which no bidders other than RCG were

present.  Spiro Stylianopoulos, an employee of RCG, attended the sale and submitted a $4

million bid on  behalf of RCG.

On January 14, 2011, RCG mailed a Notice of Sale for a sale to be held on January

26, 2011 to Inofin and all creditors with UCC financing statements on file. This sale also was

advertised once in the *Boston Herald* on January 16, 2011. On January 26, 2011, Dean

conducted an auction at which no bidders other than RCG attended. Spiro Stylianopoulos,

attended the sale and submitted a $4 million bid on behalf of RCG.

RCG paid Dean $898.12 for the January 18, 2011 sale and $897.86 for the January 26,

2011 sale.  Dean executed two Memoranda of Sale on February 8, 2011, reciting the absence

of bidders and the $4 million bid made by RCG.

These multiple notices caused Richard Sgarzi ("Sgarzi"), a member of a substantial

lender group, to contact Green about the sale as the notice relative to the January 26th sale,

which did not indicate that it was superseding the prior notice for the incorrect Tuesday,

January 20th sale, did not reference that sale notice or date. Unlike the notice that was sent

only to  Inofin for the January 18th sale, which was labeled "CORRECTED NOTICE OF

SALE[,]" the notice sent to the 30 UCC filers and the Debtor relative to the January 26th

sale did not indicate that it was a corrected notice of sale.  When Sgarzi inquired on January

15th about the reason for the second notice for January 26th, Green did not disclose that

RCG was proceeding with a foreclosure sale on January 18th, stating only that the disparity

in dates was due to a mistake in his office.

RCG's expert, Shilson, opined that the foreclosure sale was commercially reasonable.

He testified that the market for Installment Contracts such as those possessed by RCG was

very limited partly because they were concentrated in the Boston, Massachusetts area,

adding that the $4 million RCG bid was reasonable.  In addition, he testified that it would

take a potential buyer two weeks to perform adequate due diligence with respect to a loan

portfolio such as the one held by RCG.

Ayre challenged Shilson's testimony as to the areas where Installment Contracts

were generated. Ayre testified that the Trustee had collected, as of July 13, 2013,

$4,042,877.70, net of dealer reserves and collection costs, with respect to the Installment

Contracts for which RCG had bid $4 million.

Following the January 26, 2011 foreclosure sale, on January 27, 2011, RCG sent a

demand letter to Inofin, claiming to be the owner of collateral "consisting of 1,971

automobile installment contracts," and requesting their turnover. Shortly thereafter, on or

around February 9, 2011, RCG filed a Verified Complaint against Inofin in the  Suffolk

Superior Court, Department of the Massachusetts Trial Court, setting forth four counts,

captioned Conversion, Mandatory Injunction, Specific Performance, and Declaratory

Judgment.  In the Verified Complaint, RCG defined the term "Collateral" with reference

to the 1996 Security Agreement, attaching it to the Verified Complaint and stating, at

paragraph 7, that "[t]his gave RCG a security interest in the auto loans (the "Collateral")

that Inofin made using the funds borrowed from RCG." It also represented in its Verified

Complaint that it "secured its loan [of $15,700,000.00] by taking a security interest in the

auto loans that Inofin made to customers [sic]using the borrowed funds . . . [and] . . .

perfected its security interest in this collateral through possession of chattel paper

comprising the auto loans and also by making the required filing under the Uniform

Commercial Code ("UCC")," adding, at paragraph 8, that "RCG perfected its security

interest in the Collateral by filing the required UCC notice and by holding in its possession

the chattel paper and related instruments that embodied the Collateral."[24] It attached the

Security Agreement dated April 17, 1996 to the Verified Complaint. RCG did not mention

or attach either the Loan Agreement or a representative Allonge to the complaint.

After the filing of the involuntary petition on February 9, 2011 and prior to filing its

Motion for Relief from the Automatic Stay, RCG expressed concern about its collateral. In

an email response, dated February 21, 2011, Jeffery stated:

> As you know, Ray foreclosed upon his Inofin [sic] and took it back by credit
> bid at the foreclosure sale. Notwithstanding this, in the event that Inofin's
> bankruptcy trustee challenges that foreclosure sale, we need to keep our eye
> on the expiration date of Ray's 2006 UCC, which was filed April 18, 2006, and
> will expire April 18, 2011. If the Inofin trustee is successful in challenging
> Ray's foreclosure sale, this will likely occur after the expiration of the 2006
> UCC, and we don't want to be in a position where the foreclosure sale is
> overturned and the UCC-1 has lapsed, making Ray an unsecured creditor.
> . . . I think we should consider filing a UCC-1 renewal on April 15, or so, just
> for some downside protection.

---

[24] Inofin made loans to Dealers, not customers for the purchase of automobiles.

44

Subsequently, in its Motion for Relief from the Automatic Stay filed on March 9, 2011, RCG represented "[t]o secure the amounts owed to RCG, the Debtor executed [the Security Agreement] granting RCG a lien against, among other things, all chattel paper, instruments and motor vehicle installment sales contracts purchased by the Debtor with the proceeds of loans from RCG."

F. The Parties' Stipulated Facts

On the petition date, February 9, 2011, the outstanding balance owed by Inofin to RCG was not less than $8,249,517, consisting of outstanding principal plus accrued unpaid interest calculated at the original 13% contract rate for the Term Loans and the reduced 8% interest rate under the LMA for the $7 million and $8 million loans.  That amount does not include default interest, legal fees or auction fees.  The RCG Collateral was worth less than the outstanding balance owed to RCG by Inofin on the petition date and at all relevant times during the 90 day period prior to the petition date.

On July 19, 2012, RCG's files were reviewed in order to confirm the identity of the Installment Contracts as to which RCG claims a perfected security interest by possession. For each Installment Contract listed in Agreed Exhibit No. 55, RCG either: (i) has physical possession of the original Installment Contract, original signed Allonge, motor vehicle title (except for vehicles older than ten years for which no titles were issued by the Registry of Motor Vehicles), and copies (not originals) of the PPA, or (ii) had returned the file to the Inofin, after request for the same, on or after January 26, 2011.

The Trustee and RCG agree that in the event that it is determined that RCG has a

45

valid, enforceable and perfected security interest in the Installment Contracts listed in Agreed Exhibit No. 55, RCG's lien is only junior to another secured creditor with respect to only eight particular contracts.

The Debtor was insolvent at all times during the ninety days prior to the petition date.[25]

Agreed Exhibit Numbers 60 and 61 accurately set forth the payments made by Inofin and the advances made by RCG during the period January 2, 2008 through the petition date (the involuntary petition was filed on February 9, 2011), which includes the entirety of the 90 day preference period. Specifically, from October 8, 2010 through January 3, 2011, with the exception of the week of December 12, 2010, Inofin made interest payments each week of $12,291.69.

RCG cannot trace the use of any of its loan proceeds to Inofin's purchase of the Installment Contracts identified in Agreed Exhibit No. 55. Neither RCG nor Inofin made any attempt to trace the use of any of RCG's loan proceeds to the purchase of any Installment Contracts.

Agreed Exhibit Numbers 68 and 67, respectively, accurately set forth the Installment Contracts which Inofin delivered to RCG and RCG delivered to Inofin during the 90 day preference period. On the first day of the 90 day preference period, the outstanding

---

[25] When the petition date and the order for relief date are different, "[t]he preference period is measured from the date the involuntary petition is filed, not the date the order for relief is entered." *See* Official Comm. of Unsecured Creditors v. Liberty Savs. Bank, FSB (In re Toy King Distribs., Inc.), 256 B.R. 1, 96 (Bankr. M.D. Fl. 2000) (citation omitted).

principal balance of the Installment Contracts which Inofin's records identify as being

delivered to RCG was approximately $9,880,749.15. On the last day of the 90 day preference

period, the outstanding principal balance of the Installment Contracts which Inofin's

records identify as being delivered to RCG was approximately $8,425,774.57.[26]

G. Further Testimonial Evidence Adduced at Trial

Green testified about his understanding of the loan documents. In an email to

Wallerstein, dated March 24, 2011, prepared after the filing of RCG's Motion for Relief from

the Automatic Stay, Green stated:

> The basic funding procedure involved Inofin sending me weekly the entire
> consumer file including the title, keys, etc, and based on the receipt of those
> documents I funded a set amount which over the years ran between $100,000
> and $170,000 per week. The Trustee seems to think it was important that my
> checks be used only to purchase loans that were immediately funded by
> Inofin. I did not monitor this as my review of the collateral consisted of
> making sure that I had all the documents and that my loans were a certain
> percentage of the NADA value.

Wallerstein, in response, stated:

> The Trustee is relying solely on terms of the original Security Agreement
> which did contemplate that Ray would be making loans solely to fund the
> purchase of the installment contracts (which I always understood to be the
> deal). Other than the initial advance, the assigned contracts should always
> have been ones purchased with Ray's money. The Loan Agreement
> provided for weekly examinations of Inofin's records. The Trustee may have
> a point if it [sic] can establish that some of Ray's money was diverted for

---

[26] The parties did not distinguish between, or introduce testimony specifically
about, the "Principal Balance at Allonge Date" of the Installment Contracts delivered to
RCG during the preference period as set forth in Exhibit 68 and the manner of tracking
the Installment Contracts used in the "Allonge Closing Reports" in Exhibit 62, where
the "Inofin Partial Purchase Price" was recorded up until the Report dated November 5,
2010.

improper purposes (such as buying real estate).  However, that would have to have happened with the proceeds of the 2 loans that are currently outstanding.

The Trustee ignores the Loan Agreement, which itself contains all of the requisites of a security agreement under Article 9 and, of course, no filing was required to perfect the security interests, just possession of the installment contracts.

In addition, as noted above, Wallerstein testified that he did not intend the 1996 Security Agreement to be the sole source of RCG's security, as he intended to expand, not limit RCG's security interest, by ensuring that rights granted to RCG by the 1996 Security Agreement would be cumulative with those provided by other loan documents.  In his words, "we [RCG] would have a security agreement for those things we had to perfect by filing and we would have an allonge for those things that we would perfect by possession." With respect to the allonges used to transmit Installment Contracts to RCG, Wallerstein testified:

It served two functions. The first was to assign a specific installment contract as collateral to RCG and the second was to fulfill the requirement of Section 23 of Chapter 90(d), which said that a lien in a motor vehicle could be assigned by the lienholder provided that there was an assignment in the form provided by the registrar. When I called the Registry to find the assignment because I couldn't find it in the CMR [Code of Massachusetts Regulations], I was told that there wasn't one and that I could use an assignment form that I wished.

Mann's testimony was consistent with that of Green and Wallerstein, namely his understanding that the allonges were separate grants of security.

While acknowledging that Installment Contracts could not be traced to the proceeds of RCG advances, Green testified that "[y]ou don't know that they didn't use my proceeds

… t]here's nothing in the documents that have limited my ability to take notes that weren't purchased with my proceeds," and "this whole tracing concept and going back and looking at my money is a concept that the Trustee came up with."

H. Inofin's Solvency and the Trustee's Evidence on 11 U.S.C. § 547(b)(5)

The Trustee testified that the total claims in the case are approximately $72 million and that unsecured creditors will not receive "anywhere near close" to a 100 percent dividend in the case. Exhibit 59 is the expert report prepared by Craig R. Jalbert, CIRA and Thomas C. Bailey, Esq. of the accounting firm, Verdalino & Lowey, P.C. (the "Accountant"). The report was based upon a detailed review of over 50 documents including financing statements, tax returns and bank statements. The Accountant submitted a balance sheet prepared by Inofin dated October 31, 2010, less than two weeks before the commencement of the preference period. The balance sheet showed total assets of $65,023,086, of which $24,918,185 were current, and total liabilities of $71,864,320, leaving a deficit of $6,841,234, before downward adjustments to zero made by the Accountant for the values ascribed to assets for "Deferred Tax Assets" ($355,000) and "Loan Origination Costs" ($569,681). The Accountant also determined that a downward adjustment was required for the value of "Notes Receivable" from parties related to Inofin, namely the "Drive Entities" and the "Prime Entities." The Accountant noted that Inofin's independent auditor, Tobin & Associates, determined that the Drive Entities were insolvent as of December 2010 and made a downward adjustment of the note receivable from the Drive Entities of $12 million. In sum, the Accountant determined that "after consideration of the

49

other adjustments, Inofin's liabilities exceed the fair value of its assets by $19,765,914 as of

October 31, 2007." The Accountant also concluded that "Inofin remained insolvent at all

times during the Preference Period."

The Court also may take judicial notice of its docket.[27] The Court's claims register

shows secured claims of $12,252,106.14, priority claims of $2,147,585.85, and total

unsecured claims of $71,933,847.93.

According to the Accountant, during the 90 days prior to the petition date, RCG

received weekly cash payments of principal and interest from Inofin with respect to four

loans as follows:

| Loan | Principal | Interest | Total |
|---|---|---|---|
| $400,000 | $20,641.13 | $ 1,056.63 | $ 21,697.76 |
| $200,000 | $ 8,271.47 | $ 2,614.31 | $ 10,885.77 |
| Flow Loans | $      0.00 | $86,041.83 | $ 86.041.83 |
| Total | $28,912.59 | $89,712.77 | $118,625.36 |

Thus, the payments consisted of interest payments on the 2008 and 2009 notes, totaling

$86,041.83, and principal and interest payments on two smaller term notes in the amounts

of $200,000 and $400,000. In addition, as set forth in the Accountant's report and Ayre's

testimony, RCG received Installment Contracts during the 90 day preference period with

an aggregate principal balance of $1,692,491.40 for the purpose of maintaining an

outstanding principal balance equal to the greater of $10 million or 125% of the outstanding

---

[27] *See* <u>In re Mailman Steam Carpet Cleaning Corp.</u>, 196 F.3d 1, 8 (1st Cir.1999)
("The bankruptcy court appropriately took judicial notice of its own docket.").

principal balance due RCG pursuant to the LMA . During the 90 day preference period,

Inofin collected principal payments on the installment contracts included in the Installment

Contract transfers totaling $313,056.32. Therefore, after accounting for the principal

payments Inofin collected and retained prepetition, the net value of the Installment

Contract transfers to RCG, on a principal balance basis, was $1,379,435.08.[28]

## III.  DISCUSSION AND CONCLUSIONS OF LAW

In view of the complexities of the issues and arguments presented, the Court shall

summarize the positions of the parties and make its conclusions of law in the context of the

discrete issues presented.

A. The Trustee's Status under 11 U.S.C. § 544(a)(1)

1. Applicable Law

Through Count I of his Amended Complaint, the Trustee seeks a declaratory

judgment as to the invalidity of RCG's security interest in the Installment Contracts.

Similarly, through Count I of its Counterclaim, RCG seeks a declaratory judgment as to the

validity of its security interest. Section 544(a)(1) is pertinent to the relief both parties seek,

---

[28] RCG bid $4 million for its portfolio of Installment Contracts on January 18,
2011, shortly before the filing of the involuntary petition.  The parties also agreed that
on the petition date RCG was owed not less than $8,249,517 and that it is undersecured.
In addition, Ayre testified that the Trustee had collected, as of July 13, 2013,
$4,042,877.70 with respect to the Installment Contracts for which RCG bid $4 million.
Accordingly, this Court determines for the purpose of the preference analysis that the
unsecured portion of RCG's claim is  $4,249,517 ($8,249,517 - $4,000,000).  If RCG
received payments and transfers of approximately $1.5 million toward the unsecured
portion of its "deficiency" claim of $4,249,517, it obtained  payment of approximately
35% of the unsecured portion of its claim.

although the Trustee did not bring a separate count under section 544. Section 544

provides in relevant part:

> (a) The trustee shall have, as of the commencement of the case, and without
> regard to any knowledge of the trustee or of any creditor, *the rights and
> powers of,* or may avoid any transfer of property of the debtor or any
> obligation incurred by the debtor that is voidable by--
>
> > (1) a creditor that extends credit to the debtor at the time of the
> > commencement of the case, and that obtains, at such time and
> > with respect to such credit, a judicial lien on all property on
> > which a creditor on a simple contract could have obtained such
> > a judicial lien, whether or not such a creditor exists. . . .

11 U.S.C. § 544(a)(1)(emphasis added).

> 2. Arguments of the Parties

The Trustee argues that he may rely on section 544(a)(1) because the crux of his

claims is not to avoid RCG's security interest or lien, but to obtain a determination that

RCG's security interest did not attach to any of the Installment Contracts in the RCG

portfolio and that, even if this Court were to find that the Security Documents, as defined

in the Loan Agreements did collectively grant RCG a security interest in the RCG portfolio,

that security interest was not properly perfected because RCG did not possess any of the

original PPAs. Because section 544(a)(1) gives a trustee the "rights and powers of" a

judicial lien creditor, the Trustee maintains that he was not required to include a count

under section 544(a)(1) to establish his priority over an unperfected security interest. In his

words, he merely "needs a declaratory judgment that RCG's security interest either did not

attach to any of the Installment Contracts in the RCG Portfolio or that it was unperfected

on account of RCG's failure to obtain any of the original Partial Purchase and Assignment Agreements."

Relying in part on <u>Zilkha Energy Co. v. Leighton</u>, 920 F.2d 1520, 1523 (10th Cir. 1990), the Trustee contends that, if the Court determines that RCG's security interest attached to the RCG portfolio, but is unperfected, he can exercise his statutory power and rights as a judicial lien creditor to assume priority over RCG's unperfected security interest and treat RCG's claim as a general unsecured claim.  In his view, these circumstances are no different than those in which a trustee objects to a secured proof of claim as being unperfected. He adds, correctly, that perfection has been an issue in this adversary proceeding since its inception, citing RCG's Answer to the First Amended Complaint and Count I of its Counterclaim, as well as its Memorandum and the parties' Joint Pretrial Memorandum. In addition, he references Wallerstein's testimony that RCG perfected a security interest by possession of the Installment Contracts.

The Trustee, citing Fed. R. Civ. P. 15(b)(2), made applicable to this proceeding by Fed. R. Bankr. P. 7015, and <u>Olsen v. Russell (In re Kleckner)</u>, 81 B.R. 464, 465 (Bankr. N.D. Ill. 1988), *rev'd,* 81 B.R. 464 (N.D. Ill. 1988), also argues that the First Amended Complaint can be amended to conform to the evidence.  He states that both he and RCG expressly pled declaratory judgment counts seeking judgment with respect to the validity, extent and priority of RCG's purported security interest in the RCG portfolio, adding that the specific legal issue of whether RCG's failure to obtain original PPAs precluded perfection by possession was identified by both parties in the Joint Pretrial Memorandum such that, as

53

in <u>Kleckner</u>, "an avoidance claim under § 544(a)(1) is a logical extension of the claims and arguments the parties presented at the trial in this adversary proceeding." <u>Id.</u> at 466.[29]

RCG argues in its post-trial memorandum that the Trustee's failure to plead avoidance of RCG's security interest in the Installment Contracts under his strong arm powers pursuant to section 544(a)(1) of the Bankruptcy Code is fatal to his claims. Citing <u>Lassman v. McQuillan (In re Charles River Press Lithography, Inc.)</u>, 338 B.R. 148 (Bankr. D. Mass. 2006), RCG asserts that the Trustee failed to allege that RCG was unperfected and that it would be unfair to permit the Trustee to amend his pleadings to do so now, particularly where he successfully opposed RCG's pretrial efforts to amend its affirmative defenses to formally plead the improvement in position defense under 11 U.S.C. § 547(c)(5).[30]

In addition, RCG asserts that even if the Trustee were to be permitted to file a post-trial amendment, he failed in his burden of proof. Because it had possession of Installment Contracts and did not need to be listed as the lienholder on the certificates of title in order to perfect its security interest under Mass. Gen. Laws ch. 90D, § 23, RCG maintains that it was perfected by possession. It also contends that it did not need the originals of the PPAs

―――――――――――――――

[29] The Trustee failed to note the reversal of the bankruptcy court's decision in <u>Kleckner</u>.

[30] Section 547(c)(5) provides that a trustee may not avoid as preferential, subject to certain limitations, a transfer "that creates a perfected security interest in inventory or a receivable or the proceeds of either . . . ." 11 U.S.C. § 547(c)(5). Inofin did not grant RCG a security interest in inventory or receivables. Rather, it granted RCG security interests in instruments, chattel paper, guaranties of the foregoing and documents, books and records relating to the foregoing.

because they were not chattel paper and did not limit the absolute nature of the Dealer's

assignment of its lien in the vehicle to Inofin.

In reply to RCG's arguments on his status as a hypothetical lien creditor under §

544(a)(1), the Trustee distinguishes the cases cited by RCG, specifically, <u>In re Charles River</u>

<u>Press Lithography, Inc.</u>, 338 B.R. 148 (Bankr. D. Mass. 2006), and <u>Brandon v. GMAC Mortg.</u>

<u>LLC (In re Simmons)</u>, No. 11-00068, 2012 WL 1899375  (Bankr. D. Mont. May 24, 2012), *aff'd*,

2012 WL 5304701 (D. Mont. Oct. 25, 2012).  He points out that in the former case, although

the court held that a trustee could not raise section 544 claims post-trial on a number of

grounds, it further determined that the trustee made his argument only in his post-trial

brief and did not assert his powers under section 544 in his complaint or in any pleading.

338 B.R. at 164.  In the latter case, the court ruled against the trustee only after concluding

that the parties did not "by express or implied consent agree[ ] to consider the Trustee's

contentions based on § 544(a)(1). . . ." 2012 WL 1899375 at *7.

### 3. Analysis

Rule 15(b), provides in pertinent part:

> <u>For Issues Tried by Consent</u>. When an issue not raised by the pleadings is
> tried by the parties' express or implied consent, it must be treated in all
> respects as if raised in the pleadings. A party may move--at any time, even
> after judgment--to amend the pleadings to conform them to the evidence and
> to raise an unpleaded issue. But failure to amend does not affect the result of
> the trial of that issue.

Fed. R. Civ. P. 15(b)(2).  Under this rule, post-trial amendments of claims for relief may be

allowed in circumstances where the parties consented to introduction of evidence relevant

to the claims, and where the parties had a full and fair opportunity to litigate the claims for relief. In Pummill v. Greensfelder, Hemker & Gale (In re Richards & Conover Steel, Co.), 267 B.R. 602 (B.A.P 8th Cir. 2001), the trustee commenced an action against the defendants to avoid preferential transfers. When the defendants defended on the ground that no debtor-creditor relationship existed between themselves and the debtor, the trustee, without formally amending his complaint, moved to amend his complaint to conform to evidence at trial to assert fraudulent transfer claims. The United States Bankruptcy Appellate Panel of the Eighth Circuit observed that issues may be tried either by express or implied consent and that in the absence of express consent the moving party must establish implied consent. It noted that implied consent "is much more difficult to establish and seems to depend on whether the parties recognized that an issue not presented by the pleadings entered the case at trial." Id. at 610. It added that "the test for such consent is whether the opposing party had a fair opportunity to defend and whether he would have presented additional evidence had he known sooner the substance of the amendment."Id. (quoting In re Prescott, 805 F.2d 719, 724–25 (7th Cir.1986), and Hardin v. Manitowoc-Forsythe Corp., 691 F.2d 449, 456 (10th Cir. 1992) (internal quotations omitted)). *See also* Noonan v. Rauh (In re Rauh), 119 F.3d 46, 52 (1st Cir. 1997) (reversing bankruptcy court's refusal to permit amendment to judgment to conform to evidence where the trustee, at trial and without objection, introduced competent evidence relating to fraudulent transfer claims); Nickless v. Conley (In re Byers), 304 B.R. 1 (B.A.P. 1st Cir. 2004) (remanding case for determination of whether pleadings should be amended to conform to evidence at

trial).

The Court concludes that the Trustee is not barred from relying on the provisions of section 544(a)(1).  To the extent required, the Court shall construe the pleadings to conform to the evidence as the principles pertinent to allowance of amendments to conform to the evidence are applicable here.  Both the Trustee and RCG asserted counts for a declaratory judgment and had ample opportunities to introduce relevant evidence as to the perfection of RCG's security interest.  RCG cannot plausibly claim that it is unfairly prejudiced by the Trustee's assertion of his status as a judicial lien creditor under section 544(a)(1).  Moreover, as will be discussed below, in view of the Court's determination as to RCG's security interest in the Installment Contracts, RCG is not harmed by the Court's ruling with respect to the Trustee's status.

B. The Extent of RCG's Security Interest

1.  The Arguments of the Parties

(a) The Trustee's Arguments

The Trustee maintains that the evidence unequivocally established that RCG "consistently and repeatedly relied on the 1996 Security Agreement as its primary grant of security with respect to the Retail Installment Sale Contracts." He maintains that because of the language employed in the Security Agreement limiting RCG's security interest to Installment Contracts purchased by Inofin with RCG's loan proceeds and assigned and delivered to it, RCG's security interest failed to attach and RCG has no perfected security interest in the Installment Contracts.  He cites the following evidence:

1) the Security Agreement is the only security agreement referenced in the $7 million promissory note dated May 2, 2008 and the $8 million promissory note dated August 21, 2009, which comprise most of RCG's $8 million claim;

2) Green's decision not to provide Jeffery with a copy of the Loan Agreement or an Allonge when he consulted him when Inofin's demise appeared certain;[31]

3) RCG's representations that its security interest was limited to the Installment Contracts purchased with RCG's loan proceeds in accordance with the terms of the Security Agreement in the draft Disposition and Servicing Agreements prepared by Wallerstein in December 2010 ("As security for the Secured Loans, Inofin granted Green security interests in the Installment Contracts purchased with the proceeds of Green's loans. . . .");

4) RCG's representations that its security interest was limited to the Installment Contracts purchased with RCG's loan proceeds in accordance with the terms of the Security Agreement in its Verified Complaint filed with the Suffolk County Superior Court on February 9, 2011 (which was reviewed by Attorney Wallerstein and verified by Green);

5) RCG's representations in its Motion for Relief from the Automatic Stay, filed with the Court on March 9, 2011, that its interest in the RCG portfolio was secured by the Security Agreement and that the RCG portfolio was purchased with the proceeds of RCG's loans.

According to the Trustee, RCG raised its present arguments for the first time when he objected to the Motion for Relief from Stay pointing out that the loan proceeds could not be traced to the purchase of Installment Contracts.

In addition, the Trustee criticizes Wallerstein's testimony with respect to the Security Agreement, noting that, while RCG argued that the Security Agreement was to provide additional, or supplemental, security with respect to dealer guarantees [the Seller Agreements] and related documents and to cover possible advances made in the future for

---

[31] Wallerstein sent Jeffery a copy of a Loan Agreement in January 2011.

contracts not actually delivered and assigned, Wallerstein's testimony failed to explain how and why that would happen.  In the Trustee's view, Wallerstein's testimony that he never interpreted the Security Agreement as requiring the purchase of Installment Contracts with RCG's loan proceeds was incredible because the terms of the Security Agreement required an assignment of the Installment Contracts for the security interest to attach. Moreover, the Trustee criticizes Wallerstein's testimony that the Security Agreement merely supplemented grants of security interests set forth in the 1996, 2008 and 2009 Loan Agreements and the allonges.   The Trustee reasons that 1) the terms of the Loan Agreements are subject to the terms of the notes (e.g., ". . .Lender agrees to make the Loan available to Borrower as a line of credit not to exceed $7,000,000 principal outstanding . . . repayable two years from the date hereof, subject to the conditions as set forth in the Note."); and 2) the notes contain language that did not appear in the 1996 promissory note as they specifically referred to Installment Contracts (e.g., "Each interest payment shall be accompanied by a principal payment equal to the sum of: (i) the amount advanced by the holder to the Maker for the purchase of each of the outstanding 'Installment Contract' collaterally assigned to the holder pursuant to Section 2 of the Loan Agreement . . ."). Thus, the Trustee asserts that, consistent with the Security Agreement, the notes contemplated that the Installment Contracts assigned to RCG would be purchased with the proceeds of RCG's loans.  According to the Trustee, neither Green nor Wallerstein disputed this interpretation of the notes.

The Trustee also criticizes Wallerstein's testimony regarding the Verified Complaint,

noting that he testified that he assumed that most of the Installment Contracts assigned to RCG were purchased with proceeds of loans made to Inofin, and he admitted that there were no references in the Verified Complaint to the Loan Agreements or the allonges.

In addition, the Trustee criticizes Green's testimony concerning the representation made in RCG's Motion for Relief from Stay that all Installment Contracts were purchased with proceeds of RCG loans when it is unable to trace Installment Contracts purchased with proceeds, citing Green's testimony "[y]ou don't know that they didn't use my proceeds …[t]here's nothing in the documents that have limited my ability to take notes that weren't purchased with my proceeds," and "this whole tracing concept and going back and looking at my money is a concept that the Trustee came up with." Finally, the Trustee cites the e-mail exchange between Wallerstein and Jeffery in March of 2011.[32]

The Trustee contends that RCG does not have a valid and enforceable security interest in the portfolio of Installment Contracts for several reasons.  In the first place, he maintains that RCG's security interest is limited to Installment Contracts purchased with the proceeds of RCG's loans and assigned and delivered to RCG. Citing the provisions of Mass. Gen. Laws ch. 106, §9-203(b)(3)(A), the decision in <u>Clearly Canadian Beverage Corp.</u>

---

[32] Wallerstein wrote:

[T]he terms of the original Security Agreement did contemplate that [RCG] would be making loans solely to fund the purchase of the installment contracts (which I always understood to be the deal). Other than the initial advance, the assigned contracts should always have been ones purchased with Ray's money.

v. American Winery, Inc., 257 F.3d 880, 895-96 (8th Cir. 2001), and the unambiguous

description of RCG's collateral in the Security Agreement, he asserts RCG's security

interest attached only to Installment Contracts traceable to the proceeds of RCG's loans that

had been assigned and delivered to it, which the parties agree cannot be done.

In this regard, the Trustee rejects any attempt to expand RCG's security interest with

reference to what he considers inadmissible extrinsic evidence because the Security

Agreement is unambiguous and, at least, partially integrated.  In other words, he maintains

that the parol evidence introduced by RCG at trial cannot be used to contradict or modify

the terms of the 1996 Security Agreement.  In support of his argument, he asserts the

"composite document rule" enunciated in such cases as In re Numeric Corp., 485 F.2d 1328

(1st Cir. 1973), is inapplicable because there is an unambiguous security agreement, citing

First Premier Capital LLC v. Republic Bank of Chicago (In re Equip. Acquisitions Res. Inc.),

692 F.3d 558, 561 (7th Cir. 2012). In the Trustee's view, extrinsic evidence may only be

considered to determine whether the 1996 Security Agreement is integrated.  He cites Bank

v. Internat'l Bus. Machines Corp., 145 F.3d 420, 424 n.2 (1st Cir. 1998), for the proposition

that extrinsic evidence is admissible in only limited circumstances.  Thus, the Trustee

concludes:

> While the 1996 Security Agreement does not contain an express integration
> clause, it does contain all that is required to create an enforceable security
> agreement under Massachusetts law. *See* Mass. Gen. Laws ch. 106, § 9-203.
> It contains unequivocal granting language, a clear description of the
> collateral, and is even conspicuously titled "SECURITY AGREEMENT." . .
> . On its face, the 1996 Security Agreement "contains nothing that would
> indicate that the parties did not intend it to be a complete and final

61

expression of their rights and obligations[]" with respect to RCG's security interest. Coll v. PB Diagnostic, 50 F.3d [1115] at 1123 [(1st Cir. 1995)]. Therefore, this Court should conclude that the 1996 Security Agreement is at least a partially integrated agreement with respect to the scope of RCG's security interest, if not completely integrated with respect to the secured transaction. See id.

While recognizing that the Court could admit evidence to ascertain whether the Security Agreement was a final expression of the terms of the parties' agreement, the Trustee urges the Court to reject testimony and other evidence offered by RCG. Specifically, he urges the Court to reject or give no weight to Green's testimony because of his evasive answers and prior inconsistent deposition testimony during which he stated that it was always his understanding and assumption that RCG's security interest was limited to Installment Contracts purchased with RCG loan proceeds. The Trustee also urges the Court to discredit Mann's testimony relating to the allonges as a separate grant of security because discussions he had with Green occurred over 17 years ago and his answers, in any event, were in response to leading questions.

Finally, the Trustee urges the Court to reject the testimony of Wallerstein and Green for purposes of determining whether the Security Agreement was integrated, contending that it was not relevant extrinsic evidence. According to the Trustee, Wallerstein merely testified that he drafted the Security Agreement based upon the Commitment Letter and that he was not involved in negotiating its contents. The Trustee argues that the documentary evidence supports the conclusion that the Security Agreement was an integrated and final expression of the parties' intent, particularly as it set forth audit rights,

a power of attorney, rights relative to collections, events of default, and choice of law.  He points out that the Security Agreement was incorporated in the 1996 note due to the reference to Section 2 of the 1996 Loan Agreement.  Section 2 identified the "Security Documents" as the Security Agreement, the UCC-1 Financing Statement, the  Installment Contracts, the PPAs, the Application for Title, and the Allonge, with the Loan Agreement and the note referenced as "Loan Documents."  Thus, the Trustee points to that evidence, rather than testimony, to support his argument that the Security Agreement was fully integrated, adding that the testimony can only be considered for purposes of making a determination as to the extent of integration, not for purposes of interpretation.

The Trustee further argues that extrinsic evidence is inadmissable in the absence of any latent ambiguity in the contract language, citing, *inter alia,* Coffin v. Bowater, Inc., 501 F.3d 80, 97 (1st Cir. 2007).  He maintains that the Security Agreement is not ambiguous and contains no latent ambiguity.  Instead, in his view, RCG wants the language "not to mean what it says," asserting that the testimony of Green, Mann, and Wallerstein should be excluded as it was both subjective and self-serving and, therefore, unreliable, to create an exception to the parol evidence rule.

The Trustee adds that express terms of the Security Agreement must control over any inconsistent course of performance, citing Mass. Gen. Laws ch. 106, § 1-303(e), governing course of performance.  Specifically, the Trustee maintains that because the Loan Agreements and notes are consistent with the express terms of the Security Agreement, they do not contain a separate grant of security.  In his view, "[i]f the 1996 Security

Agreement was truly a supplemental grant of security, there would have been no need to reference 'Installment Contracts' in the Notes as those purchased with RCG's proceeds, or conspicuously state at the end of each Note 'Secured by a Security Agreement dated April 17, 1996.'"  He asserts that the Loan Agreement is not identified as a "security document," and the language employed in the Loan Agreement, (i.e., "In consideration of, and to evidence and secure the Loan, Borrower has executed and delivered, or will execute and deliver prior to the first weekly advance, the following documents . . .") does not constitute a separate grant of security. The Trustee argues that the Loan Agreement cannot be reasonably construed as a grant of security in view of the express terms of the Security Agreement.

The Trustee next argues that the allonges are consistent with the express terms of the Security Agreement and also do not contain a separate grant of a security interest.  He reasons that the language employed in the Security Agreement (i.e., " . . . all motor vehicle installments sales contracts purchased by Debtor with the proceeds of the loans from Secured Party and assigned and delivered to Secured Party") is consistent with the language in the allonges, (i.e., "Inofin, Inc. hereby assigns, with full recourse, to Raymond C. Green Inc., all its right, title and interest in, to and under the following instruments . . . ").   Thus, in his view, the allonges were merely the mechanism used to satisfy the requirement of the Security Agreement.  The Trustee rejects RCG's contention that Inofin granted it a separate security interest in each of the Installment Contracts delivered with each Allonge because his construction of the allonges is consistent with the Security

Agreement and the parties' course of performance.  The Trustee adds that Shilson, RCG's expert in the "buy here/pay here" industry, testified that he had never seen the term "allonge" used with respect to collateral packages like the ones delivered by Inofin to RCG.

Expanding on the argument that the parties' course of performance was consistent with the express terms of the Security Agreement and that the allonges did not create separate grants of security interests, the Trustee notes that Wallerstein consistently relied upon UCC-1 Financing Statements; was concerned when he discovered that the UCC-1 Financing Statement in favor of RCG lapsed sometime before April 18, 2006 when he was documenting the 2006 loan; filed a new UCC-1 Financing Statement with the same language employed in the  Security Agreement; and always assumed the Installment Contracts were purchased with the proceeds of RCG's loans.  Indeed, according to the Trustee, Wallerstein understood that filing the second UCC-1 Financing Statement was to ensure that RCG had a first priority security interest in Installment Contacts and eliminated any concerns about the "double pledging" of Installment Contracts because he stated in a memorandum to Green, in part, that "[a]ssuming you do a new filing now, you will be behind their loans."  The Trustee asserts that Green also understood the significance of the UCC-1 filings because in his July 20, 2010 memorandum to his file, following his meeting with Jeffery, he confirmed Jeffery's recommendation that RCG "do a UCC search back to 2003 to find out what UCC's are outstanding" based on the understanding that the "the law of UCCs [sic] seems to be first on record first in line for the assets."  The Trustee emphasizes that the witnesses' statements and conduct are consistent with the security

interest contemplated in the Security Agreement as the primary grant of security because perfecting with a recorded UCC-1 Financing Statement was "the most efficient and comprehensive way to put creditors on record notice" of RCG's security interest in Installment Contracts purchased with RCG's loan proceeds and assigned to RCG.  That sequence would put the burden on subsequent secured lenders to determine what Installment Contracts were purchased with the proceeds of RCG's loans and assigned to RCG.

In this regard, the Trustee argues the Court should reject Wallerstein's testimony that he did not structure the Inofin transaction so that there would be exclusive perfection by filing, as well as his testimony that he considered the primary means for RCG to perfect its security interest in Installment Contracts was through possession.  The Trustee maintains that Wallerstein's testimony is a recent contrivance and incredible in view of his emails, citing an email  exchange between Wallerstein and Green in which he stated:  "I assumed you were advancing the entire amount up front.  If so, there is no need for a loan agreement.  The Security Agreement referenced at the end of the note still governs." The Trustee adds that the 2008 and 2009 notes also contained payment provisions relating to "the amount advanced  . . . for the purchase of each of the outstanding 'Installment Contracts' collaterally assigned to the holder pursuant to Section 2 of the Loan Agreement." He further cites the Forbearance Agreement and the Disposition and Servicing Agreement, both drafted in December 2010.  The latter, according to the Trustee, is consistent with the Security Agreement as it specifically references Installment Contracts "purchased with the

proceeds of [RCG's] loans. . . ."   He contends Wallerstein's attempts to downplay the significance of the recitations in documents he drafted was disingenuous.  The Trustee also cites the Verified Complaint filed in the Suffolk Superior Court, Jeffery's concern about the impending expiration of RCG's UCC-1 in his email, dated February 11, 2011, despite RCG's purported perfection by possession, and RCG's Motion for Relief from Stay, which contained no references to the allonges or the Loan Agreements.

The Trustee cites other alleged recent contrivances of RCG, namely Wallerstein's March 24, 2011 email to Jeffery, stating that "the Loan Agreement . . . contains all the requisites of a security agreement under Article 9 and, of course, no filing was required to perfect the security interests, just possession of the installment contracts;" and RCG's Reply to the Trustee's Objection to its Motion for Relief from the Automatic Stay in which it set forth a "composite doctrine" theory.  According to the Trustee, "[t]his theory is not only an unreasonable construction of the express terms of that agreement and the parties' consistent course of performance, but is also both untenable and illogical."  Thus, the Trustee argues that Wallerstein's testimony that he drafted the Security Agreement "to expand RCG's security interest to get contracts that we didn't have possession on, we lent against, but we had advanced funds," should be rejected because Wallerstein failed to explain how the Security Agreement could have granted RCG a security interest in Installment Contracts purchased with RCG's loan proceeds, if those Installment Contracts were never assigned and delivered to RCG, and he failed to explain the absence of references to the allonges and Loan Agreements until after the bankruptcy case was

67

commenced. The Trustee notes that the UCC-1 Financing Statement would have been futile unless the collateral could be traced to RCG's loan proceeds, adding that there were too many inconsistencies in Wallerstein's testimony for it to be credible.

Finally, the Trustee asks the Court to discredit RCG's argument that it would have been "impossible" for the Installment Contracts to have been purchased with its advances because the advances were made after the collateral was delivered, noting that Green contradicted his own testimony.[33]   The Trustee concludes that the parties' course of performance must be construed with the express terms of the Security Agreement.

(b) RCG's Arguments

RCG argues in the first instance that the Security Agreement was not integrated in whole or in part, relying upon Wallerstein's testimony that it was not his intent to limit, but rather to expand, RCG's security interest, "ensuring that rights granted to RCG by the 1996 Security Agreement be cumulative with those provided by other loan documents."  RCG notes that Wallerstein testified that he intentionally omitted an integration clause, that the purpose of the Security Agreement was to "expand" the scope of RCG's security interest in collateral, and that because RCG would be perfected by possession there would be no need in the UCC-1 to make reference to contracts assigned and delivered to RCG that were

---

[33] According to the Trustee, Green first stated, in response to a question as to when the collateral would come in relative to your loan advance ,"[t]he collateral came first." But at his deposition, he testified "'We would advance that money.  They would send in these contracts and they would make their payment . . . we would advance that money.  They would send in these conditional contracts."  The Trustee also relied on RCG's own internally created document in which RCG stated:  "We usually make a weekly advance of $150,000.  Then Inofin sends in a number of deals . . . ."

not purchased with the proceeds of its loans.

RCG also points to the Loan Agreements as providing additional grants of security, stating that "nowhere does the Loan Agreement state or imply that the Security Documents listed in Subparagraph 2(e) as being executed and delivered 'prior to or simultaneously with each advance' be limited by just those contracts purchased from the proceeds of the particular advance or any other advance." It contends that its witnesses testified that their understanding was that Paragraph 2(e) encompassed all of the contracts assigned and delivered to RCG.   RCG cites Wallerstein's testimony that he intended the Loan Agreements to contain a grant of security to RCG and his testimony that it was his intention in drafting Paragraph 2 to the 1996 Loan Agreement to include all contracts assigned and delivered to RCG prior to or simultaneously with each loan advance to be RCG's collateral, which would have to include at least some contracts not purchased with RCG loan proceeds.   According to RCG,  Paragraph 2 of the Loan Agreements makes it clear that the Security Agreement was not the exclusive Security Document.

RCG also argues that any documents that were not executed, such as the Disposition and Servicing Agreement, that contain references to the Security Agreement "have little or no evidentiary value."   RCG explains that, because M&K had no involvement in the loan transactions until RCG sought their advice following default, it was unaware of the other documents. Initially, Green provided the firm with only limited loan documents, such that the description of RCG's collateral in the Security Agreement found its way into the state court Verified Complaint and later the Motion for Relief from Stay.  RCG argues that once

M&K had all of the documents and the benefit of the Trustee's initial objections, it "expanded on the fuller grant of security found in the Allonges, course of dealing, Loan Agreements and the LMA." RCG contends that the initial omission of the fuller grant of security interests was due to Green's lack of understanding as to what legal documents were most relevant to establishing his security interest.

In addition, RCG argues that the allonges were intended to contain separate grants of security. In support of this assertion, RCG relies upon Mann's testimony in which he stated that each Allonge was intended to be a separate grant of security to RCG. RCG emphasizes that it needed independent assignments in order to cause the Registry of Motor Vehicles to issue new certificates of title naming RCG as the lienholder should it be required to enforce its security interest in the event of Inofin's default. RCG maintains that the absolute language of assignment constitutes a security agreement as the parties intended it to be one, citing, *inter alia*, <u>Darr v. Raytheon Co. (In re Navigation Tech. Corp.)</u>, 880 F.2d 1491, 1493 (1st Cir. 1989). It notes that the allonges are identified as "Security Documents" and reiterates that the purpose of the allonges was to provide an unambiguous assignment to cause the Registry of Motor Vehicles to issue new certificates of title should RCG be required to enforce its security interest against Inofin in specific automobiles.

RCG relies heavily on the parties' course of performance, referencing Green's testimony that it was his understanding that "all of the original contracts assigned to him and in his possession were collateral for his loans, not because they might have been

70

purchased from his loan proceeds, but simply because they were assigned and delivered

to him." It also relies upon the testimony of Wallerstein, Mann, and Ayre, an employee of

the Trustee.  RCG, based on the testimony, contends:

> The weekly practice was so regular and lasted for so long that as of Inofin's
> bankruptcy filing, it was no longer clear whether the weekly advance
> was intended to be secured by the prior week's delivery of collateral or by the
> collateral to be delivered a few days following the advance.

RCG admits that in light of the parties' understanding "no attempt was ever made by

either Inofin or RCG to confirm that the contracts assigned to RCG had been purchased

specifically with RCG loan proceeds," and the parties conducted themselves as if there

were no such requirement. RCG concludes: "the 15-year long weekly course of

performance between the parties by which the Inofin *expressly assigned and delivered* chattel

paper to RCG without regard to the exact source of funds used by Inofin to purchase such

contracts manifests an agreement between them that all such contracts are RCG's

collateral." (emphasis in original).

 RCG further asserts that it had a security interest in all Installment Contracts in its

possession at the petition date. It argues that if Inofin could not have denied the existence

of a security agreement, the Trustee, standing in its shoes, cannot do so, citing , *inter alia*,

In re Molten Metal Techs., Inc., 271 B.R. 711, 721 (Bankr. D. Mass. 2002) ("the Trustee is a

successor to the Debtor's causes of action, and he steps into the Debtor's shoes for purposes

of maintaining such causes of action.").

Noting that general contract construction principles apply, together with those set

forth in the UCC, RCG maintains that the UCC "expressly contemplates through its provisions and Official Commentary that the course of performance of parties may supplement or modify the express terms of a written instrument, even a written instrument that is 'final' as to its subject matter." It cites Mass. Gen. Laws ch. 106, § 9-203(b)(3)(B) which provides that a security agreement may be enforceable by possession without a written security agreement provided there is an "agreement" as defined in Mass. Gen. Laws ch. 106, § 1-201(3). RCG recognizes that repealed UCC 2-§ 208 governs, although it notes the amendments adopted in Massachusetts on July 1, 2013.

RCG argues that the relevance of course of performance is not confined to sales contracts and any proposition to the contrary has been rejected by the courts, citing, *inter alia,* Westinghouse Credit Corp. v. Shelton, 645 F.2d 869 (10th Cir. 1981). It adds that the cases it cites "demonstrate that the scope of a security interest granted in a written security agreement may be either expanded or contracted by the parties through their post-execution course of performance." According to RCG, course of performance can modify a written security instrument and under the UCC, a security agreement itself can consist of both written words and course of performance so as long as the two can be reasonably construed together. Thus, RCG relies on General Elec. Capital Commercial Automotive Fin. v. Spartan Motors, 246 A.D.2d 41, 51, 675 N.Y.2d 626 (N.Y.A.D. 1988) (court applied UCC § 1-205(4) along with UCC § 2-208(2) to determine that an inventory financing arrangement in which cars were, on occasion, purchased by the dealer before loans were made and then reimbursed by the financier was still a purchase-money security

interest; even where inconsistent, a course of performance may modify the parties' agreement).  RCG contends that the July 1, 2013 amendments to ch. 106, specifically Mass. Gen. Laws ch. 106, § 303(a),[34] serve to strengthen its argument and are consistent with modern commercial dealings as recognized in Mass. Gen. Laws ch. 106, §1-102(2).

RCG also argues that the facts adduced at trial established a security agreement based on course of performance within the meaning of M.G.L. c. 106 § 1-201(3) because there was an exchange of money for collateral, adding that the parties' agreement called for weekly loan advances and weekly assignments and delivery of Installment Contracts, a pattern that repeated itself on a weekly basis for 15 years without objection by either party.  It adds that there was also an established course of dealing because each new loan facility was accompanied by a new Loan Agreement that repeated the terms of the prior Loan Agreements, and was followed either by one delivery of collateral for a term loan, or weekly advances and weekly delivery of collateral for the 2008 and 2009 loans.  Thus, RCG contends that the course of performance excused the requirement that the Installment Contracts assigned to it be purchased with the proceeds of its loans.

In addition, RCG contends that the allonges "assigned Inofin's rights to the installment contracts without qualification," consistent with the testimony of Wallerstein, as well as Green and Mann as to their intentions.  It adds that the circumstances are "on all fours with Spartan Motors," and that the course of performance and the Security

---

[34] Mass. Gen. Laws ch. 106, § 1-303 was added by St. 2013, ch. 30, § 2, effective July 1, 2013.

Agreement must be read as consistent with one another unless such reading is "unreasonable," as recognized in <u>Spartan Motors</u>, 246 A.D.2d at 51-53, and UCC § 1-303(f)(2001) [sic].[35]  It concludes that there is no inconsistency because the Security Agreement is not integrated and does not by its terms prohibit the assignment of contracts not purchased with RCG's loan proceeds.  In its words, "it merely neglects to include them." Thus, RCG asserts that the only consistent reading is that the course of performance between Inofin and RCG supplemented the more narrow grant contained in the Security Agreement and, "[e]ven if the Court viewed the course of performance as inconsistent with the 1996 Security Agreement, the course of performance is relevant to showing a *modification* of the granting clause of the 1996 Security Agreement."

Recognizing that its argument as to course of performance is directly contrary to the Trustee's contention that the Security Agreement must be the lens through which every other action and written agreement is interpreted, RCG, citing the Official Comment to UCC § 1-303, maintains that this Court must give recognition to the commercial context in which RCG and Inofin dealt with one another.  In sum, RCG argues that the language utilized in the Security Agreement does not control the scope of its security interest, and this Court is required to reconcile the document and course of performance to give effect to the intent of the parties, citing, *inter alia,* <u>Chelsea Indus., Inc. v. Florence</u>, 358 Mass. 50, 55-56 (1970).  According to RCG, doing so is the only way to give meaning to the parties'

---

[35]  Mass. Gen. Laws ch. 106, § 1-303(f), effective July 1, 2013 provides:  "Subject to Section 2-209, a course of performance is relevant to show a waiver or modification of any term inconsistent with the course of performance."

15 year course of performance.  In addition, RCG distinguishes the cases relied upon by the

Trustee, including In re Martin Grinding & Mach. Works, Inc., 793 F.2d 592 (7th Cir. 1986);

Evergreen Bank v. St. Onge (In re St. Onge), No. 94-CV-1441, 1996 WL 77389 (N.D.N.Y. Feb.

21, 1996), and Fed. Deposit Ins. Corp. v. Hill, 13 Mass. App. Ct. 514 (1982), adding that

neither the parol evidence rule nor any other legal principle precludes consideration of the

course of performance because the Security Agreement was not integrated and was not

intended to be integrated.

 2. Analysis

  (a)  Legal Principles Applicable to Contract Interpretation

 "[A] security agreement is effective according to its terms between the parties,

against purchasers of the collateral, and against creditors."  Mass. Gen. Laws ch. 106, § 9-

201(a).  In addition to the provisions of Article 9, general provisions of the UCC, including

Article One, as well as principles of contract interpretation under Massachusetts law,

govern the interpretation of a security agreement. *See* Pride Hyundai, Inc. v. Chrysler Fin.

Co., L.L.C., 369 F.3d 603 (1st Cir. 2004); Bank v. Int'l Bus. Machs. Corp., 145 F.3d 420, 424

(1st Cir. 1998); Boston Edison Co. v. Fed. Energy Regulatory Comm'n, 856 F.2d 361, 365 (1st

Cir. 1988).  Liberty Mut. Ins. Co. v. Gibbs, 773 F.2d 15, 17 (1st Cir.1985).

 The general rule under Massachusetts law is that where the language  of a contract

is unambiguous, the contract must be enforced according to its terms.  Pride Hyundai, Inc.,

369 F.3d at 615-16. The United States Court of Appeals for the First Circuit has recognized

that "in Massachusetts, '[t]he parol evidence rule precludes evidence of earlier or

contemporaneous discussions that would modify the provisions of a later *integrated*

agreement which the proponent of the agreement seeks to enforce.'" <u>Bank</u>, 145 F.3d at 424

(citation omitted, emphasis supplied).  The rule "promotes confidence in the written terms

of secured transactions and allows subsequent creditors to rely on the contents of security

interest documents."  <u>First Premier Capital LLC v. Republic Bank of Chicago (In re Equip.</u>

<u>Acquisition Res. Inc.)</u>, 692 F.3d 558, 561 (7th Cir. 2012) (citing <u>In re Martin Grinding and</u>

<u>Mach. Works, Inc.</u>, 793 F.2d 596-97 (7th Cir. 1986)).

　　　　The parol evidence rule is not a complete bar to extrinsic evidence. It operates as a

rule of substantive law and renders inoperative prior oral and written agreements.  It

applies only where the parties have created a partially or fully integrated document and

does not apply if a contract is not integrated.  *See* Restatement (Second) of Contracts § 213

cmt. a and b.  According to the First Circuit,

> An integrated agreement is a writing that constitutes a final expression of one
> or more terms of an agreement.. "Where the parties reduce an agreement to
> a writing which in view of its completeness and specificity reasonably
> appears to be a complete agreement, it is taken to be an integrated agreement
> unless it is established by other evidence that the writing did not constitute
> a final expression."

<u>Coll v. PB Diagnostic Sys., Inc.</u>, 50 F.3d 1115, 1123  (1st Cir. 1995) (citations omitted).  *See*

*also* <u>RGJ Assocs. v. Stainsafe, Inc.</u>, 338 F.Supp.2d 215, 244 n.56 (D. Mass. 2004).  Thus,

extrinsic evidence is admissible to determine whether a writing is integrated.  <u>Antonellis</u>

<u>v. Northgate Constr. Corp.</u>,  362 Mass. 847, 849 (1973) ("Whether there was an integration

as the plaintiffs contended was a question of the intention of the parties on which proof

could be received ranging beyond the writing proper."); Ferrari v. Family Mutual Savs.

Bank (In re New Era Packaging, Inc.), 186 B.R. 329, 333-34 (Bankr. D. Mass. 1995), *abrogated*

*on other grounds*, In re Merrimac Paper Co., Inc., 420 F.3d 53 (1st Cir. 2005);   U.S. v.

Clementon Sewerage Auth., 365 F.2d 609, 613 (3d Cir. 1966).

Extrinsic evidence beyond contractual terms may also be permitted to determine

whether the contract is ambiguous. Thus, in Bank v. Int'l Bus. Machs. Corp., the First

Circuit stated:

> Massachusetts law also may permit, in limited circumstances, the use of
> extrinsic evidence "for the very purpose of deciding whether the
> documentary expression of the contract is ambiguous." Donoghue v. IBC
> USA (Publications), Inc., 70 F.3d 206, 215 (1st Cir.1995). As Donoghue makes
> clear, however, the purpose of allowing such a "peek" at extrinsic evidence
> under some circumstances is merely to ensure that the contract is read "'in
> light of the circumstances of its execution'" rather than as some hypothetical
> document existing outside the parties' real business relationship. Id. at 216
> (quoting Robert Indus. v. Spence, 362 Mass. 751, 291 N.E.2d 407, 409 (1973)).

Bank, 145 F.3d at 424 n.2.   Although objective evidence is admissible to determine a latent

ambiguity, such evidence must exclude the self-serving testimony of one party as to what

the party believes the contract means or to add terms to a complete contract.   Coffin v.

Bowater Inc., 501 F.3d 80, 98 (1st Cir. 2007).

(b) UCC Provisions

(i) Definitions

The Security Agreement, and all rights and obligations pertinent to it, are governed

by Massachusetts law.  As this Court recognized in Levitz v. Arons Arcadia Ins. Agency,

Inc. (In re Levitz Ins. Agency, Inc.), 152 B.R. 693, 697 (Bankr. D. Mass. 1992), the nature,

77

extent and validity of an interest in a debtor's assets must be determined in accordance with state law. 152 B.R. at 697 (citing <u>Butner v. United States</u>, 440 U.S. 48 (1979)). Accordingly, Massachusetts law, and, in particular, its version of the UCC, governs the interpretation of the Security Agreement and the related loan agreements and informs the Court's decision as to the validity and extent of RCG's claimed security interest in the Debtor's chattel paper and other assets.

In this regard, the Massachusetts version of the UCC provides definitions pertinent to resolution of the issues in this case. Massachusetts amended provisions of the UCC and repealed others, effective July 1, 2013. The amendments are not applicable to the Trustee's claims and RCG's counterclaims now before the Court, *see* 2013 Mass. Legis. Serv. ch. 30, § 116(b) ("Sections 1 to 82, inclusive, shall not apply to a right of action that has accrued before the effective date of said sections 1 to 82, inclusive."), but they are informative. The Court shall refer to the version of the UCC in effect in Massachusetts prior to the 2013 legislation, but is mindful of the amendments, particularly Mass. Gen. Laws ch. 106, § 1-303.

In the version of the UCC in effect at the time the Trustee's claim for relief accrued, "agreement" meant:

> the bargain of the parties in fact as found in their language or *by implication from other circumstances including course of dealing or usage of trade or course of performance* as provided in this chapter (sections 1-205 and 2-208). Whether an agreement has legal consequences is determined by the provisions of this chapter, if applicable; otherwise by the law of contracts (section 1-103).

Mass. Gen. Laws ch. 106, § 1-201(3)(emphasis supplied).[36]  A "security agreement" "is an

agreement that creates or provides for a security interest," id. § 9-102(73), while a "security

interest" is "an interest in personal property or fixtures which secures payment or

performance of an obligation."  Id. § 1-201(37).

"Course of performance" is a concept set forth in the definition of an "agreement;"

it is a concept specifically considered in Article 2 of the UCC.  Pursuant to Mass. Gen. Laws

2-208 (repealed by St. 2013, c. 30, § 7, eff. July 1, 2013),[37]

_____

[36] The Court notes that "agreement" is now defined with reference to Mass. Gen.
Laws ch. 106, § 1-303 as follows:

> "Agreement", as distinguished from "contract", means the bargain of the
> parties in fact, as found in their language or inferred from other
> circumstances, including course of performance, course of dealing or
> usage of trade, as provided in section 1-303.

Mass. Gen. Laws ch. 106, § 1-201(3) effective July 1, 2013.

[37] Section 1-303, effective July 1, 2013,  contains the substance of repealed section
2-208.  It provides:

> (a) A "course of performance" is a sequence of conduct between the
> parties to a particular transaction that exists if:
>
>> (1) the agreement of the parties with respect to the
>> transaction involves repeated occasions for performance by a
>> party; and
>>
>> (2) the other party, with knowledge of the nature of the
>> performance and opportunity for objection to it, accepts the
>> performance or acquiesces in it without objection. . .
>
> (d) A course of performance or course of dealing between the parties or
> usage of trade in the vocation or trade in which the parties are engaged or
> of which the parties are or should be aware is relevant in ascertaining the

(1) Where the contract for sale involves repeated occasions for performance by either party with knowledge of the nature of the performance and opportunity for objection to it by the other, any course of performance accepted or acquiesced in without objection shall be relevant to determine the meaning of the agreement.

(2) *The express terms of the agreement and any such course of performance, as well as any course of dealing and usage of trade, shall be construed whenever reasonable as consistent with each other*; but when such construction is unreasonable, express terms shall control course of performance and course of performance shall control both course of dealing and usage of trade (section 1-205).

(3) Subject to the provisions of the next section on modification and waiver, such course of performance shall be relevant to show a waiver or modification of any term inconsistent with such course of performance.

------

meaning of the parties' agreement, may give particular meaning to specific terms of the agreement and may supplement or qualify the terms of the agreement. A usage of trade applicable in the place in which part of the performance under the agreement is to occur may be so utilized as to that part of the performance.

(e) Except as otherwise provided in subsection (f), the express terms of an agreement and any applicable course of performance, course of dealing or usage of trade must be construed, whenever reasonable, as consistent with each other. If such a construction is unreasonable:

(1) express terms prevail over course of performance, course of dealing and usage of trade;

(2) course of performance prevails over course of dealing and usage of trade; and

(3) course of dealing prevails over usage of trade.

(f) Subject to Section 2-209, a course of performance is relevant to show a waiver or modification of any term inconsistent with the course of performance. . . .

Mass. Gen. Laws ch. 106, 1-303.

Mass. Gen. Laws ch. 106,  § 2-208 (emphasis supplied).[38]

Chattel paper is defined in pertinent part as "a record or records that evidence both a monetary obligation and a security interest in specific goods," Mass. Gen. Laws ch. 106, § 9-102(11), and "'monetary obligation' means a monetary obligation secured by the goods." Id. An "instrument" is defined as "a negotiable instrument or any other writing that evidences a right to the payment of a monetary obligation, is not itself a security agreement or lease, and is of a type that in ordinary course of business is transferred by delivery with any necessary indorsement or assignment. . . ." Mass. Gen. Laws ch. 106, § 9-102(47).[39] As evident from a review of the documents pertinent to this decision, RCG and Inofin appear to have used the term "instrument" loosely.

---

[38]  Pursuant to Mass Gen. Laws ch. 106, § 2-102,

Unless the context otherwise requires, this Article applies to transactions in goods; it does not apply to any transaction which although in the form of an unconditional contract to sell or present sale is intended to operate only as a security transaction nor does this Article impair or repeal any statute regulating sales to consumers, farmers or other specified classes of buyers.

Id.

[39]  Notably, "general intangible" means any personal property, including things in action, *other than* accounts, *chattel paper*, commercial tort claims, deposit accounts, documents, goods, *instruments*, investment property, letter-of-credit rights, letters of credit, money, and oil, gas,  other minerals before extraction. The term includes payment intangibles and software. Mass Gen. Laws ch. 106, § 9-102 (42).

(ii) Security Interest - Attachment and Perfection

Section 9-203 of the UCC[40] sets forth the method for determining whether a security

interest has attached. *See* 25A Herbert Lemelman, Manual on Uniform Commercial Code,

Mass. Practice Series, § 9:53 (3d ed. 2011). The Massachusetts version of the UCC provides

that, for a security interest to attach, it must be enforceable; attachment is automatic when

the security interest becomes enforceable. Id.

---

[40] Section 9-203 of the Uniform Commercial Code, as enacted in Massachusetts,
provides in relevant part the following:

(a) Attachment. A security interest attaches to collateral when it becomes
enforceable against the debtor with respect to the collateral, unless an
agreement expressly postpones the time of attachment.

(b) Enforceability. Except as otherwise provided in subsections (c) to (i),
inclusive, a security interest is enforceable against the debtor and third
parties with respect to the collateral only if:

(1) value has been given;
(2) the debtor has rights in the collateral or the power to transfer
rights in the collateral to a secured party; and
(3) one of the following conditions is met:

(A) the debtor has authenticated a security
agreement that provides a description of the
collateral  . . .;
(B) the collateral is not a certificated security
and is in the possession of the secured party
under Section 9-313 pursuant to the debtor's
security agreement....

Mass. Gen. Laws ch. 106, 9-203(a) and (b).  Section 9-313 provides that "Except as
otherwise provided in subsection (b), a secured party may perfect a security interest in
negotiable instruments, goods, instruments, money, or tangible chattel paper by taking
possession of the collateral. . . ." Mass. Gen. Laws ch. 106, § 9-313.

Value must be given, the debtor must have rights in the collateral and one of four

alternate conditions must be satisfied before a court can determine whether a security

interest is enforceable.  Two of the conditions are pertinent to the instant case, namely the

existence of an authenticated, or signed, security agreement, *see* Mass. Gen. Laws ch. 106,

§ 9-102(a)(7)[41] and possession of the collateral pursuant to a security agreement.

In In re Levitz Ins. Agency, Inc., this Court considered whether the terms of a

security agreement created an enforceable security interest, observing:

> Under Massachusetts law, the creation of a security interest requires a
> security agreement that describes the collateral. M.G.L. c. 106, § 9–203(1). *A
> security interest attaches only to the property described in the security agreement.*
> In re Nightway Transp. Co., Inc., 96 B.R. 854 (Bankr. N.D. Ill. 1989). There is
> no requirement that the agreement be entitled security agreement to be
> enforceable as long as it evidences an intent to create a security interest. In
> re Sportsland, Inc., 17 U.C.C. Rep. Serv. 1333 (Bankr. D. Mass. 1975). Indeed,
> the security agreement may consist of several documents. Baystate Drywall,
> Inc. v. Chicopee Savings Bank, 385 Mass. 17, 429 N.E.2d 1138 (1982). The
> description is sufficient if it "reasonably identifies what is described." M.G.L.
> c. 106, § 9–110.

152 B.R. at 697 (emphasis supplied).   *See also* Jojo's 10 Restaurant, LLC v. Devin Props.,

LLC  (In re Jojo's 10 Restaurant, LLC), 455 B.R. 321, 325 (Bankr. D. Mass. 2011).

The Massachusetts Supreme Judicial Court in Baystate Drywall, Inc. v. Chicopee

---

[41] "Authenticate" means:

> (A) to sign; or
> (B) to execute or otherwise adopt a symbol, or encrypt or
> similarly process a record in whole or in part, with the
> present intent of the authenticating person to identify the
> person and adopt or accept a record . . . .

Mass. Gen. Laws ch. 106, § 9-102(a)(7).

Savings Bank, 385 Mass. 17 (1982), relying on a number of decisions including In re

Numeric Corp., 485 F.2d 1328, 1331-32 (1st Cir. 1973), has recognized a flexible definition

of the terms "security agreement" and "agreement," observing:  "A debtor need not . . .

sign a document designated 'security agreement' in order to satisfy the code [UCC}

requirement that the debtor sign a security agreement.  A combination of documents may

meet that requirement." 385 Mass. at 22.  *See also* In re Jojo's 10 Restaurant, LLC, 455 B.R.

at 326 (the security agreement may consist of several different documents that 'collectively

establish an intention to grant a security interest' in the collateral identified in the

documents.").  According to the court in Jojo's 10 Restaurant, LLC, "[i]f one such document

lists the collateral to be secured, it must contain some granting language expressing the

debtor's intent to create a security interest."  Id.  (citing  In re Rowe, 369 B.R. 73, 76–77

(Bankr. D. Mass. 2007)).

Generally, to be enforceable, a security interest must be perfected either by filing a

UCC-1 financing statement or by possession, as "[m]ost perfection is not automatic." *See*

NetBank, FSB v. Kipperman (In re Commercial Money Center, Inc.), 350 B.R. 465, 475

(B.A.P. 9th Cir. 2006). *See also* Mass. Gen. Laws ch. 106, § 9-310(b)(6) ("The filing of a

financing statement is not necessary to perfect a security interest: . . . in collateral in the

secured party's possession.").  As noted in 4 James J. White, Robert F. Summers, & Robert

A. Hillman, *Uniform Commercial Code*, § 31-4 (6th ed. 2013),

> Perfection also earns the secured party priority over a subsequent lien
> creditor. The lien creditor par excellence is the trustee in bankruptcy,
> wielding rights under section 544(a) of the Bankruptcy Code. Thus, a secured

> party who perfects prior to bankruptcy usually enjoys a solitary feast, but an
> unperfected secured party will invariably have to eat from the general
> creditors' trough in bankruptcy. Likewise, the date of the perfecting act is
> commonly the date from which priority is measured vis à vis other perfected
> secured creditors. Usually, though not invariably, a creditor who perfects
> takes priority over secured creditors who perfect later, yet is subordinate to
> those who perfected previously.

Id. (footnote omitted).

If value has been given and the debtor has rights in the collateral, a security interest in chattel paper may be enforceable under Mass. Gen. Laws ch. 106 § 9-203(b)(3)(B) ("the collateral is not a certificated security and is in the possession of the secured party under Section 9-313 pursuant to the debtor's security agreement").  Section 9-313(a) provides: "Except as otherwise provided in subsection (b), a secured party may perfect a security interest in negotiable documents, goods, instruments, money, or tangible chattel paper by taking possession of the collateral."  Mass. Gen. Laws ch. 106, § 9-313(a).  According to a leading Massachusetts commentator,

> § 9-313 deals with the availability of the common law pledge as a method of
> perfection. Under former § 9-203, such a pledge as was available under the
> section did not have to be accompanied by an agreement. The language of
> the present provision, § 9-203, however, makes it clear that in order for a
> pledge to attach and be enforceable, it must be pursuant to an agreement. .
> . .  § 9-308(c) provides that if there has been a filing for perfection and
> thereafter perfection by taking possession (a pledge), the perfection is
> deemed to be continuous for the purpose of priority so long as there is no
> intervening period during which the security interest is unperfected. One
> should also be reminded of the common law principle that in the case of a
> pledge, the debtor or the debtors [sic] agent cannot be the one in possession
> of the collateral.

27B Herbert Lemelman, UCC Forms Annotated, Mass. Practice Series, § 9-313  (3d ed.

2013).

> The difference between possessory and non-possessory security interests provides a basis for a flexible approach in finding whether a security agreement exists. It should be noted that such an agreement is required even if possession, or control, is transferred; in that, such event must be pursuant to an agreement. What may not be necessary is an authenticated document.

25A Herbert Lemelman, Manual of Uniform Commercial Code, § 9:54 (3d ed.  2011).

Similarly, "Section 9-203(b)(3)(B) . . . renders the security agreement of a possessing creditor enforceable even though there is no signed writing or other authenticated record. So, possession can fulfill two functions: enforceability (9-203) and perfection (9-313)."  4 James J. White, Robert S. Summers, & Robert A. Hillman, *Uniform Commercial Code* § 31-8 (6th ed. 2013) (footnotes omitted).

> (c) Conclusions of Law: RCG's Security Agreement, Loan Agreement and  Allonges

A fundamental issue in this proceeding is the effect to be afforded the restrictive language in the Security Agreement limiting RCG's security interest to Installment Contracts purchased with its loan proceeds and assigned to it, as well as the language employed in the notes, UCC-1 Financing Statements, and Loan Agreements when considered with the parties' course of performance and testimony as to their intent to create an enforceable security interest in all Installment Contracts beyond the language employed in the Security Agreement.  RCG was afforded the opportunity to submit evidence as to the parties' intentions, and on the issue of whether the Security Agreement was an integrated document.  It also was afforded the opportunity to submit evidence as

to whether a separate security agreement can be determined from the allonges and the parties' course of performance, such that RCG has a perfected security interest by reason of possession of Installment Contracts.

Interpretation of all the loan documents at issue presents close questions of fact and law. In the Security Agreement, RCG expressly and unequivocally limited its security interest in its collateral, including Installment Contracts, to those purchased with proceeds of its loans and assigned to it. In subsequent documents and court filings, it repeatedly referenced the Security Agreement, and the parties also contemplated in the Loan Agreements receipt, "prior to each advance" a schedule from Inofin "confirming that the income stream from the 'Buyer's'. . . principal payment under each Installment Contract . . .[would] . . . fully amortize the principal amount advanced by Lender with respect to that Installment Contract prior to the maturity date of the Note." In addition, during the 15 years within which it did business with Inofin, RCG advanced funds that could not be traced to purchases of specific Installment Contracts, and Inofin regularly assigned Installment Contracts to it via allonges after weekly loan advances. Nevertheless, both Green and Mann testified that they intended RCG to have a security interest in the Installment Contracts so delivered.

The Security Agreement dated April 17, 1996 described types of collateral in which RCG was to have a security interest, including, most significantly, chattel paper purchased by Inofin with proceeds of RCG's loans and assigned and delivered to RCG. The Installment Contracts are chattel paper as that term is defined in Mass. Gen. Laws ch. 106,

87

§ 9-102(11). The Security Agreement contained unambiguous granting language pursuant to which Inofin, then known as First Investors Factoring, Inc., granted a security interest to RCG to secure repayment of the note of the same date.  The Security Agreement, which is a four-page, single spaced document, excluding the signature page, contained numerous provisions affording RCG the right to examine Inofin's books and records, appointing RCG as Inofin's "true and lawful attorney" for six specified purposes, including endorsing checks and notes and receiving and opening mail, providing for events of default and acceleration, and other remedies.  Nevertheless, it did not contain an integration clause, and Wallerstein testified that it was his practice not to include such clauses in agreements he drafted.  Moreover, he testified that he intended the Security Agreement to expand, not limit RCG's rights in collateral.

Based upon the testimony and documentary evidence, as well as the decisions in Coll v. PB Diagnostic Sys., Inc., 50 F.3d 1115, 1122-23 (1st Cir. 1995), Bank v. Int'l Bus. Machs. Corp., 145 F.3d 420, 424 (1st Cir.1998); and RGJ Assocs. v. Stainsafe, Inc., 338 F.Supp.2d 215, 244 n.56 (D. Mass. 2004), the Court finds that the Security Agreement, was not integrated. It was, however, partially, integrated as it contains an expression, though not the complete expression, of some of the terms of the parties' agreement.  As the Trustee correctly notes, there were repeated references to the Security Agreement in  UCC-1 Financing Statements, at the end of the notes, and in the Loan Agreements.  Indeed, in the Loan Agreements, the parties agreed that  no modification or waiver of any provision of the Loan Documents, which included the Security Agreement, would be effective unless

signed in writing by the parties.  Moreover, RCG viewed the Security Agreement as integral to its rights as a secured creditor as it attached or referenced that document in its Verified Complaint filed in state court and in its Motion for Relief from the Automatic Stay. It appears that it was not until RCG realized that its funds could not be traced to the purchase of Installment Contracts that RCG advanced its current interpretation of the Security Agreement and asserted that its security interest in the Installment Contracts arose from the alonges and the parties' course of performance and that security interest could supplement the security interest granted in the Security Agreement.

RCG was in a position to demand that Inofin maintain a segregated account for its loan advances so that it could trace its funds to the purchase of Installment Contracts as set forth in the Security Agreement.  It neither made such a demand nor monitored or audited Inofin's books and records, as was its right under the Security Agreement, to ascertain the use Inofin made of its funds.  It did not do so because, as Wallerstein stated, prior to the commencement of this adversary proceeding, the Security Agreement "did contemplate that Ray [RCG] would be making loans solely to fund the purchase of the installment contracts (which I always understood to be the deal).  Other than the original advance, the assigned contracts should always have been ones purchased with Ray's money."

Wallerstein testified, however, that the Security Agreement was intended to expand the scope of RCG's security interest to include Installment Contracts for which RCG had advanced funds but had not obtained delivery, including titles to vehicles, not just Installment Contracts that were in RCG's possession. Both he and Green readily conceded

89

that RCG obtained Installment Contracts that were not necessarily purchased with funds advanced by RCG.  Indeed, because the parties neither contemplated nor established a segregated account, RCG could not have determined how its funds were used by Inofin, and it would be unable to trace the use of its funds to the purchase of specific Installment Contracts that remained undelivered.

Thus, to obtain a perfected security interest in the Installment Contracts,  RCG was obliged to submit evidence as to the existence of an "agreement" to grant a "security interest" in the Installment Contracts by virtue of the parties' course of performance and the allonges.  In its view, it perfected the security interest so obtained by possession of the Installment Contracts.

The Security Agreement did not refer to any class of collateral that was not to be purchased by Inofin with RCG loan proceeds and thereafter assigned and delivered to RCG.  Because none of the collateral can be traced to RCG's funds, RCG was compelled to rely upon both the Loan Agreements and the allonges, asserting that they contain separate grants of a security interest.  With respect to the Loan Agreements, Wallerstein testified that he intended them to constitute a security agreement.  The Court unequivocally rejects that notion as the language employed in the Loan Agreement is merely descriptive:: "[i]n consideration of, and to evidence and secure the Loan, Borrower has executed and delivered, or will execute and deliver prior to the first weekly advance, the following loan documents . . . ."  There is no granting language such as that employed in the Security Agreement where the parties stated that "[t]he Collateral is pledged, assigned, mortgaged

and transferred , and a security interest therein is granted to . . . [RCG] . . . as security for payment of all sums due. . . ."   Moreover, the Loan Agreement, which Wallerstein characterized as a road map, is not identified as a Security Document.  Security Documents in that document were identified by the parties as the Security Agreement, the UCC-1 Financing Statements, as well as four additional documents which were to be delivered "prior to or simultaneously with each advance," namely  original Installment Contracts, original PPAs, Applications for Title and alonges.   Although those four categories of Security Documents are identified as such, there is no question that at least the first three are not security agreements between Inofin and RCG granting RCG a security interest in collateral.

Because the Security Agreement and the Loan Agreements do not contain a grant of a security interest in Installment Contracts delivered prior to or simultaneously with each advance - - in other words, Installment Contracts not necessarily purchased with the proceeds of RCG's loans - - RCG turns to the alonges, maintaining that each was intended to be a separate grant of a security interest.   Pursuant to each Allonge, Inofin "hereby assign[ed] with full recourse" to RCG two "instruments," namely  a specific Installment Contract and a specific PPA, relying upon the parties' course of performance and asserting that its course of performance with Inofin supplements the unambiguous Security Agreement.   In its view, because the Debtor did not necessarily use RCG advances to purchase Installment Contracts, but nevertheless assigned Installment Contracts to RCG through the Allonge mechanism, the Security Agreement should be expanded by what the

parties actually did.

The question thus becomes whether the "assignment" in an Allonge of an Installment Contract, without written reference to any underlying obligation, constituted a "security agreement."[42]  If each Allonge does not constitute such a security agreement when coupled with the parties' course of performance which can give meaning to the their agreement, then RCG's security interest in the Installment Contracts is defined by the unambiguous and limiting terms of the Security Agreement.  If that were the case, the security interest specified in the Security Agreement failed to attach because the Installment Contracts RCG possessed were not purchased with proceeds of RCG's loans, and possession of Installment Contracts would be insufficient to perfect the security interest granted by the Security Agreement.  In other words, there must be a security interest, provided for in a security agreement, whether authenticated or not, that attached to the Installment Contracts not purchased with RCG's loan proceeds so that RCG could perfect that interest by possession pursuant to Mass. Gen. Laws 106, § 9-203(b)(3)(B) and 9-313(a).

A salient purpose of the allonges, according to Wallerstein, was to enable RCG to obtain titles with its name as lienholder if Inofin defaulted.  Pursuant to Mass. Gen. Laws ch. 90D, § 23, RCG could present the original certificates of title and original allonges to the

---

[42] RCG states that § 9-203(b)(3)(B) provides that "a security interest may be enforceable without a written security agreement provided there is *an* agreement." This is not entirely accurate.  There need not be an authenticated security agreement, but there must be a "security agreement" arising from an agreement.

Registry of Motor Vehicles following which a new certificate of title naming RCG as

lienholder would be issued.[43]

RCG relies upon <u>Dahar v. Ratheon Co. (In re Navigation Tech. Corp.)</u>, 880 F.2d 1491

(1st Cir. 1989), to support its position that the allonges were assignments intended for

security and were effective to grant RCG a security interest in the Installment Contracts.

In that case, the First Circuit construed the following assignment:

> To secure the payment of Bank debt, the Assignor [Navtec] hereby assigns
> and transfers to the Bank all accounts and Contract Rights arising under the
> Contracts [the License Agreement] [and] the proceeds thereof ...; but no
> security interest in goods in favor of the Bank shall arise hereunder in any
> case where such interest would conflict with any title to or lien upon the
> goods in favor of the United States of America. . . .

880 F.2d at 1493.  The court determined:

> The assignment itself indicates that it serves *"To secure the payment of Bank
> debt," and this is generally seen as sufficient to establish a security agreement.*
> White & Summers at 301 ("Even unorthodox documents containing words
> such as . . . 'to secure,' 'security,' [or] assignment language . . . are likely to be
> upheld as adequate security agreements, even when not explicitly labeled as
> such.").

880 F.2d at 1493 (emphasis supplied).  Notably, the language employed in the allonges

contained an absolute assignment and omitted any reference to a specific loan or a security

interest as was the case in <u>Navigation Tech. Corp.</u>, merely referencing "One Dollar ($1.00)

and other valuable consideration."  Nevertheless, Inofin delivered Allonge packages to

RCG following its weekly advance of funds.  Inofin conveyed the Installment Contracts to

---

[43] The allonges, however, do not reference certificates of title to the vehicles, just
the VIN. The certificates of title were, however, part of the Allonge packages.

RCG to be held until the amount set forth in the PPA was paid in full.

With respect to its course of performance argument, RCG maintains that the present

case is "on all fours" with Gen. Elec. Capital Commercial Auto. Fin. v. Spartan Motors, 246

A.D.2d 41, 675 N.Y.S.2d 626 (1998). In that case, the court stated:

> It is well established that the terms of a written security agreement may be
> amplified by "other circumstances including course of dealing or usage of
> trade or course of performance" (UCC 1-201 [3]; *see also*, UCC 1-205, 2-208;
> New W. Fruit Corp. v Coastal Berry Corp., *supra*). Here, GECC does not deny
> that, although the written terms of GMAC's contract with Spartan appeared
> to contemplate a single method of inventory financing (i.e., GMAC's
> payment to Spartan's sellers in advance of the purchase transaction), in fact
> it was not at all unusual for the parties to pursue the same end by somewhat
> different means (i.e., GMAC's posttransaction reimbursement to Spartan for
> its inventory purchases), as GMAC employee Canterino repeatedly
> explained.

> Generally, the express terms of an agreement and a differing course of
> performance, course of dealing, and/or usage of trade "shall be construed
> whenever reasonable as consistent with each other" (UCC 1-205 [4]; 2-208
> [2]). Only when a consistent construction would be "unreasonable" must
> express terms control over course of performance, and course of performance
> prevail over course of dealing and usage of trade. GMAC's election on some
> occasions to fund Spartan's floor planning by reimbursing the car dealership
> for its purchases can hardly be considered inconsistent with its decision on
> other occasions to accomplish the same goal by following the strict wording
> of the contract and prepaying the supplier directly. Rather, it is only
> reasonable to consider these two methods of financing to be entirely
> compatible with one another.

> In any event, it is well established that a written contract may be modified by
> the parties' postagreement "course of performance" (UCC 2-208 [1], [3]; *see,
> e.g.*, Farmers State Bank v Farmland Foods, 225 Neb 1, 402 NW2d 277; *see also*,
> Rose v Spa Realty Assocs., 42 NY2d 338, 343-344; Maynard Ct. Owners Corp.
> v Rentoulis, 235 AD2d 867; Indemnity Ins. Co. v Levine, 168 AD2d 323, 326;
> Recon Car Corp. v Chrysler Corp., 130 AD2d 725, 729).

Spartan Motors, 246 A.D.2d at  51-52. Although RCG asserts Spartan Motors is dispositive

of this issue before the Court, the specific issue addressed in that case was different than the one posed in this case which does not involve a purchase money security agreement. According to the New York court, the issue was "whether GMAC's payment as reimbursement to Spartan after it had acquired the two Mercedes-Benz vehicles on two different occasions qualifies as an "advance" or "obligation" that enabled Spartan to purchase the cars, such that GMAC acquired a purchase-money security interest in the vehicles." Id. at 46. The court, in construing UCC § 9-107(b), recognized that courts have been reluctant to decide that a purchase-money security interest has been created where title to, and possession of, the merchandise have passed to the debtor before the loan was advanced and also "where the literal wording of the agreement between GMAC and Spartan appears to accord GMAC purchase-money secured status only when the finance company paid Spartan's 'manufacturer, distributor or other seller' *directly*." Id. (emphasis in original). Despite the distinguishing elements in Spartan Motors, RCG is correct that the court considered the parties' course of performance as dispositve in reaching its holding and afforded relief to GMAC depsite the literal wording of the parties' agreement.

Interpretation of the Security Agreement and allonges turns on whether the parties' course of performance, in conjunction with the allonges, evidence an "agreement" within the meaning of the UCC that created a security agreement such that the Installment Contracts that were assigned to RCG were perfected by possession. The Court concludes that RCG's position is correct, and that the parties supplemented the Security Agreement by an agreement evidenced by their course of performance over a period of 15 year which

95

included the use of the alloonges.  In other words, the Court concludes that the express

terms of the Security Agreement can be construed as consistent, and reasonably so, with

their course of performance.  *See* Mass. Gen. Laws ch. 106, § 2-208(repealed); *see also* Mass.

Gen. Laws ch. 106, § 1-303 (effective July 1, 2013).

Massachusetts contract law supports the Court's determination.  In Schinkel v. Max-

Holdings, Inc., 30 Mass. App. Ct. 41, 565 N.E.2d 1219 (1991), the court stated:

> It is open to parties to modify a written agreement by a later agreement not
> in writing. *See* Zlotnick v. McNamara, 301 Mass. 224, 225–226, 16 N.E.2d 632
> (1938). The later agreement may be proved through the conduct of the
> parties. *See* Flynn v. Wallace, 359 Mass. 711, 715, 270 N.E.2d 919 (1971);
> Church of God in Christ, Inc. v. Congregation Kehillath Jacob, 370 Mass. 828,
> 832–834, 353 N.E.2d 669 (1976); First Pa. Mort. Trust v. Dorchester Sav. Bank,
> 395 Mass. 614, 625, 481 N.E.2d 1132 (1985). On parallel reasoning, where the
> parties' conduct after signing the written agreement conforms with a
> previous oral modification, rather than with the terms of the written
> agreement, it may reasonably be inferred that the parties have agreed after
> the signing to be bound by the oral modification of the written contract,
> ratifying it, in effect, by their conduct.

30 Mass. App. Ct. at 47, 565 N.E.2d at 1223.

While the parties agreed that the Security Agreement and Loan Agreements could

not be modified except in writing, neither Inofin nor RCG sought to enforce the provisions

during their business relationship. Moreover, the Court permitted testimony as to the

parties' intentions and whether the Security Agreement was integrated, the Court

concludes that the parol evidence rule is not violated.  Finding partial integration, the

Court has relied upon the parties' course of performance, general testimony as to their

intention, but not testimony as to what the Loan Documents, as defined in the Loan

Agreements, were intended to do, to determine the parties' agreement to afford RCG a security interest in the Installment Contracts assigned to RCG in addition to the Security Agreement executed in 1996. Thus, notwithstanding the unambiguous terms of the Security Agreement, the parties through their course of performance, expanded the security interest granted in the Security Agreement through the transfer of Installment Contracts to RCG via allonges which RCG perfected by possession. This enlargement occurred almost immediately and was a consistent feature throughout the parties' fifteen-year relationship. Although RCG introduced significant evidence as to the parties' intent, the Court considers what the parties did, rather than what the witnesses said at trial, for purposes of determining the scope of the parties' agreement.

As noted above, a partially integrated document can be supplemented with evidence of consistent additional terms. The allonges contain the language of assignment; they contain no additional terms that would contradict, irreconcilably modify, or vary the terms of the Security Agreement. Thus, the intention of the parties is crucial to determine whether execution of the allonges created a security interest. Determination of such intent is a question of fact and not a matter of law, or in some instances a mixed question of fact and law. Front Row Seating, Inc. v. New England Concerts, Ltd., 33 Mass. App. Ct. 945, 602 N.E.2d 1103, 1105 (Mass. App. Ct. 1992). In this regard, the Court is mindful that UCC § 9-102 unequivocally directs that the provisions of Article 9 should be "liberally construed" "to permit the continued expansion of commercial practices through custom, usage and *agreement of the parties*." *See* Mass. Gen. Laws ch. 106, § 1-102 (emphasis

supplied).

The Trustee's interpretation of the allonges as the methods for implementing the

Security Agreement's requirement that chattel paper be both purchased with the proceeds

of RCG's loans and assigned to RCG is inconsistent with the parties' course of performance

utilizing the allonges to convey Installment Contracts and motor vehicle titles.  RCG's

position with respect to the allonges, though seemingly recently developed, is consistent

with the common law of pledge[44] and also would effectuate the drafter's intention that the

UCC be liberally construed. *See* Mass. Gen. Laws ch. 106, § 1-102.

In view of the definition of an "agreement," set forth in Mass. Gen. Laws ch. 106,

§ 1-201(3), with its reference to course of performance, this Court is justified in considering

course of performance, especially in view of the provisions of § 1-303 which are now in

effect owing to the repeal of § 2-208.[45]  In this regard, UCC § 1-303, cmt. 1 provides:

---

[44] In transmitting security documents to Jeffery neither RCG nor Wallerstein provided him with a copy of an Allonge or informed him that the allonges together with possession of Installment Contracts were the means by which RCG *obtained* and perfected its security interest in Installment Contracts.  Indeed, Wallerstein, apparently overlooking the common law of pledge, indicated to Joan Green in a memorandum dated January 4, 2011, that Jeffery was "now set" for purposes of his representation as he had in his possession the Security Agreement and "the Loan Agreement that incorporates it."  Moreover, Wallerstein consistently emphasized the importance of making sure the UCC-1 Financing Statement did not lapse.  Jeffery shared that sentiment, stating in a memorandum dated February 21, 2011, "we don't want to be in a position where the foreclosure sale is overturned and the UCC-1 has lapsed, making Ray an unsecured creditor."

[45] As noted above, § 2-208, in pertinent part provides:  "[a] course of performance . . . is relevant in ascertaining the meaning of the parties' agreement, may give particular meaning to specific terms of security agreements and may supplement or qualify the terms of the agreement."

> The Uniform Commercial Code rejects both the "lay-dictionary" and the "conveyancer's" reading of a commercial agreement. Instead the meaning of the agreement of the parties is to be determined by the language used by them *and by their action*, read and interpreted in the light of commercial practices and other surrounding circumstances. The measure and background for interpretation are set by the commercial context, which may explain and supplement even the language of a formal or final writing.

Id. (emphasis supplied).

Moreover, in addition to Shinkel v. Maxi-Holdings, Inc., 30 Mass. App. Ct. 41, 565 N.E.2d 1219 (1991), case law supports reference to course of performance.  In Westinghouse Credit Corp. v. Shelton, 645 F.2d 869 (10th Cir. 1981), the Tenth Circuit rejected the district court's conclusion that UCC § 2-208 governs only sales and could not apply to a secured transaction governed by Article 9.  It stated:

> The district court's second conclusion that section 2-208 on course of performance applies only to Article Two sales and not to Article Nine secured transactions is also incorrect as a matter of statutory construction. The Uniform Commercial Code is written so that definitions appearing in any particular Article usually apply only to transactions governed by that Article. . . . [An] Article Nine "security agreement" is first an Article One "agreement," which "means the bargain of the parties in fact as found in their language or by implication from other circumstances including course of dealing or usage of trade or course of performance as provided in this Act (Sections 1-205 and 2-208)." Id. s 1-201(3).

Shelton, 645 F.2d at 872 n.3 (emphasis supplied). *See also* Gen. Elec. Capital Commercial Auto. Fin., Inc. v. Spartan Motors, 246 A.D.2d 41, 52, 675 N.Y.2d 626 (1998) ("it is well established that a written contract may be modified by the parties' postagreement "course of performance" (UCC 2-208 [1], [3].").

The allonges, when coupled with the parties' course of performance using them,

embodied an agreement to create a security interest, albeit one that was not authenticated in the same manner as the Security Agreement.  As the court in <u>Front Row Seating, Inc.</u>, recognized,

> The [C]ode does not require the use of any magic words in order to create a security interest. It is usual to state in a security agreement that the debtor 'grants' a security interest in described collateral to the secured party . . . but the mere fact that granting clauses are traditional does not mean that they are immutable. The Code requires no such terminology. . . ." Henson, Handbook of Secured Transactions Under the Uniform Commercial Code 25 (1973).

33 Mass. App. Ct. at 1105.  Moreover,

> Section 9-313(a) authorizes perfection by possession of negotiable documents, goods, instruments, money, or tangible chattel paper and by delivery of a certificated security.  Section 9-203(b)(3)(B) also renders the security agreement of a possessing creditor enforceable even though there is no signed writing or other authenticated record. So, possession can fulfill two functions: enforceability (9-203) *and* perfection (9-313).

4 James J. White, Robert S. Summers & Robert A. Hillman, *Uniform Commercial Code*, § 31-8 (6th ed. 2013)(internal quotations omitted, footnotes omitted, emphasis in original).

Weighing all of the evidence presented by both parties, considering the applicable provisions of contract law and the UCC, including the definition of an "agreement" and UCC § 9-102, and attempting to construe express terms of the parties' agreements and their course of performance in a consistent and reasonable manner, the Court concludes that the assignment language in the allonges, together with the parties' course of performance, was sufficient to create an agreement to create a security interest in favor of RCG in the Installment Contracts assigned and delivered to it, in addition to serving as the means by which RCG could obtain titles to vehicles identified in Installment Contracts.  The Court

100

views the allonges, as did Green in his Commitment Letter to Cuomo ("All original titles

must be delivered to Lender with an allonge assigning said titles to Lender"), namely the

method by which RCG could be named lienholder on the certificate of title pursuant to

Mass. Gen. Laws ch. 90D, § 23(b).[46] This interpretation is consistent with the parties' actual

course of performance, and is consistent with the testimony as to the parties' intent.  Green

and Mann indicated that the parties had agreed that RCG would obtain a security interest

in the Installment Contracts assigned and delivered to its possession pursuant to the

allonges.  Their course of performance and practice of using the allonges as the method of

transferring the Installment Contracts and other documents supplemented the Security

Agreement executed in 1996.   This conclusion, however, is subject to consideration,

discussed below, of whether RCG was required to possess original PPAs to perfect its

security interest in the Installment Contracts.

---

[46] Section 23(b) provides:

It is not necessary for the assignee to have the certificate of title endorsed
or issued with the assignee named as lienholder in order to continue the
perfected status of the security interest against creditors of and transferees
from the owner. The assignee may, however, have the certificate of title
endorsed or issued with the assignee named as lienholder, upon
delivering to the registrar the certificate and an assignment by the
lienholder named in the certificate in the form the registrar prescribes.

Mass. Gen. Laws ch. 90D, § 23(b) .

C. <u>The Effect of the Loan Modification Agreement</u>

1. Arguments of the Parties

(a) The Trustee's Arguments

The Trustee maintains that the LMA did not broaden RCG's security interest in the Installment Contracts assigned and delivered to RCG, arguing that it just increased and established a minimum level of collateral Inofin was required to deliver going forward pursuant to the Security Agreement and 2008 and 2009 Loan Agreements. In his view, it simply discharged RCG's obligation to make advances while improving its collateral position. The Trustee highlights the language that the Installment Contracts were to be assigned and delivered pursuant to Section 2(e) of the Loan Agreements and the parties to the LMA ratified, confirmed and approved in their entirety the documents executed in connection with the 2008 and 2009 loans which were to secure the notes as amended.

The Trustee further argues that even if this Court were to determine that the LMA satisfies the requirements under Mass. Gen. Laws ch. 106, § 9-203(b) for the granting of a security interest, it should only be construed as granting a security interest to RCG in Installment Contracts delivered to RCG "on or after the date" of the LMA, as set forth in paragraph 4 because the ratification clause in paragraph 9 cannot be interpreted to retroactively eliminate the "purchased with the proceeds" requirement contained in the Security Agreement and the notes with respect to the Installment Contracts delivered between 2008 and September 30, 2010. He adds that, if the Court were to find that the LMA provided RCG with a security interest in Installment Contracts delivered to RCG on or

after October 1, 2010, those Installment Contracts that were delivered to RCG during the period beginning November 11, 2010 through December 24, 2010 are avoidable by the Trustee as preferential transfers under 11 U.S.C. § 547(b), and, therefore, any such security interest granted to RCG under the LMA would only attach to Installment Contracts delivered from October 1, 2010 through November 10, 2010.  Alternatively, he asserts that if the Court were to conclude that the LMA gave RCG a security interest in Installment Contracts delivered on or after October 1, 2010, RCG still failed to perfect that security interest by failing to obtain possession of the original PPAs.  Finally, the Trustee contends that value was not given because the true consideration given by RCG was forbearance from foreclosing a security interest which it did not have.

The Trustee also asserts that, although the  language in the LMA, "all secured by a security interest, pledge and assignment of Installment Contracts, the 2008 and 2009 notes tie the amount of principal and interest payments to the sum of the amount advanced "for the purchase of each outstanding 'Installment Contracts' collaterally assigned to the holder pursuant to Section 2 of the Loan Agreement [sic]," and the Loan Agreements are subject to the terms of the notes.  Therefore, in his view, "'Installment Contracts as defined in the Loan Agreements' requires [sic] that they be both purchased with RCG's proceeds and collaterally assigned to RCG." The Trustee emphasizes that the LMA did not modify the term "Installment Contract" or the terms of the Security Agreement and the parties ratified the Security Agreement.

(b) RCG's Arguments

With respect to the LMA, RCG contends that in July of 2010 it was holding approximately $10 million "in unpaid principal balance of consumer notes," i.e., the amount consumers owed pursuant to the Installment Contracts to secure approximately $8 million in debt. Because both RCG and Inofin believed the Installment Contracts were RCG's collateral, Green testified that he offered relief to Inofin in the form of a reduced interest rate and forbearance from collecting principal. Referencing paragraph 9 of the LMA, pursuant to which the parties "[e]xcept as specifically modified herein," "ratified, confirmed and approved in their entirety" all the loan documents[47] executed in conjunction with the 2008 and 2009 notes which were to secure those notes as amended, RCG cites Wallerstein's testimony that paragraph 9 was to be a "looking backward" provision with respect to collateral that had been given to RCG at the time of the LMA. RCG references testimony as to the parties' understanding of the document, including Green's testimony that he would not have "done the deal" unless it was confirmed that the Installment Contracts were his collateral and that they secured his loans. In addition, RCG points to Mann's testimony that the concessions made by RCG provided value to Inofin. It also argues that the integration clause in the LMA answered "the question as to what the parties had been doing on a weekly basis for 15 years and meant the language in the LMA superseded any other prior document that would limit RCG's collateral.

---

[47] Loan Documents were defined in the Loan Agreements dated May 2, 2008 and August 21, 2009.

RCG also contends the LMA, which is integrated, independently satisfies all of the legal requirements to establish its security interest without reliance on course of performance as it meets all the requirements of Mass. Gen. Laws ch. 106, § 9-203(b), including authentication and value in the form of financial concessions and forbearance. In addition, it maintains that the LMA contains "express granting language" referring to the first "Wherefore" clause which provides that RCG and Inofin "are parties to a loan facility . . . [consisting of the 2008 and 2009 Notes and Loan Agreements]. . .which are all secured by a security interest, pledge and assignment of Installment Contracts (as defined in the Loan Agreements)." It also references Paragraph 9 arguing that it expressly confirms and ratifies the parties' belief that "all of the Loan Documents executed in connection with the Loan Facility . . . shall secure the Notes as amended." Thus, RCG maintains that the LMA does not contain any requirement that the contracts be purchased from proceeds of RCG loans (nor would it because RCG ceased advancing funds).

RCG argues that, even if the Security Agreement is given a narrow interpretation, the LMA expanded the scope of the security interest because the parties modified their prior agreement through their subsequent integrated writing ("This Agreement represents the entire agreement of the parties . . . and supercedes all prior discussions, and may not be modified or amended except by a writing executed by both parties."). Specifically, it points to that language in which the parties stated that the May 2, 2008 note and the August 21, 2009 note and the related Loan Agreements, defined as the "Loan Facility" are "all secured by a security interest, *pledge and assignment* of Installment Contracts" (emphasis

105

supplied);  that Inofin "[a]s security for the Loan Facility . . . shall assign and deliver to Lender, pursuant to Section 2(e) of the Loan Agreement, Installment Contracts having an outstanding balance of equal to the greater of (i) $10,000,000.00 or (ii) 125% of the outstanding principal balance due to Lender under the Loan Facility (both Notes);" and that "all the loan documents executed in connection with the Loan Facility are hereby ratified, confirmed and approved in their entirety and shall secure the Notes as amended."

2.  Analysis

Because the LMA is an integrated document, the parol evidence rule prevents the admission of evidence of prior or contemporaneous agreements to supplement or contradict its terms.  Coll v. PB Diagnostic Sys., Inc., 50 F.3d at 1122.  The LMA is not ambiguous, and its interpretation rests solely with the Court. The Court notes, however, that testimony was introduced that the LMA had prospective and retroactive components.

Based upon the language employed by the parties in the LMA, and the provisions of Mass. Gen. Laws ch. 106, § 9-203(b), the Court concludes that the LMA gave RCG a perfected security interest in the entire portfolio of Installment Contracts.  The language employed in the LMA amended the Security Agreement and expressly deleted the requirement that Installment Contracts be purchased by Inofin with proceeds of loans from RCG.  The Court also rejects the Trustee's argument that value was not given for the right to foreclose an unperfected security interest.[48]

---

[48] Although the Court had been persuaded by the Trustee's argument during the lift stay proceeding on this issue, in light of further evidence and authorities, the Court now concludes that value was given.

As noted in 4 James J. White, Robert S. Summers & Robert A. Hillman, *Uniform Commercial Code*, § 31-3 (6th ed. 2013), "lending money to a debtor is giving value to that debtor; and a pre-existing obligation is value enough to support a later security interest. Consideration in the form of a promise, forbearance, or forgiveness of debt is value." (footnotes omitted).  Accordingly, the Court concludes that RCG gave substantial value to the Debtor in exchange for the LMA, namely, a reduced interest rate and forbearance from collection after default.

D.   The Effect of RCG's Failure to Possess the Original PPAs

1. Issue Presented

This Court has determined that RCG's possession of the Installment Contracts, coupled with the parties' course of performance and the allonges, created a security interest and thus supplemented the Security Agreement and that, in addition, the LMA rectified any limitation set forth in that Security Agreement.  RCG's security interest in the Installment Contracts established by possession, however, would not be perfected if RCG were required to hold original PPAs, as well as original Installment Contracts.  In other words, if the PPAs are part of the chattel paper, then RCG was required, as stated in the Loan Agreements, to have possession of the *original* PPAs to perfect its security interest in Installment Contracts.

2. Arguments of the Parties

(a) The Trustee's Arguments

The Trustee maintains that possession by RCG of the original PPAs was required

based on the Trustee's view that they were the documents by which RCG acquired title to

payment streams under the Installment Contracts.  Accordingly, the Trustee asserts that

because RCG only had copies of the PPAs, the Installment Contracts were not perfected,

and, therefore, RCG had no rights to the Installment Contracts.  The Trustee argues that the

PPAs are the "operative document[s]" with respect to the Dealers' rights under the

Installment Contracts and relies on the language at the end of each Installment Contract.[49]

He also points to the Loan Agreements which provided that "Lender agrees that if and to

the extent that there is a difference between the Borrower's rights under any 'Partial

Purchase and Assignment' and any 'Recourse Assignment' [the Allonge], the former shall

control."

> The Trustee argues the following:
>
> In order to perfect its security interest in chattel paper by possession, a creditor must have possession of the original chattel paper described in its security agreement. See In re Equitable Financial Management, Inc., 164 B.R. 53, 56 (Bankr. W.D. Pa. 1994). "A secured party fails to perfect by possession its security interest in [chattel paper] when it fails to exercise dominion and control over all chattel paper pertaining thereto." Id.; see also In re Funding Systems Asset Management Corp., 111 B.R. 500 (Bankr. W.D. Pa. 1990).

Because the PPAs are integral to the purchase of the Installment Contracts by Inofin from

Dealers, as Inofin was not purchasing the entire payment stream due under the Installment

---

[49]  The language is as follows:

. . . Dealer hereby transfers and assigns to Inofin . . . all of its rights, title and interest in the contract and the collateral.  This transfer and assignment is made pursuant to and is subject to an Agreement between the Dealer and the Assignee by which the Assignee has agreed to accept the transfer and assignment of contracts from Dealer . . . .

Contracts and because the assignment language contained at the conclusion of the

Installment Contracts does not constitute an absolute assignment, the Trustee contends

that, in the absence of possession of original PPAs, RCG could not perfect a security

interest in the Installment Contracts by possession.  The Trustee adds that RCG's failure

to require Inofin to assign and deliver the original PPAs (despite the requirement to do so

in the Loan Agreements) is "further evidence that RCG was not primarily relying on

'possession' to perfect its security interest."

(b)  RCG's Arguments

RCG asserts that it did not need the original PPAs because the PPAs are not chattel

paper, and that the PPAs did not limit the absolute nature of the Dealer's assignment of its

lien in the vehicle to Inofin.  According to RCG, the PPAs provided Inofin with no rights

and only provided the Dealers with the right to compel the re-assignment of Installment

Contracts after Inofin had collected the agreed upon "Amount Purchased." It diminishes

the importance of the PPAs as "merely a side deal between the Dealer and Inofin," which

did not affect RCG's right to pursue and obtain the payments due from consumers under

the Installment Contracts or repossess vehicles in the event of default.  RCG did not

attempt to distinguish the cases cited by the Trustee with respect to the absence of original

PPAs.

3.  Applicable Law and Analysis

Although the Loan Agreements provided that RCG was to receive original PPAs,

RCG received only copies of the original documents.  An issue arises as to whether the

PPAs were part of the "record or records that evidence both a monetary obligation and a security interest in specific goods . . . " namely, chattel paper or the Installment Contracts. Certainly, the PPAs circumscribed Inofin's rights after payment of the "Amount Purchased" or net sum set forth in the PPAs. Moreover, the Dealers were provided with important rights under the PPAs. For example, the Dealers' assignment of the Installment Contracts terminated when Inofin received the Amount Purchased required under the Agreement, together with all other additional expenses for which Inofin might have been entitled. Upon such termination, Inofin, and thus RCG, as its assignee, was required to reassign to the Dealer all Inofin's remaining right, title and interest in particular Installment Contracts (and execute any necessary documents and instruments to effect the reassignment and termination of Inofin's interest as a matter of record). In addition, the Dealers could terminate the assignment at any time by paying Inofin the amount due together with all other additional expenses for which it was entitled to be reimbursed; Inofin also could terminate the assignment and any residual interest that the Dealers may have had in the Installment Contracts at any time sixty days after a default had occurred.

The Court concludes that the PPAs were "instruments" as that term is defined in Mass. Gen. Laws ch. 106, § 9-102(47). An instrument is a writing 1) that evidences a right to payment of a monetary obligation; 2) that is not a security agreement or lease; and 3) that in the ordinary course of business is transferred by delivery with any necessary endorsement or assignment. The PPAs evidence a monetary obligation. The PPA introduced as an exhibit contains the language "The right to receive the net sum of

110

$14,016.00 is due the Buyer in accordance with such obligation . . . ." The PPAs are not security agreements, and they could be, and were, transferred by delivery as evidenced by the provisions of the Loan Agreements.

RCG's statement that the PPAs provided Inofin with no rights, is inaccurate, as Inofin had rights against the Dealers pursuant to the PPAs, as evidenced by the PPA submitted as an exhibit, as Inofin bought, for example, the right to receive $14,016.00 from the Dealer with respect to the Installment Contract, which were assigned to RCG. The assignment set forth in the Installment Contract from the Dealer to Inofin was made subject to an "Agreement" between the Dealer and Inofin as assignee. Whether that is a reference to the Seller Agreement or the PPA, it is clear that Inofin had rights against the Dealer and vice-versa.

Although RCG and Inofin intended RCG to obtain a security interest in Installment Contracts pursuant to the allonges, RCG's ostensible perfection by possession is unavailing if the Loan Agreements required it to obtain original PPAs as part of its security interest in chattel paper, namely the Installment Contracts. Because Inofin was contractually obligated to the Dealers for backend payments pursuant to the PPAs, it could not convey unfettered rights to the stream of payments owed by consumers under the Installment Contracts. Although RCG diminishes the significance of the PPAs, its rights in the Installment Contracts were circumscribed by them. Its rights terminated when the "Amount Purchased" set forth in the PPA was paid in full or when a Dealer paid Inofin the amount due. Indeed, on the Worksheet that was made part of the Allonge submitted as

an exhibit, the $1,927.20 backend payment to the Dealer was set forth and that Worksheet

number was set forth on the PPA.  In addition, the Inofin Allonge Closing Reports from

July 2, 2010 through November 5, 2010 referred to "Inofin Partial Purchase Price," not the

"Principal Balance," which appeared on later reports.  Accordingly, the Court must

consider the effect of RCG's failure to obtain the original PPAs.

Two decisions from the United States Bankruptcy Court for the Western District of

Pennsylvania provide guidance on the issue of what constitutes chattel paper.  In Glosser

v. Colonial Pacific Leasing Co. (In re Equitable Fin. Mgmt., Inc.), 164 B.R. 53 (Bankr. W.D.

Pa. 1994), the Chapter 7 trustee sought, pursuant to 11 U.S.C. § 544(a)(1), to avoid the

security interest of defendant Colonial Pacific Leasing Company ("CPL") in two equipment

leases. According to the Chapter 7 trustee, CPL's security interest could be avoided

pursuant to the holding in Funding Sys. Asset Mgmt. Corp. v. Chem. Bus. Credit Corp. (In

re Funding Sys. Asset Mgmt. Corp.), 111 B.R. 500 (Bankr. W.D. Pa.  1990), because the

debtor possessed "duplicate originals" of the chattel paper evidencing CPL's security

interest.  CPL contended the trustee could not avoid its security interest because the

documents the debtor possessed did not constitute "duplicate originals" of the chattel

paper in its possession and that all chattel paper pertaining to the leases in question

remained in its exclusive possession at all relevant times.  Equitable Fin. Mgmt., Inc., 164

B.R. at 54.  The court framed the issue as whether or not the defendant's security interest

was fully perfected as of the date of the filing of the petition by virtue of its possession of

the chattel paper which the debtor had delivered to it.  The bankruptcy court observed:

112

> A secured party fails to perfect by possession its security
> interest in a lease when it fails to exercise absolute dominion
> and control over all chattel paper pertaining thereto. *See* In re
> Funding Sys. Asset Mgmt. Corp., 111 B.R. at 518. Accordingly,
> CPL's security interest in the above leases is unperfected by
> possession only if an entity other than CPL had control and
> possession of chattel paper pertaining thereto.

In re Equitable Fin. Mgmt., Inc., 164 B.R. at 56.  The court found the trustee's contention

without merit because "[t]he lease agreements debtor possessed were merely preliminary

versions and were not completed documents having any legal effect. Id. at 57.

In In re Funding Sys. Asset Mgmt. Corp., however, the same court reached a

different conclusion.   In that case, two affiliated debtors, referred to by the court

collectively as FS, sought to, among other things, avoid security interests under 11 U.S.C.§

544(a)(1) in twelve computer leases granted to Chemical Business Credit Corporation and

others, referred to collectively as Chemical.  FS had been engaged in leveraged leasing of

computer equipment to various end-users, obtaining secured loans to finance the purchase

of the equipment to be leased.  For each transaction, FS and the end-user would execute a

master lease, which would set forth the general terms and conditions of the lease.   The

master lease did not provide specifics such as a description of the equipment to be leased,

the amount of rental payments, and the payment schedule. These specifics were set forth

in a separate "equipment schedule," which incorporated the provisions of the master lease

by reference. Over time, numerous equipment schedules would be executed between FS

and an end-user under the umbrella of a single master lease. Id. at 503.

In order to finance the purchase of computer equipment, FS obtained a loan from

113

a subsidiary of Chemical Bank. The loan was documented by a note, a security agreement covering the leases and underlying equipment, a separate acknowledgment of assignment of the leases, executed by FS and the end-user. The acknowledgment allowed the rental payments to be made directly to Chemical.  The end result was that Chemical had a security interest in both the leases (including their rental streams) and the underlying computer equipment. Id.

For each end-user, three master leases were issued in original form (i.e., bearing original ink signatures). In addition, three equipment schedules were executed as duplicate originals. In the usual case, one set of completed originals would be left with the end-user, one set would be left with FS, and one set would go to Chemical. Id. at 504. Chemical required receipt of an original master lease, when one was available, but original master leases were not always available because frequently numerous equipment schedules, all of which made reference to the same master lease, would be executed and the original master had already been transmitted to some other lending institution which had financed one (or more) of the prior equipment schedules. In that case, Chemical received (and accepted) a photocopy of the underlying master lease. Id. at 504-505.  FS challenged Chemical's security interest in the computer leases as unperfected because of its failure to retain possession of all duplicate originals of the lease documentation. The bankruptcy court agreed and avoided a security interest worth more than $5 million. Chemical argued that its possession of an original equipment schedule for each challenged lease was chattel paper, regardless of the number of other originals that may have been executed, and was

114

sufficient to satisfy the possession requirement of Article 9. Id. at 515.  The court, however,

rejected this argument, defining the chattel paper broadly. It stated:

> Each of the challenged transactions in this case is evidenced by a group of writings, which together constitute the chattel paper. Specifically, the chattel paper includes the equipment schedules, the master leases, and the assignment, assumption and indemnity agreements (where they exist).
>
> Both the master leases and the equipment schedules constitute chattel paper. Only the equipment schedule specifies the equipment to be leased, the amount of the monthly rental payments, and the terms of the lease. The master lease contains none of these provisions but, instead, sets forth general terms and conditions concerning such matters as the use of the equipment, maintenance and repairs, inspection, warranties, risk of loss, etc. The equipment schedule, however, does not contain these terms and provisions. Rather, it incorporates by reference those general provisions of the master lease as though they were fully set forth in the equipment schedule. The master lease and the equipment schedule, when taken together, evidence a monetary obligation and a lease of specific goods.
>
> In addition, the assignment, assumption and indemnity agreements in  . . . [certain leases] . . . also qualify as chattel paper in this case.

Id. at 515-16. The court concluded:

> All of the assignment, assumption and indemnity agreements are basically the same. Assignor assigned to Debtor all of its rights and Debtor assumed all of the obligations arising out of the particular user lease. These agreements qualify as instruments and hence also are included among the chattel paper in this case. They evidence a right to payment of money in that the assignor assigned to Debtor the right to receive rental payments from the use-lessee pursuant to the terms of the equipment schedule. In addition, these agreements are the type of writing which normally would be transferred by assignment.

Id. at 516.

The Funding Sys, Asset Mgmt. Corp. case is compelling, but the Court is hampered

by the lack of evidence as to the significance of the PPAs.  The Trustee submitted no

evidence to establish that the PPA was, in fact the "operative document" as he contends,

although Shilson testified that it was an important document in the "buy/here sell here"

market.[50]  In other words, the Court cannot answer the question of whether Inofin could

have procured funds by providing original PPAs as security for loans coupled with copies

of Installment Contracts - - the converse of what it did with RCG.  It is unclear whether

Inofin could in Wallerstein's words, "double hawk" the Installment Contracts by offering

original PPAs and copies of Installment Contracts to other lenders in exchange for loans.

The Trustee introduced no evidence that a lender in the business of financing Inofin's

acquisition of Installment Contracts would lend money to Inofin without an original

Installment Contract and titles with Inofin's name appearing as lienholder, if it were

offered only a PPA and a copy of an Installment Contract and a certificate of title.  In

addition, the Trustee offered no detailed analysis with analogies of how the Funding

Systems Asset Management Corp. case and the documents considered by the court should

be applied to the documents used by Inofin and RCG.

Neither the Trustee nor RCG submitted evidence relative to how other creditors

secured their interests in Installment Contracts purchased by Inofin.  In the instant case,

RCG maintains that possession of the Installment Contracts was sufficient and a copy of

the PPA sufficed.  Thus, the Court lacks evidence to determine the importance of the PPAs

in the sub-prime automobile financing industry.  The Trustee did not sustain his burden

---

[50] He was not asked to elaborate on that testimony, and the Trustee's counsel
conducted no cross-examination on that point.

of showing that the PPAs were chattel paper which RCG was required to possess to have a perfected security interest. The Trustee failed to submit sufficient evidence for this Court to conclude that the absence of original PPAs would have the effect of defeating RCG's security interest in the Installment Contracts. Although RCG may not have had "control" over the PPAs, the lack of such control appears not to have conferred on Inofin an ability to "double hawk" Installment Contracts. The only evidence that exists was Shilson's testimony that the PPAs were "important" documents. That description is different from an essential one. Without expert testimony as to how the business of purchasing and servicing sub-prime loans is documented, the Court must conclude that the Trustee failed in his burden of establishing that the PPA was, as he asserts, the "operative document."

E. The Foreclosure Sales

1. Arguments of the Parties

(a) The Trustee's Arguments

(i) The Foreclosure Sales Are Void

The Trustee argues that because RCG did not have a valid and enforceable security interest in its portfolio of Installment Contracts, it did not have a security interest to foreclose and its purported foreclosure sales were nullities. He adds that even if this Court were to conclude that RCG had a valid and enforceable security interest in the RCG portfolio, the foreclosure sales are void because they were conducted in a commercially unreasonable manner and in bad faith.

The Trustee relies upon the provisions of Mass. Gen. Laws ch.106, § 9-610(b) and the

117

decision in <u>Wells Fargo Bus. Credit v. Environamics Corp.</u>, 77 Mass. App. Ct. 812, 820, 934

N.E.2d 283, 289 (2010) (quoting 4 White & Summers, *Uniform Commercial Code*, § 34-11, 464-

66 (6th ed. 2010)). The Trustee also relies upon the decision in <u>Poti Holding Co. v. Piggott</u>,

15 Mass. App. Ct. 275, 277, 444 N.E.2d 1311 (1983), *review denied* 388 Mass. 1105(1983), in

which the court determined a sale was not commercially reasonable because the creditor

failed to submit evidence with respect to "the normal commercial practices in disposing

of  collateral of this type; the experience of the auctioneer in auctioning this kind of

machinery; the areas of circulation of the newspapers in which the advertisements were

placed; and whether there were experienced brokers available to sell goods of this type."[51]

Based upon the foregoing authorities, the Trustee concludes that the foreclosure sales were

not commercially reasonable, noting that the first notice contained the wrong date; the

second notice provided the correct date, but was sent only to Inofin two business days

prior to the sale; and the third notice gave notice of a January 26th  sale, which made no

reference to the other two sale notices or dates.  He added:

> From a creditor's point of view, the first notice sent to creditors related to a
> sale on January 20th which never occurred. The second notice sent to
> creditors related to a sale on January 26th and which was mailed on January
> 14th prior to the January 18th sale that had been advertised on January 7,
> 2013 in the *Boston Herald*.

---

[51] The court also noted that "although the plaintiff had placed advertisements in
the *Boston Herald American*, the *Wall Street Journal* and a local newspaper, and had
notified between 210 and 235 parties, including the defendant, it had only notified two
of the nine or more companies in the high temperature wire business in the eastern
United States, and had not advertised in any publication of the wire industry."  <u>Poti
Holdings</u>, 15 Mass. App. Ct. at 277.

In sum, he states that "[t]he three sale notices should be regarded as invalid because they were contradictory, misleading, confusing, in furtherance of a perfunctory foreclosure sale."

The Trustee also criticizes RCG's method of advertising in the *Boston Herald*, the lack of an independent marketing effort by the auctioneer, the testimony of Shilson, who based his assessment of the reasonableness of the sale on the erroneous determination that RCG's portfolio was concentrated in the Boston, Massachusetts area, and his lack of expertise in the foreclosure process itself. The Trustee also observes that, although Green testified that his bid of $4 million dollars was simply a gut-reaction estimate of what he felt the loan portfolio was worth at that time, hindsight, namely that $4 million approximates the net value of the portfolio based on actual collections, should not validate a "guesstimate" or make the bid commercially reasonable.

Shilson testified that at least two weeks advance notice of a foreclosure sale is needed for a buyer to conduct adequate due diligence. Accordingly, the Trustee observes that, because the January 26th sale notice was mailed to UCC filers on January 14th, they were provided with only twelve days notice.

The Trustee also asserts that the foreclosure sales were conducted in bad faith, citing provisions of the UCC in effect in Massachusetts at the time of the accrual of the Trustee's cause of action, namely the obligation of good faith, i.e., "[e]very contract or duty within this chapter imposes an obligation of good faith in its performance or enforcement,"*see* Mass. Gen. Laws ch. 106, § 1-203, and the definition of "good faith,"namely, "honesty in

119

fact in the conduct or transaction concerned." *See* Mass. Gen. Laws ch. 106, § 1-201(19).  The

Trustee relies upon <u>Hamilton v. Moore Flying, Inc. (In re Hamilton)</u>, 197 B.R. 305 (Bankr.

E.D. Ark. 1996) ("since the sale did not conform to the requirements of the statute, the

purchaser in this private sale can take good title only if there is good faith"), and <u>Foote v.

Smart Chevrolet Co. (In re Foote)</u>, No. 4-02-AP-1050E, 2002 WL 32114561 (Bankr. E.D. Ark.

May 14, 2002).  In this regard, the Trustee asserts that RCG failed to properly accelerate the

loans, receiving loan payments on January 3, 2011, just two days before the date of the first

notice.  Specifically he maintains that paragraph 4(8) of the amended notes ("if any lawsuit

or enforcement action is filed against the Maker by any government agency or lender,

which lawsuit or enforcement action alleges that the Maker's method of raising money

and/or doing business violates federal or state law") was not triggered by the Cease and

Desist Order, which he maintains was unrelated to the SEC investigation.

The Trustee urges the Court to discredit the testimony of witnesses about the

foreclosure sales, asserting that they were disguising their motives and testified

inconsistently.  In addition, the Trustee asserts that any "advice of counsel defense" is

unavailing to vitiate RCG's bad faith, citing <u>G.S. Enters., Inc. v. Falmouth Marine, Inc.</u>, 410

Mass. 262, 275 (1991) (setting forth elements of an advice of counsel defense).

<center>(ii) RCG's Conduct Violated Ch. 93A</center>

Finally, the Trustee asserts he is entitled to damages under Mass. Gen. Laws ch. 93A

because of RCG's bad faith conduct throughout the foreclosure process and because of its

post-foreclosure misrepresentations and non-disclosures in connection with it attempts to

<center>120</center>

confirm the foreclosure and recover its portfolio.  He cites RCG's conduct with respect to filing the Verified Complaint in the Superior Court and its Motion for Relief from the Automatic Stay in this Court.

The Trustee, not content with a finding that the foreclosure sale was commercially unreasonable, specifically urges the Court to determine that the foreclosures sales were conducted in bad faith and constitute a violation of the provisions of Mass. Gen. Laws ch. 93A, §§ 2 and 11, relying upon the same evidence. He maintains that RCG initiated the foreclosure process without properly accelerating the loans, that it failed to offer evidence of a payment default, and that it cannot rely on paragraph 4(8) of the LMA as the Cease and Desist Order was not the type of action contemplated by the LMA.

The Trustee also points to RCG's conduct post-foreclosure, referencing representations made in its Verified Complaint filed in the Superior Court and its Motion for Relief from the Automatic Stay.  He asserts that RCG's pursuit of the Motion for Relief from stay harmed the estate, entitling the Trustee to recover his substantial legal fees.  He emphasizes that his damages under Ch. 93A are not limited to those associated with the foreclosure sales.  He asks the Court to treble his fees of $333,776.50 incurred in conjunction with the defense of the Motion for Relief from the Automatic Stay.

In sum, the Trustee seeks a declaration that RCG's foreclosure sale is void. Alternatively, he seeks relief under Mass. Gen. Laws ch. 106, § 9-625, and, in addition, he seeks damages under Mass. Gen. Laws ch. 93A, § 11.

121

(b)  RCG's Arguments

(i) The Foreclosure Sales Are Not Void

With respect to the foreclosure sale process, RCG emphasized its reliance on the advice of its counsel, M&K  and, in particular, the advice provided by Jeffery that public advertising of a foreclosure sale might alert the Division of Banks and create difficulties down the road. Specifically, it argues that the evidence established that RCG acted in good faith and consistent with its own customary practices with respect to both foreclosure sales. Additionally, it asserts that its primary motivation was to complete the sale and gain control over its collateral as soon as possible to avoid problems that might arise in the event of a bankruptcy, and to minimize losses which were  mounting on a weekly basis as consumers paid down their loans to Inofin.  It references Shilson's testimony that the foreclosure sales were commercially reasonable, as the market for Installment Contracts was limited, partly because the  Installment Contracts were generated by Dealers concentrated in Massachusetts, and that the $4 million bid was reasonable.

Recognizing that the Trustee attacked its expert's testimony, RCG points to the absence of evidence offered by the Trustee in support of damages such as the identity of potential purchasers who might have appeared at the sale, the reasonableness of the bid, Green's intent to harm Inofin, the actual harm to Inofin as a result of the foreclosure sales, any other lienholder's entitlement to notice, as well as the absence of evidence that the other notice would have produced a different result.

(ii) The Trustee is Not Entitled to Ch. 93A Damages

RCG asserts that its conducted did not exhibit in bad faith, and, as a result, the

Trustee cannot prove a violation of Chapter 93A, § 11.  It argues that the statute requires

proof that its conduct was unfair or deceptive and in a commercial context, the standard

that applies is significantly higher than in a commercial context, citing, *inter alia*, <u>Levings</u>

<u>v. Forbes & Wallace, Inc.</u>, 8 Mass. App. Ct. 498, 504, 396 N.E.2d 149 (1979).  In its view, the

Trustee fell well short of establishing that its conduct was within "the penumbra of some

common law, statutory, or other established concept of unfairness" or was "immoral or

unethical, oppressive or unscrupulous." <u>Levings</u>, 8 Mass. App. at 504.

RCG also asserts that the Trustee failed to establish any harm to Inofin as a result

of the foreclosure sales or that any creditor of Inofin suffered any harm as a result of any

"unfair and deceptive" conduct on the part of RCG.  It adds "even if RCG had harmed a

creditor, the Trustee has no standing or other statutory authority to assert such creditor's

claim and/or to seek damages on behalf of such creditor."

2.  Applicable Law

Massachusetts General Laws provides:

> Every aspect of a disposition of collateral, including the method, manner,
> time, place, and other terms, must be commercially reasonable. If
> commercially reasonable, a secured party may dispose of collateral by public
> or private proceedings, by 1 or more contracts, as a unit or in parcels, and at
> any time and place and on any terms.

Mass. Gen. Laws ch. 106, § 9-610(b).  In non-consumer transactions, Mass. Gen. Laws ch.

106, § 9-612 provides that "a notification of disposition sent after default and 10 days or

more before the earliest time of disposition set forth in the notification is sent within a reasonable time before the disposition."  Section 9-611, cmt. 2 provides that "notification must be reasonable as to the manner in which it is sent, its timeliness (i.e., a reasonable time before the disposition is to take place), and its content."  Mass. Gen. Laws ch. 106, § 9-611, cmt. 2.  Although a debtor's entitlement to a commercially reasonable disposition of collateral cannot be waived, *see* Shawmut Worcester County Bank, N.A. v. Miller, 398 Mass. 273, 279, 496 N.E.2d 625 (1986), a debtor may waive the right to notification of disposition of collateral under UCC § 9-611 by an agreement entered into and authenticated after default.  Mass. Gen. Laws ch. 106, § 9-624(a).

Aside from the price received at a foreclosure sale, courts consider several other factors to determine whether a transaction is commercially unreasonable.  These include the six factors set forth in the case cited by the Trustee, Wells Fargo Bus. Credit v. Environamics Corp., 77 Mass. App. Ct. 812, 820, 934 N.E.2d 283, 289 (Mass. App. Ct. 2010)(citing 4 White & Summers, *Uniform Commercial Code*, § 34-11, 464-466 (6th ed. 2010)), namely

> [1] whether the timing between the sale and notice was too short or too long;
> [2] whether the seller advertised the sale; [3] whether the sale was in a proper
> place; [4] whether the seller permitted necessary inspections by prospective
> bidders; [5] whether the seller performed necessary repairs; and [6] whether
> the seller held the sale at the same time and location as advertised.

77 Mass. App. Ct. at 820.  The court in Environamics added:  "In this regard, adjudication of the ''commercially reasonable' standard . . . produces inquiry into *the competence and aggressiveness* of the marketing effort." Id. (emphasis supplied). *See* Pemstein v. Stimpson,

36 Mass.App.Ct. 283 (1994). After a sale or disposition of collateral, a debtor is liable for

any deficiency. Where a sale is commercially unreasonable, a debtor has a right to recover

any loss caused by the failure to comply. *See* Poti Holding Co., 15 Mass. App. Ct. 275, 444

N.E.2d at 1314.

3. Analysis and Conclusions of Law

a. Violations of Mass. Gen. Laws ch. 106, § 9-625

Based on the evidence with respect to the manner and notice of the sales conducted

by RCG, the Court concludes that the sales were not conducted in a commercially

reasonable manner. Although the Security Agreement provided that ten days notice would

be sufficient and reasonable, the Trustee correctly points out that the first notice, which was

sent to approximately 30 creditors as well as Inofin, contained the wrong date; the second

notice was sent only to Inofin two days before the date of sale; and the third notice

provided notice of a sale to be conducted on January 26, 2011, although RCG already had

conducted a foreclosure sale as to Inofin on January 18, 2011. Accordingly, at the time the

notice for the January 26th sale was sent on January 14th, and published on January 16,

2011,there were three separate notices of sale issued by RCG for three different dates. In

the midst of these notices, Inofin executed a "Waiver of Notice" under UCC § 9-601 on

January 17, 2011. RCG never informed any of Inofin's creditors with UCC-1 financing

statements on file that the first notice indicating that a sale would be conducted on January

20th was erroneous or that the January 26th notice superseded prior notices. RCG

published its ad for the January 26th sale two days prior to the January 18th sale and nine

125

days after the same ad appeared for a sale on January 18th. When a creditor, Richard

Sgarzi, inquired about the foreclosure sale, Raymond Green failed to inform him that the

sale would be held on January 18, 2011.

Joan Green lacked experience in preparing notices of foreclosure sales of non-real

estate collateral and acknowledged needing assistance in drafting the notice.  Moreover,

she was unaware of whether Inofin was in default at the time she prepared the notices of

sale and did not issue or cause a notice of default to be delivered to Inofin.  She failed to

direct the auctioneer to contact Inofin's competitors and extensively advertise the sale;

indeed, Green contacted the auctioneer in an attempt to have the ad for the January 18,

2011 sale canceled.  Other irregularities with respect to the sales include the absence of

language of conveyance in the Memoranda of Sale, both dated February 8, 2011.

Thus, RCG made no reasonable efforts to market its loan portfolio and limited notice

of the foreclosure sales.  As noted, it attempted to cancel the only ad that ran for the

January 18th foreclosure sale.  The limited notice coincided with the issuance of the Cease

and Desist Order issued by the Massachusetts Division of Banks on December 30, 2010.

The auctioneer, who was paid a flat fee of $500 for conducting each foreclosure sale,

made no effort to solicit bids from individuals or entities in the industry by placing ads in

trade publications.  He merely placed ads in the *Boston Herald* and conducted an auction

at which he accepted RCG's bid because no other bidders were present.  There was

insignificant interest in bidding on the loan portfolio of 1,971 Installment Contracts,

particularly as the notice in the *Boston Herald* would not have reached interested parties in

the states along the Eastern Seaboard where Inofin conducted its business.

The lack of any serious marketing effort by RCG's auctioneer, Dean, highlights the deficiencies with respect to the January 26th foreclosure sale, compelling the conclusion that it was perfunctory and intended to give RCG control over its portfolio before a bankruptcy proceeding, which was anticipated by Green. RCG prepared Memoranda of Sale for the auctioneer to sign, memorializing what had transpired at the foreclosure sales as RCG was concerned about a challenge to the foreclosure sales if Inofin filed a bankruptcy petition.

Notwithstanding the above ruling, the Trustee submitted no factual or legal authority for this Court to determine that RCG's foreclosure sale is void. Section 9-625 of the Massachusetts version of the UCC provides in relevant part:

> (a) Judicial orders concerning noncompliance. If it is established that a secured party is not proceeding in accordance with this article, a court may order or restrain collection, enforcement, or disposition of collateral on appropriate terms and conditions.
>
> (b) Damages for noncompliance. Subject to subsections (c), (d), and (f), a person is liable for damages in the amount of any loss caused by a failure to comply with this article. Loss caused by a failure to comply may include loss resulting from the debtor's inability to obtain, or increased costs of, alternative financing.

Mass. Gen. Laws ch. 106, § 9-625. Although the Trustee relies upon subsection (a) for his claim that the sale is void, the Court finds that that subsection is inapplicable to the instant proceeding. Its provisions are cast in the present tense and are intended to curtail violations of UCC provisions while they are occurring. The Court does not interpret § 9-

127

625(a) to authorize voiding the foreclosure sale even if RCG did not act in a commercially reasonable manner, as cmt. 2 clarifies that "under subsection (a) an aggrieved person may seek injunctive relief, and under subsection (b) the person may recover damages for losses caused by noncompliance." Accordingly, the foreclosure sale is not void because of a violation of the provisions of UCC § 9-625 (Count IV).

The Court concludes that the Trustee has not sustained his burden with respect to avoidance of the sale because of the absence of a valid security interest (Count II) or because it was conducted in a commercially unreasonable manner. The remedy for a commercially unreasonable sale is money damages. *See* Wells Fargo Bus. Credit v. Environamics Corp., 77 Mass. App. Ct. 812, 823, 934 N.E.2d 283, 292 (2010). Moreover, the Court concludes that there was no bad faith on the part of RCG, and, in any event, if bad faith existed, it is not a ground for voiding the sale. (Count III).

At the time of its foreclosure sales, Inofin was under a Cease and Desist Order, dated December 30, 2010, from the Division of Banks and under investigation by the SEC. Its operations were curtailed. It was ordered to stop engaging in the business of a motor vehicle sales finance company; Green correctly recognized that the December 30th order "spell[ed] the death knell for Inofin." RCG's decision to foreclose its collateral did not evidence bad faith. Although its method for doing so was commercially unreasonable in the sense that it provided inadequate notice and did not take sufficient stops to market the Installment Contracts, the Court agrees with RCG's litany as to deficiencies in the Trustee's proof. Specifically, to paraphrase RCG:

128

The Trustee offered no evidence that any person or business would have appeared at the sale and bid had the sale been conducted in any different manner;

The Trustee offered no evidence that the $4 million bid by RCG was anything but reasonable;

The Trustee offered no evidence that Green acted with the intent to deceive or harm the Debtor in any way, but rather acted only in the best interests of RCG to gain control over what RCG reasonably believed to be its collateral before suffering from a further decline in its value, consistent with the legal requirements of Article 9 as explained to him by his professional advisors;

The Trustee offered no evidence that Inofin or the bankruptcy estate or any of Inofin's creditors suffered actual harm by the manner in which RCG foreclosed and exercised its rights under Article 9; and

The Trustee offered no evidence that any other UCC lienholder was entitled to notice of the sale under Article 9 or that the giving of any such notice would have produced a different outcome.

With respect to RCG's $4 million bid, Ayre testified that expected collections on the RCG portfolio, net of collection costs and dealer reserves, would likely be in the range of just slightly more than $4 million. Indeed, as of July 13, 2013, net of dealer reserves and collection costs, the Trustee has collected $4,042,877.70 with respect to the RCG collateral. Shilson also testified that the $4 million bid by RCG was reasonable. Although Green may have "guesstimated," he appears to have done so with an acute awareness of the value of the his security.

This case is analogous to the decision in Poti Holding Co., Inc. v. Piggott, 15 Mass. App. Ct. 275, 444 N.E.2d 1311 (1983), *review denied* 388 Mass. 1105 (1983). There a creditor conducted a foreclosure sale of collateral in a commercially unreasonable manner but was

not precluded from seeking a deficiency from a guarantor because it obtained fair market

value for the collateral it sold. The court observed:

> Whether a noncomplying creditor is entitled to a deficiency judgment is a
> matter on which the authorities are in dispute[.]
>
> We think more consistent with Massachusetts law and the provisions for
> remedies in the Uniform Commercial Code are those authorities which
> provide for a balancing of equities between the parties and allow the
> "remedy and the recovery . . . [to] be adjusted to the particular situation."
>
> Although we have found no case in the Supreme Judicial Court or this court
> on the precise issue before us, our cases frown on forfeitures and penalties.
> . . .
>
> The Code does not require automatic forfeiture. Specific remedies are
> provided in G.L. c. 106, § 9–507(1) [now § 9-625], against a secured creditor
> who, among other misdeeds, fails to sell collateral in a commercially
> reasonable manner. A debtor may restrain an improper sale and also "has a
> right to recover from the secured party any loss caused by [the] failure to
> comply" with the Code. There is no mention of a forfeiture of the right to a
> deficiency and, in addition, G.L. c. 106, § 1–106, states that the Code remedies
> are to be "liberally administered to the end that the aggrieved party may be
> put in as good a position as if the other party had fully performed but neither
> consequential or special nor penal damages may be had except as specifically
> provided in this chapter or by other rule of law."

15 Mass. App. Ct. at 279-80, 444 N.E.2d at 1313-14 (footnotes omitted, citations omitted).

*See also* Wells Fargo Bus. Credit v. Environamics Corp., 84 Mass. App. Ct. 1131, 2 N.E.3d

200 at *1 (2014) ("If the collateral that secures the loan was not disposed of in a

commercially reasonable manner, then the debtor is entitled to a jury instruction that there

is as rebuttable presumption that the value of the collateral is equal to the debt.") Thus, as

in Poti, where the creditor's remedies against a guarantor was not extinguished, RCG

conducted a commercially unreasonable sale, but the Trustee failed to submit evidence that

RCG failed to obtain a fair market value for the collateral.  Moreover, the parties have stipulated that the amount of RCG's debt exceeds the value of its collateral and that it is undersecured.  Accordingly, the Court finds that the Trustee failed in his burden of proof under Count IV.

### b. The Trustee's Chapter 93A Claims

With respect to the Trustee's claim under Mass. Gen. Laws ch. 93A, §§ 2 and 11 (Count V),[52] the Trustee fails to distinguish between his damage claims as a proxy for Inofin in relation to RCG's ostensible bad faith in conjunction with its foreclosure sales and his claims arising from RCG's post-foreclosure conduct in relation to its alleged material misrepresentations of fact and failures to disclose essential information in its Verified Complaint and Motion for Relief from the Automatic Stay.  Moreover, the Trustee did not address the issue of whether he is engaged in trade and commerce and is acting in a business context with RCG post-petition.  The Court takes judicial notice that the Trustee has obtained Court authority to operate Inofin's business on a limited basis pursuant to 11

---

[52] RCG maintains that Count V is non-core and has not consented to having this claim adjudicated by a bankruptcy judge.  Accordingly, in this section, the Court makes proposed findings of fact and rulings of law with respect to Count V which shall be submitted to the United States District Court for the District of Massachusetts pursuant to 28 U.S.C. § 157(c)(1).

Any claims Inofin may have had against RCG for its prepetition conduct in relation to the foreclosure sales would be property of the bankruptcy estate.  *See* 11 U.S.C. § 541(a). The Trustee did not address damages from that conduct (or the effect of the waiver executed by Inofin), seeking a declaration that the foreclosure sales were void; rather he asserts that RCG's pursuit of its Motion for Relief from Stay evidenced "RCG's bad faith and deceptive conduct which caused harm to the Trustee, resulting in damages in the form of legal fees of $333,776.50.

U.S.C. § 721.

In John Beaudette, Inc. v. Sentry Ins. A Mutual Co.,  94 F.Supp.2d 77 (D. Mass. 1999),

the court stated:

> Section 11 [of Mass. Gen. Laws ch. 93A] . . .  applies "if, first, the interaction between the parties is commercial in nature, and second, the parties were both engaged in trade or commerce, and therefore acting in a business context." Trustees of Boston University v. ASM Communications, Inc., 33 F.Supp.2d 66, 76 (D. Mass. 1998) (internal quotation marks and brackets omitted); Linkage Corporation v. Trustees of Boston University, 425 Mass. 1, 679 N.E.2d 191, 206–207 (1997) (section 11 requires interaction which "is 'commercial' in nature" between two parties "engaged in 'trade or commerce'"), cert. denied, 522 U.S. 1015, 118 S.Ct. 599, 139 L.Ed.2d 488 (1997). In other words, section 11 requires both a commercial transaction between persons who are both engaged in trade or commerce. Linkage Corporation v. Trustees of Boston University, 679 N.E.2d at 206–207.
>
> *In general, no commercial relationship exists where the parties only contact occurs in the context of litigation*. See First Enterprises, Limited v. Cooper, 425 Mass. 344, 680 N.E.2d 1163, 1165 (1997). Section 11's commercial transaction requirement likewise excludes from its reach "intra-enterprise" or strictly private transactions between parties in the same venture. Linkage Corporation v. Trustees of Boston University, 679 N.E.2d at 207 & n.33; *see, e.g.*, Linthicum v. Archambault, 379 Mass. 381, 398 N.E.2d 482 (1979) (duplex owner who rented half of duplex to tenant and occupied remaining half was engaged in commerce under section 11 for purposes of suit against roofing contractor).

John Beaudette, Inc., 94 F.Supp.2d at 121 (emphasis supplied).

The Court concludes that the Trustee failed to sustain his burden that he and RCG

were engaged in trade or commerce with each other post-petition for purposes of Mass.

Gen. Laws ch. 93A, § 11. RCG conducted its foreclosure sale  prior to the commencement

of the bankruptcy case.  Moreover, the Trustee was not a named defendant in the Superior

Court action commenced by RCG.  Further, the Trustee is operating Inofin's business only

on a limited basis in conjunction with the performance of his statutory duties to liquidate assets of Inofin's Chapter 7 estate after Inofin's operations ceased as a result of the Cease and Desist Order.  The Motion for Relief from the Automatic Stay and the legal fees incurred in conjunction with that motion do not involve trade and commerce, but rather litigation.  Id.

The Trustee's claim for unfair and deceptive conduct must involve an act or practice that is "within at least the penumbra of some common-law, statutory or other established concept of unfairness, is immoral, unethical, oppressive, or unscrupulous, and causes substantial injury to consumers (or competitors or other businessmen)." Baker v. Goldman Sachs & Co., 949 F.Supp.2d 298, 307(D. Mass. 2013)(quoting In re Pharm. Indus. Average Wholesale Price Litig., 582 F.3d 156, 184 (1st Cir. 2009) (internal quotations omitted)).  The court in Baker added "The crucial factors in an unfairness inquiry are the nature of [the] challenged conduct and on the purpose and effect of that conduct." Id. (quoting  In re Pharm. Indus. Average Wholesale Price Litig., 582 F.3d at 184 (internal citations omitted)). "An act or practice is deceptive if it has the capacity or tendency to deceive." Baker, 949 F.Supp.2d at 307 (quoting  In re Pharm. Indus. Average Wholesale Price Litig., 582 F.3d at 185 (internal quotations omitted)).  Although the Trustee would not need to prove actual reliance on a misrepresentation, he would have to establish a causal connection between the deception and the loss and that the loss was foreseeable as a result of the deception. Baker, 949 F.3d at 307.

The Court concludes that, even if the Trustee could establish that he is asserting

133

Inofin's claims against RCG in conjunction with the foreclosures sales or that he and RCG were involved in trade or business vis à vis the foreclosure and post-foreclosure conduct for which the Trustee seeks attorneys' fees as damages, "Chapter 93A 'does not attach liability for all of the unseemly business practices justly loathed by . . . business professionals.'" Id. Rather, objectionable conduct must attain "a level of rascality that would raise an eyebrow of someone inured to the rough and tumble of the world of commerce." Id. (citations omitted). Thus, while RCG may have cut corners and was sloppy with respect to its notices of the foreclosure sales, its conduct both before and during the bankruptcy case does not rise to a level that would warrant Ch. 93A liability and damages. Moreover, the Trustee did not seek or prove damages in conjunction with the foreclosure sales. Accordingly, the Court, pursuant to 28 U.S.C. § 157(c)(1), proposes that the District Court find and conclude that the Trustee failed to sustain his burden of proof and is not entitled to judgment on Count V.

    F.  <u>Preferential Transfer Claims Against RCG</u>

        1. The Arguments of the Parties

The Trustee, in seeking to avoid both the transfer of Installment Contracts (Count IX) and payments (Count X) made during the preference period, asserts and RCG does not dispute that the transfers (i) were property of Inofin, (ii) occurred within the 90 days prior to the petition date, (iii) were on account of RCG's prepetition loans to Inofin, and (iv) were made when Inofin was insolvent. RCG stipulated that its claim in the approximate amount of $8.25 million is undersecured; the Trustee testified that the total general unsecured

claims in the case are approximately $72 million and that unsecured creditors will not receive "anything close" to a 100% dividend with respect to their claims. In addition, the parties agreed to the admissibility of the Accountant's Report which unequivocally established that Inofin's liabilities far exceeded the value of its assets.

The Trustee recognized that the issue is whether RCG received more than it would receive in a case under Chapter 7.  Citing <u>Adams v. Hartconn Assocs., Inc. (In re Adams)</u>, 212 B.R. 703, 713 (Bankr. D. Mass. 1997), he relies on the parties' stipulation of fact that RCG's claim is undersecured and his testimony that unsecured creditors will not receive a 100% dividend.  He adds that  RCG did not offer any evidence that it would have been entitled to receive the transfers post-petition.

RCG and the Trustee stipulated that the principal balance of the RCG portfolio decreased from $9,880,749.15 at the beginning of the 90 day preference period to $8,425,774.57 as of the petition date, i.e., by $1,454,974.58. While the Trustee does not dispute that there was a reduction in principal during the 90 day preference period, he maintains that this fact is irrelevant to the analysis of the issue of whether RCG received more through the transfers than it would receive in a Chapter 7 case.

RCG simply maintains that the Trustee did not prove his prima facie case because he did not prove that any of the collateral transfers or payments of money enabled RCG to receive more than it would have received had the transfers not been made.

2. Applicable Law

Pursuant to Counts IX and X of the Amended Complaint, the Trustee is seeking to

avoid under 11 U.S.C. § 547(b) Inofin's transfer of Installment Contracts, as well as

payments made, to RCG within 90 days of the petition date as preferential transfers.

Under 11 U.S.C. § 547(b), a trustee may avoid a transfer of an interest of a debtor in

property if it was to or for the benefit of a creditor; for or on account of an antecedent debt;

made while the debtor was insolvent; made on or within 90 days before the

commencement of the case; and "(5) that enables such creditor to receive more than such

creditor would receive if-- (A) the case were a case under chapter 7 of this title; (B) the

transfer had not been made; and (C) such creditor received payment of such debt to the

extent provided by the provisions of this title." 11 U.S.C. § 547(b). The trustee bears the

burden of proving each of the elements under 11 U.S.C. § 547(b). *See* 11 U.S.C. 547(g); Triad

Int'l Maint. Corp. v. Southern Air Transp., Inc. (In re Southern Air Transp., Inc.), 511 F.3d

526, 534 (6th Cir. 2007) (citing Waldschmidt v. Ranier (In re Fulghum Constr. Corp.), 706

F.2d 171, 172 (6th Cir.1983), *cert. denied,* 464 U.S. 935 (1983)).

Where a creditor's claim is fully secured as of the date of the challenged transfer,

there is no preferential transfer because the debtor's payments to the creditor do not enable

it to receive a greater percentage of its debt than it would receive in a Chapter 7 case. *See*

Sloan v. Zions First Nat'l Bank (In re Castletons, Inc.), 990 F.2d 551, 554 (10th Cir. 1993).

*See also* Telesphere Liquidating Trust v. Galesi (In re Telesphere Commc'ns, Inc.), 229 B.R.

173, 177 (Bankr. N.D. Ill. 1999). *See also*. If a creditor is only partially secured, however,

payments made during the preference period may result in the transfer enabling the

creditor to receive more from the prepetition payment than it would receive in the Chapter

7 case. In that circumstance, the secured status of the claim is measured by the value of the

collateral at the time of the challenged transfer based upon the proceeds that the creditor

could have realized in a commercially reasonable sale. *See* <u>In re Telesphere Commc'ns,</u>

<u>Inc.</u>, 229 B.R. at 177. As a general rule, almost all payments or transfers of security to

undersecured creditors will meet the test, that is the undersecured creditor will receive

more as a result of the transfer. As the court in <u>Telesphere Commc'ns</u> observed:

> . . . [I]f a payment is made on debt that is not fully secured, the payment will still be nonpreferential if it only reduces the secured portion of the indebtedness. A partially secured claim is treated, pursuant to § 506(a) of the Code, as though it were two distinct claims: a secured claim to the extent that the value of the collateral supports the claim, and an unsecured claim to the extent of the deficiency in collateral value. Given the treatment of "secured claim" in § 506(a), a payment can only reduce the secured portion of a partially secured claim if it reduces the amount of collateral supporting the claim (since a payment that left the collateral intact would necessarily reduce the unsecured portion of the claim). There are only two ways to reduce the amount of a secured creditor's collateral: to return some or all of the collateral, or to make a payment from unencumbered property in exchange for a release of the lien on an equivalent amount of collateral. In either of these situations, the creditor is simply given what it would have obtained in a Chapter 7 liquidation—the collateral or the value of the collateral—and so, again, there is no preference under the liquidation test. <u>Schwinn Plan Comm.</u> <u>v. Transamerica Ins. Fin. Corp. (In re Schwinn Bicycle Co.)</u>, 200 B.R. 980, 988 (Bankr. N.D. Ill. 1996) ("[A] creditor that receives payment attributable to a secured claim is not usually 'preferred' because secured creditors generally receive 100% of the value of their collateral upon distribution in a Chapter 7 case.")

> . . .[T]o the extent that payment of a partially secured debt reduces the unsecured portion of the debt, the payment is preferential (unless all creditors of similar priority are paid in full). Payment of the unsecured portion of an undersecured claim can only be made from assets of the debtor that are not encumbered by the creditor's lien (since, as noted above, if the payment is made from the creditor's collateral, it reduces the secured portion of the claim), and, for the same reason, the payment cannot result in a release

of the lien. Such a payment is always preferential in the absence of full payment of all unsecured creditors, because it takes assets that, in a Chapter 7 liquidation, would be distributed pro rata in payment of all unsecured claims (including the unsecured deficiency of the secured creditor) and gives those assets to the secured creditor exclusively. *See* David Gray Carlson. Voidable Preferences and Proceeds: A Reconceptualization, 71 Am.Bankr.L.J. 517, 532 (1997) ("[U]ndersecured creditors always fall afoul of [the Chapter 7 liquidation] test—when they receive unencumbered dollars from the debtor.")

In re Telesphere Commc'ns, Inc., 229 B.R. at 177-78. *See also* Krafsur v. Scurlock Permian Corp. (In re El Paso Refinery, L.P.), 171 F.3d 249, 254 (5th Cir. 1999)("To determine whether an undersecured creditor received a greater percentage recovery on its debt than it would have under chapter 7 the following two issues must first be resolved: (1) to what claim the payment is applied and (2) from what source the payment comes. . . . Both aspects must be examined before the issue of greater percentage recovery can be decided."); Garner v. Knoll, Inc. (In re Tusa-Expo Holdings, Inc.), 496 B.R. 388, 400-01 (Bankr. N.D. Tex. 2013)(same).

Courts are divided as to when to apply the hypothetical liquidation test to an allegedly preferential transfer made to a undersecured creditor. There is a split of authority on whether the hypothetical liquidation is determined as of the petition date, or conversely, whether actual results which occurred postpetition are to be considered. *Compare* Alvarado v. Walsh (In re LCO Enterprises), 12 F.3d 938 (9th Cir. 1993)(hypothetical Chapter 7 analysis for preference avoidance purposes must be based on actual facts of case) *with* Neuger v. U.S. (In re Tenna Corp)., 801 F.2d 819 (6th Cir. 1986)(petition date was the proper reference date for preference analysis). *See also* Falcon Creditor Trust v. First Ins. Funding

(In re Falcon Prods., Inc.), 381 B.R. 543, 547 (B.A.P. 8th Cir. 2008) ("Supreme Court

precedent requires that the hypothetical liquidation test be conducted as of the petition

date."). This Court agrees with the Tenna and Falcon courts and concludes that the petition

date is the correct date for the hypothetical Chapter 7 liquidation.

In Savage & Assocs. v. Mandl (In re Telegent, Inc.), 380 B.R. 324 (Bankr. S.D.N.Y.

2008), the court observed:

> The proponent must construct a hypothetical chapter 7 case, and determine
> the percentage distribution that the defendant would have received on the
> petition date. Taunt v. Fidelity Bank of Mich. (In re Royal Golf Prods. Corp.),
> 908 F.2d 91, 95 (6th Cir.1990); *see* Hassett v. Goetzmann (In re CIS Corp.), 195
> B.R. 251, 262 (Bankr.S.D.N.Y.1996); *cf.* Palmer Clay Prods. Co. v. Brown, 297
> U.S. 227, 229, 56 S.Ct. 450, 80 L.Ed. 655 (1936)(construing the provisions of the
> former bankruptcy act). The analysis should include the cost of
> administering the hypothetical chapter 7 case, *see* McColley v. Navaro Gem
> Ltd. (In re Candor Diamond Corp.), 68 B.R. 588, 595 (Bankr.S.D.N.Y. 1986),
> and disregard all other post-petition expenses, liens and priorities. *See*
> Neuger v. United States (In re Tenna Corp.), 801 F.2d 819, 823 (6th Cir. 1986).
> As a practical matter, this element is satisfied whenever the plaintiff shows
> that the creditor would receive less than 100% in a hypothetical chapter 7
> distribution. Elliott v. Frontier Properties/LP (In re Lewis W. Shurtleff, Inc.),
> 778 F.2d 1416, 1421 (9th Cir. 1985); CIS Corp., 195 B.R. at 262 (citing cases);
> Candor Diamond Corp., 68 B.R. at 595.

In re Telegent, Inc., 380 B.R. at 339.  In Telegent, the court determined that the burden

shifted to the defendant to establish that it did not receive more than it would receive in

a hypothetical Chapter 7 case based upon an insolvency report prepared by, and the

testimony of, an expert witness.  In Horwitz v. Rote (In re Moorhouse), No. 13-CV-372-A,

2013 WL 6825653 (W.D.N.Y. Dec. 20, 2013), however, the court determined that, although

the Chapter 7 trustee treated his burden under § 547(b)(5) as incontrovertible, he neither

introduced evidence about the debtors' assets nor suggested an approximate distribution

to the defendants in the absence of the preferential transfer. The court concluded: "The

error may be insubstantial in light of the [debtors'] schedules, statements, and other

information that was generally available to the Bankruptcy Court, but the Trustee's burden

to establish the [defendants'] improvement of position under § 547(b)(5) required more

than his conclusory statements, and the record on appeal does not show that the lack of a

specific § 547(b) (5) finding is an insubstantial and harmless error." Id. at * 5 (footnote

omitted). *See also* In re Connolly N. Am., LLC, 398 B.R. 564 (Bankr. E.D. Mich 2008).[53]

---

[53] The court in Connolly N. Am., LLC, discussed the level of proof required to establish a dividend of less than 100%, stating:

> [T]he Trustee bears the burden of proving that the non-priority unsecured creditors in the hypothetical Chapter 7 liquidation case would receive less than a 100% distribution. Of course, that is what happens in the vast majority of bankruptcy cases, for "[a]n unsecured creditor's claim against a bankrupt debtor will rarely be worth one hundred cents on the dollar." T.B. Westex Foods, Inc. v. Federal Deposit Insurance Corp. (In re T.B. Westex Foods, Inc.), 950 F.2d 1187, 1192 (5th Cir.1992). But that is not always so, and where, as here, the defendant does not concede the § 547(b)(5) element, the Trustee must prove it.

> In determining whether the unsecured creditors GE Capital and Art Leather would receive a 100% distribution in the hypothetical Chapter 7 liquidation under § 547(b)(5), the Court must first consider the liquidation value of the assets that were in the bankruptcy estate when the bankruptcy petition was filed, and to add to that the value of the allegedly preferential transfers that the Trustee seeks to avoid. On the liability side, the Court must determine the amount of allowable claims against the estate as of the petition date. Because the § 547(b)(5) analysis requires the Court to assume that the allegedly preferential transfers at issue had not been made, the amount or value of those transfers must be added to the allowable claims of the transferee, in this case GE Capital.

### 3. Analysis

Although on January 26, 2011, RCG bid $4 million for the portfolio of Installment

Contracts, the Trustee did not submit evidence of what RCG would have received if its

portfolio were liquidated on the petition date. Because the foreclosure sale occurred within

14 days of the petition date, however, and this Court has determined that RCG's bid

amount was not commercially unreasonable in view of the amount realized by the Trustee,

this Court can conclude that payments made and transfers of Installment Contracts to RCG

enabled it to receive more than he would in a hypothetical liquidation as of the petition

date.  *See* In re Falcon Prods., Inc., 381 B.R. at 546.  As noted above, a partially secured claim

is treated, pursuant to § 506(a) of the Code, as though it were two distinct claims: a secured

claim to the extent of the value of the collateral supporting the claim, and an unsecured

claim to the extent of the deficiency in collateral value. 11 U.S.C. § 506(a), (d).  Thus RCG,

whose claim on the petition date was not less than $8,249,517,  can be considered to have

a secured claim of $4 million and an unsecured claim of $4,249,517.   There were no

payments that reduced the secured portion of its partially secured claim because RCG did

--------

Sixth Circuit case law requires the Court to make two other adjustments to
the allowable claims in the hypothetical Chapter 7 liquidation. First, "any
administrative expenses incurred during the pendency of the bankruptcy
proceeding should be included in the determination." Neuger v. United
States of America (In re Tenna Corp.), 801 F.2d 819, 823 (6th Cir.1986).
Second, in any case that began as a Chapter 11 case, any "post-petition
debt incurred" during the reorganization should not be included in the §
547(b)(5) determination. Id.

In re Connolly N. Am., LLC, 398 B.R. at 571.

not return any of its collateral existing on October 1, 2010 to Inofin, and Inofin transferred

additional Installment Contracts to RCG, and did not make payments from any

unencumbered property in exchange for a release of the lien on an equivalent amount of

collateral.  *See* <u>In re Telesphere Commc'ns, Inc.</u>, 229 B.R. at 177-78.

According to the Trustee, during the 90 days prior to the petition date, RCG received

weekly cash payments of interest from Inofin with respect to four loans in the total sum of

$118,625.36. The payments consisted of interest payments on the 2008 and 2009 notes and

principal and interest payments on two smaller term notes from RCG.  In addition,

pursuant to the LMA, RCG received Installment Contracts during the 90 day preference

period with an aggregate principal balance of $1,692,491.40, less $313,056.32 attributable

to reduction of principal according to the Accountant, for a total of $1,379,435.08.

Therefore, after accounting for the principal payments Inofin collected and retained

prepetition, the net value of the Installment Contract transfers to RCG on a principal

balance basis was $1,379,435.08.

As noted above, RCG contends that the Trustee did not prove his prima facie case

because he failed to establish that any of the collateral transfers or payments of money

enabled RCG to receive more than it would have received had the transfers not been made.

With respect to each transfer of money or collateral, the Trustee did not compare RCG's

position in light of the additional collateral against its position without the collateral in a

hypothetical Chapter 7.  The Trustee did, however, introduce a report prepared by the

Accountant which established that Inofin's liabilities far exceeded its assets as of October

142

31, 2010 and that Inofin was "continuously insolvent long before November 11, 2010, remained insolvent on that date and nothing positive took place in the intervening 90 days until the involuntary bankruptcy petition on February 9, 2011 that could possibly have made Inofin solvent. . . ."  In view of the magnitude of Inofin's insolvency, and taking judicial notice of this Court's claims register, the Court is justified in inferring that creditors are unlikely to receive a meaningful dividend in this case, certainly nothing close to what RCG obtained as a result of the transfers occurring during the preference period.

Under those circumstances, the burden shifted to RCG to establish with credible evidence that it received less than what it would receive in a hypothetical liquidation on the petition date.  RCG contends that because its collateral was steadily declining in value during the preference period at a faster rate than the value of the additional collateral replacing it, the additional collateral did not enable RCG to receive more, pointing to the parties' stipulation that RCG's total collateral value declined during the preference period by $1.45 million, even given the additional collateral.  It concludes, without citation to any authority, that where, as here, an undersecured creditor's collateral is unstable and declining during the preference period, it is not enough merely to prove that the undersecured creditor received payments of additional collateral; the Trustee must also prove that the payments and/or additional collateral enabled the undersecured creditor to receive more than it would have received in a hypothetical Chapter 7 – that is that the payments and additional collateral exceeded the decline. The Court disagrees.  In the first place, no such provision is part of the test contemplated in § 547(b)(5), and, in the second

143

place, where RCG is admittedly undersecured, and seriously so, it makes little difference

that the value of its collateral declined as Inofin's payments are allocated to the unsecured

portion of its claim.  *See* In re Telesphere Commc'ns, Inc., 229 B.R. at 177-78.  The Trustee

thus sustained his burden of demonstrating that RCG received preferential transfers of

payments and Installment Contracts.

    G. RCG's Preference Defense[54]

        1. Arguments of the Parties

        (a) RCG

    In support of its defense under 11 U.S.C. § 547(c)(2), RCG notes that after October

1, 2010, the date of the LMA, the parties agreed to reduce the interest rate to 8% and that

commencing on October 8, 2010, and continuing each week thereafter until the last

payment was made to it by Inofin on January 3, 2011, Inofin paid RCG $12,291.69 per week.

Thus, it maintains that all payments were made in the ordinary course of business or

financial affairs of Inofin and RCG.  It argues that parties are free to change their course of

business and can do so without loss of the defense. It relies upon Bernstein v. Sukolsky-

Brunelle Photographics (In re Kahn Assocs., Inc.), 135 B.R. 251, 253-254 (Bankr. W.D. Pa.

---

    [54] In its Answer to the Trustee's First Amended Complaint, RCG raised
affirmative defenses to the Trustee's preference claims set forth in Counts IX and X
under 11 U.S.C. 547(c)(1), (c)(2), (c)(3), and (c)(4).  In the parties' Joint Pretrial
Memorandum, it indicated that it had a defense under § 547(c)(5). The Court, however,
denied  RCG's Motion to Amend Answer to Add Affirmative Defense pursuant to 11
U.S.C. § 547(c)(5).  Moreover, in its post-trial brief, it addressed only the ordinary course
of business defense under 11 U.S.C. § 547(c)(2).  Accordingly, the Court determines that
it waived the defenses it initially asserted under § 547(c)(1), (c)(3), and (c)(4).

144

1991) (citing J.P. Fyfe, Inc. of Fla. v. Bradco Supply Co., 96 B.R. 474, 477-478 (Bankr. D. N.J.

1988)("continuation of transactions does not include those transactions that differ from

previous transactions in some significant way"), aff'd, 891 F.2d 66 (3d Cir. 1989));[55] and

Clark v. A.B. Hirchfeld Press, Inc.  (In re Buyer's Club Markets, Inc.), 123 B.R. 895, 899

(Bankr. D. Colo. 1991).  RCG also cites Fibre Lite Corp. v. Molded Acoustical Prods., Inc.

(In re Molded Acoustical Prods. Inc.), 18 F.3d 217 (3d Cir. 1994), in which the United States

Court of Appeals for the First Circuit stated:

> [T]he preference rule aims to ensure that creditors are treated equitably, both
> by deterring the failing debtor from treating preferentially its most
> obstreperous or demanding creditors in an effort to stave off a hard ride into
> bankruptcy, and by discouraging the creditors from racing to dismember the
> debtor. On the other hand, the ordinary course exception to the preference
> rule is formulated to induce creditors to continue dealing with a distressed
> debtor so as to kindle its chances of survival without a costly detour through,
> or a humbling ending in, the sticky web of bankruptcy.

Id. at 219.  Accordingly, RCG maintains that all payments made to RCG were made in the

ordinary course of business or financial affairs of Inofin and RCG.

It argues:

> [I]t would upend the very purpose of the ordinary course of business defense
> for this Court to avoid the transfers of collateral made during the 90 days.

---

[55] In J.P. Fyfe, the creditor had agreed to freeze $500,000 of prior indebtedness of
the debtor and to continue to do business with the debtor.  The creditor, however,
would not do business with the debtor on an "open account" basis as in the past. The
new arrangement included filing of notices of non-payment by the creditor which
would enable it to obtain liens, a departure from the parties' prior course of business.
Because the creditor was aware of, indeed, had intimate knowledge of, the debtor's
financial troubles, the creditor "in essence, obtain[ed] a head start in securing its
claims." 891 F.2d at 71. The Third Circuit affirmed the district court's determination that
the creditor failed in its burden of proof.

RCG could have foreclosed in July or October, 2010. Had it done so, it could have protected its collateral from rapid erosion as consumers paid down their debts and Inofin kept the money.  Instead, RCG let Inofin keep the money. The purpose of the additional collateral was merely to ensure that RCG was not hurt in the process of giving Inofin the opportunity it needed while in financial distress.

RCG adds:

The preference rules and defenses are intended, among other things, to encourage creditors to continue doing business with a distressed business. It would be ironic indeed if it turned out that the preference rules are successfully employed in this case against RCG to penalize it for forbearing from foreclosure while the SEC investigation was pending.

(b) The Trustee

With respect to the payment transfers, the Trustee contends that they were not made in the ordinary course of business of Inofin and RCG.  He argues that RCG failed to establish  that the transfers were made in the ordinary course of both its business and Inofin's business, citing Howard v. Bangor Hydro Elec. Co. (In re Bangor & Aroostook R.R. Co.), 324 B.R. 164, 168 (Bankr. D. Me. 2005).  Also citing First Software Corp. v. Curtis Mfg. Co., Inc., 81 B.R. 211, 213 (Bankr. D. Mass. 1988), he states that this "subjective" element focuses on the parties' relationship with each other, id. and is "peculiarly factual" and case-specific.

The Trustee also points to the evidence that RCG agreed to change the course of business with Inofin, arguing it was to benefit RCG, not Inofin, as Green offered to drop the interest rate in the hope that RCG's offer would encourage other lenders to do the same; that when RCG agreed to change its course of business, it believed that Inofin was in

financial distress and likely would have to file bankruptcy; that Green indicated in a memorandum, dated July 20, 2010, to Jeffery that the purpose of their meeting that day was to "get myself in the best possible position in case of a [bankruptcy] filing;"and that in an e-mail to Wallerstein, dated July 22, 2010, Green expressed concern to Wallerstein about receiving Installment Contracts from Inofin without making weekly loan advances.

The Trustee recognizes that there are cases, not cited by RCG, in which courts have found that a change in a course of business between parties does not negate an ordinary course of business defense but that they are distinguishable. *See, e.g.*, First Software Corp. v. Micro Educ. Corp. of Am., 103 B.R. 359 (D. Mass. 1988). He contends, however, that the LMA was never intended to be permanent and RCG cannot claim that the transfers created a new course of business.

In response to RCG's reliance on the ordinary course of business defense for transfers of Installment Contracts, the Trustee points to the plain language of the statute which creates a defense to avoidance of transfers *in payment* of debts incurred by a debtor in the ordinary course of business or financial affairs. In other words, he contends § 547(c)(2) is limited by its own terms to transfers "in payment of a debt." The Trustee argues that because the Installment Contract transfers did not serve as payments against RCG's loan, but rather secured advances RCG previously had made under the 2008 and 2009 notes, the transfers of Installment Contracts do not fall within the exception.[56]  He cites,

------

[56] The LMA required Inofin with each weekly interest payment to certify to RCG that the total outstanding principal balance of pledged Installment Contracts was sufficent to maintain an outstanding aggregate principal balance equal to the greater of

*inter alia*, Schatz v. Imperial Capital Bank (In re Schatz), 402 B.R. 482, 487 (Bankr. D. N.H. 2009), and Goodman v. Southern Horizon Bank (In re Norsworthy), 373 B.R. 194, 205 (Bankr. N.D. Ga. 2007). Thus, he contends the ordinary course of business defense is inapplicable to the Installment Contract transfers and RCG failed to sustain its burden with respect to its ordinary course defense to the transfers of Installment Contracts and other security documents.

2. Applicable Law

Section 547(c)(2) provides:

(c) The trustee may not avoid under this section a transfer–

. . . (2) to the extent that such transfer was in payment of a debt incurred by the debtor in the ordinary course of business or financial affairs of the debtor and the transferee, *and* such transfer was--

(A) made in the ordinary course of business or financial affairs of the debtor and the transferee; *or*

(B) made according to ordinary business terms . . . .

11 U.S.C. § 547(c)(2). RCG has the burden of proof with respect to its ordinary course defense.  11 U.S.C. § 547(g).

Section 547(c)(2) was amended by the Bankruptcy Abuse and Consumer Protection Act of 2005 ("BAPCPA").  BAPCPA established that creditors no longer have to meet all

---

$10 million or 125% of the outstanding principal balance due RCG under the 2008 and 2009 notes.

three prongs under § 547(c)(2) where § 547(c)(2) is the "first prong," § 547(c)(2)(A) is the

"second prong," and § 547(c)(2)(B) is the "third prong."  The creditor may satisfy its burden

if it establishes either the first and second prongs *or* the first and third prongs.  *See* Rentas

v. Triple-S Salud, Inc. (In re PMC Marketing Corp.), 499 B.R. 214, 219 (Bankr. D. P.R. 2013).

As the court noted in In re PMC Marketing Corp.,

> The ordinary course of business exception thrives from the core of
> bankruptcy preference law. As such, this exception cries [sic] to strike a
> dragon-fly landing-like balance between shielding payments received by
> creditors to the extent that those creditors who remain committed to a debtor
> during times of financial distress, and maintaining an elastic area of
> flexibility to creditors in dealing with the debtor so long as the steps taken
> are consistent with customary practice among specific industry participants.
> Congressional records are consistent with this interpretation as they reveal
> that the purpose of this exception is to "leave undisturbed normal financial
> relations, because it does not detract from the general policy of the preference
> section to discourage unusual action by either the debtor or [its] creditors
> during the debtor's slide into bankruptcy." H.Rep. No. 595, 95th Cong., 1st
> Sess. 373 (1977), reprinted in 1978 U.S.Code Cong. & Admin.News 6329.

499 B.R. at 219.

Neither RCG nor the Trustee focused on whether the "debt" was incurred in the

ordinary course of business.  Accordingly, the Court concludes that the Trustee concedes

that the LMA did not create a new obligation and the debt arising from the 2008 and 2009

notes was incurred in the ordinary course of business.  Both RCG and the Trustee focused

on the second prong, namely whether the payments of $118,625 and the transfers of

collateral totaling $1,379,435.08 were made in the ordinary course of business of Inofin and

RCG.

Under 547(c)(2)(A), RCG was required to demonstrate, by a preponderance of the

evidence, that the specific transaction was "ordinary as between the parties." In re PMC Marketing Corp., 499 B.R. at 219 (citing, *inter alia,* Daly v. Radulesco (In re Carrozzella & Richardson), 247 B.R. 595, 603 (B.A.P. 2d Cir. 2000)). As noted by the court in Official Comm. of Unsecured Creditors v. Martin (In re Enron Creditors Recovery Corp.), 376 B.R. 442, 459 (Bankr. S.D.N.Y. 2007), "[t]he second element is subjective and looks to whether the payment made is ordinary in relation to other business dealings between the parties. Id. at 459 (citing Logan v. Basic Distrib. Corp. ( In re Fred Hawes Org., Inc.), 957 F.2d 239, 244 (6th Cir.1992)). Courts assess several factors to determine whether a transfer satisfies the requirements of § 547(c)(2)(A), including "'(i) the prior course of dealing between the parties, (ii) the amount of the payment, (iii) the timing of the payment, (iv) the circumstances of the payment, (v) the presence of unusual debt collection practices, and (vi) changes in the means of payment.'" In re PMC Marketing Corp., 499 B.R. at 219-20 (citations omitted). In this regard, "a defendant must establish a 'baseline of dealings' between the parties to 'enable the court to compare the payment practices during the preference period with the prior course of dealing.'" Id. at 220 (citing, *inter alia,* Jacobs v. Gramercy Jewelry Mfg. Corp. (In re Fabrikant & Sons, Inc.), No. 08-1690, 2010 WL 4622449, at *3 (Bankr. S.D.N.Y. Nov. 4, 2010)).

3. Analysis

The Court concludes that RCG sustained its burden with respect to the weekly payments in the amount of $12,291.69. There were seven such payments made during the preference period pursuant to the LMA, totaling $86,041.83. The LMA provided that it

150

would be in effect from October 1, 2010 through June 1, 2011 and that Inofin would be required to pay, weekly, on the 2008 and 2009 notes until June 1, 2011, when the entire outstanding balance was to be due and payable. Because Inofin was in default in July of 2010, RCG would have been in a position to foreclose at that time. In addition, because of Green's relationship with Mann, RCG afforded Inofin time, commencing outside the preference period, to attempt to work out its financial problems, while making concessions in terms of the interest rate payable on the 2008 and 2009 notes, even though Green was not optimistic about Inofin's eventual success in restructuring its financial affairs. Although RCG was aware that Inofin might file bankruptcy and sought to position itself for that eventuality, the Trustee submitted no evidence that it took advantage of Inofin's deteriorating condition to the detriment of other creditors. RCG's conduct with respect to the LMA simply does not fit within the paradigm enunciated by the Third Circuit in In re Molded Acoustical Prods. Inc., 18 F.3d at 219 ("the preference rule is formulated to induce creditors to continue dealing with a distressed debtor so as to kindle its chances of survival").

With respect to the transfer of Installment Contracts and other security documents, the Court concludes that the Trustee correctly interprets the language of § 547(c)(2), namely the trustee may not avoid transfers *in payment* of debts incurred by the debtor in the ordinary course of business or financial affairs. In other words, the § 547(c)(2) defense is limited by its own terms to transfers "in payment of a debt." The Installment Contract transfers did not serve as payments against RCG's loan; rather they secured advances RCG

had made previously under the 2008 and 2009 notes.  Thus, the Installment Contract

transfers do not fit within the exception.  As noted by the court in <u>Schatz v. Imperial</u>

<u>Capital Bank (In re Schatz)</u>, 402 B.R. 482, 487 (Bankr. D. N.H. 2009),

> Section 547(c)(2) does not apply to the transfer of a security interest. <u>In re</u>
> <u>Norsworthy</u>, 373 B.R. [194] at 205 [Bankr. N.D. Ga. 2007]. The transfer of the
> security interest did not itself serve as payment of a debt; it secured the
> payment of a debt.

<u>Schatz</u>, 402 B.R. 487.  Accordingly, the ordinary course of business defense is inapplicable

to the Installment Contract transfers.  RCG failed to sustain its burden with respect to the

ordinary course of business affirmative defense regarding transfers of Installment

Contracts and other security documents with a principal balance of $1,379,435.08.

## IV. CONCLUSION

In view of the foregoing, the Court shall enter judgment in favor of RCG and against

the Trustee on Counts I, II, III, and IV  of the Trustee's First Amended Complaint.

The Court shall enter a judgment in favor of the Trustee and against RCG on Count

IX and avoid the transfers of Installment Contracts.  The Court shall enter judgment in

favor of the Trustee and against RCG on Count X to the extent that payments totaling

$32,583.53 ($118,625.36-$86,041.83) are avoided.  The Court shall enter judgment in favor

of the Trustee and against RCG on Count XVII and enter judgment in favor of the Trustee

in the total sum of  $32,583.53 with respect to Count XVII.  The Court shall enter judgment

in favor of the Trustee and against RCG on Count XVIII and shall preserve to the extent

necessary the avoided transfers of the Installment Contracts with a total principal balance

amount of $1,379,435.08 for the benefit of the estate.

152

The Court shall submit the proposed findings of fact and conclusions of law set forth in Section II.E, with respect to Count V, and Section III.E.3.b, in accordance with 28 U.S.C. § 157(c)(1), to the District Court for a disposition of Count V.

The Court shall enter judgment in favor of RCG and against the Trustee on Count I of RCG's Counterclaims.  The Court shall enter judgment in favor of RCG on Counts II and III of its Counterclaim and directs the Trustee to provide an accounting to RCG with respect to proceeds collected with respect to the Installment Contracts in RCG's loan portfolio and the related dealer reserve.

With respect to RCG's remaining Counterclaims, the Court shall dismiss Count IV for breach of contract and Count V for violation of Mass. Gen. Laws ch. 93A as RCG submitted neither evidence nor argument with respect to those counterclaims and, therefore, has waived them.

By the Court,

Joan N. Feeney
United States Bankruptcy Judge

Dated: June 12 , 2014